IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CREOSOTE COUNCIL,<br>357 Brown's Hill Road<br>Valencia, PA 16059, | ) ) ) ) | |
| KOPPERS INC.,<br>436 Seventh Avenue<br>Pittsburgh, PA 15219-1800, | ) ) ) ) | |
| SOUTHERN PRESSURE<br>TREATERS' ASSOCIATION,<br>206 Beverly Loop,<br>Pineville, LA 71361-3219, | ) ) ) ) ) | |
| WESTERN WOOD PRESERVERS<br>INSTITUTE,<br>7017 N.E. Highway 99, Suite 108<br>Vancouver, WA 98665, and | ) ) ) ) ) | |
| TREATED WOOD COUNCIL,<br>1111 19th Street, N.W., Suite 800<br>Washington, DC 20036, | ) ) ) ) | Civil Action No._____ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| STEPHEN L. JOHNSON,<br>Administrator,<br>U.S. Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460, and | ) ) ) ) ) ) | |
| UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Creosote Council, Koppers Inc., Southern Pressure Treaters' Association,

Treated Wood Council, and Western Wood Preservers Institute (collectively, "Plaintiffs"), by

their undersigned counsel, for their complaint against Stephen L. Johnson and the United States

Environmental Protection Agency ("EPA"), allege as follows:

## NATURE OF THE CASE

1.      This is an action for declaratory and injunctive relief to prevent EPA from

unlawfully amending the regulations governing EPA's Toxics Release Inventory ("TRI")

reporting program under the Emergency Planning and Community Right-to-Know Act

("EPCRA"), 42 U.S.C. § 11001 et seq.

2.      Under Section 313 of EPCRA, 42 U.S.C. § 11023, and implementing EPA

regulations, facilities that manufacture, process, or otherwise use specified threshold quantities of

listed chemicals are required to report annually to EPA information about those chemicals and

their releases.    The reported data is compiled by EPA in a publicly-available EPA database

known as the Toxics Release Inventory, or TRI.

3.      For close to twenty years, EPA has taken the position in various industry guidance

documents, and instructions for completing the required TRI reporting form, that releases of

reportable chemicals from finished goods and articles in the storage and holding areas of

manufacturing facilities are exempt from TRI reporting.

4.      Relying on these pronouncements from EPA, treated wood manufacturers have

reported releases from their wood treatment manufacturing activities but have not included

releases following such activities as the treated wood products had become "articles" exempt

from EPCRA reporting under 40 C.F.R. § 372.38(b).

5.       In an October 15, 2007, letter signaling its intent to enforce, EPA changed its

longstanding prior interpretation that releases from wood products in storage are exempt from

TRI reporting without first entering into notice and comment rulemaking and providing a reasoned analysis of such change.

## THE PARTIES

6.      Plaintiff Creosote Council is a non-profit, tax-exempt product stewardship organization, incorporated in the state of Delaware, whose function is to disseminate accurate scientific information about the toxicology, occupational risks, and environmental behavior of creosote.  On behalf of its members, the Creosote Council sponsors health, safety, environmental, and other research required in connection with the ongoing reregistration of creosote as a pesticide and other environmental regulations.  Members of the Creosote Council include the principal registrants of creosote in the United States and manufacturers that use creosote as a preservative to treat their wood products.  The offices of the Creosote Council are located in Valencia, Pennsylvania.

7.      Plaintiff Koppers Inc., is a global integrated producer of carbon compounds and treated wood products for use by the utility, construction, railroad, aluminum, chemical and steel industries. Koppers operates 30 facilities in the United States, Europe, Australia, China and the Phillipines, employing more than 2,000 people worldwide.  Koppers is a member of Plaintiffs Creosote Council, Treated Wood Council and Southern Pressure Treaters' Association.  Koppers is incorporated in the Commonwealth of Pennsylvania and its corporate headquarters are located in Pittsburgh, Pennsylvania.

8.      Plaintiff Southern Pressure Treaters' Association is a non-profit, tax-exempt organization, incorporated in the state of Louisiana, whose mission is to identify and manage at the state and national levels regulatory and legislative issues, market conditions and promotional campaigns relating to, or affecting, industrial wood products preserved with American Wood

Protection Association ("AWPA") approved industrial wood preservatives. Members of the

Association include manufacturers of industrial treated, and untreated, wood products, suppliers

of AWPA-approved industrial preservatives and preservative components, distributors of such

products, engineers, manufacturers, and academia. The offices of the Southern Pressure

Treaters' Association are located in Pineville, Louisiana.

9.    Plaintiff Western Wood Preservers Institute is a non-profit, tax-exempt trade

association, incorporated in the state of Oregon, whose mission is to protect and promote the

manufacture and markets for preservative-treated wood products produced by the industry in the

western United States and Canada. Members of the Institute consist primarily of treated wood

manufacturers, but also include manufacturers and distributors of industrial wood preservatives,

engineers, builders and other companies involved in the manufacture or use of treated wood

products. The offices of the Western Wood Preservers Institute are located in Vancouver,

Washington.

10.    Plaintiff Treated Wood Council is an international trade association whose

mission is to serve all segments of the treated wood industry in the field of government affairs.

The Treated Wood Council, which is incorporated in Florida, has over 350 member

organizations in the wood industry, including 175 companies that manufacture treated wood

products at more than 270 facilities. The Council's offices are located in Washington, DC.

11.    Defendant Stephen L. Johnson is the Administrator of the EPA. His office is

located at 1200 Pennsylvania Avenue, N.W., Washington, DC 20460. Administrator Johnson is

responsible for supervising the activities of the EPA. He is being sued in his official capacity.

12.     Defendant EPA is the Federal agency charged with the administration and enforcement of EPCRA that issued the regulations, guidance documents, and correspondence that are the subject of review in this matter.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter pursuant to:  28 U.S.C. § 1331, in that the cause of action arises under the laws of the United States; the provisions of the Administrative Procedures Act, 5 U.S.C. §§ 701-706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

14.     The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and the provisions of the Administrative Procedures Act, 5 U.S.C. §§ 701-706.

15.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e)(1), because defendants Stephen L. Johnson and EPA reside in this district for venue purposes.

## EPCRA STATUTORY AND REGULATORY BACKGROUND

16.     Congress enacted the Emergency Planning and Community Right-to-Know Act ("EPCRA") in October of 1986 as a separate provision of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11002-11050). Section 313 of EPCRA, 42 U.S.C. § 11023, establishes a program requiring facilities that manufacture, process, or otherwise use threshold quantities of listed chemicals to report annually information about those chemicals and their releases to EPA.

17.     Facilities subject to Section 313 must report all required information to both EPA and the appropriate state environmental agency by July 1 for the preceding calendar year.  The

data is then compiled, and used, in a publicly-available EPA database known as the Toxics

Release Inventory, or TRI, available at http://www.epa.gov/tri.

18.     TRI reporting is required only if a facility has "manufactured, processed, or

otherwise used" toxic chemicals in amounts that exceed minimum threshold quantities. EPCRA

expressly defines "manufacture" of a reportable chemical as "to produce, prepare, import, or

compound" the chemical, and "processing" of a reportable chemical as the preparation of a

reportable chemical "after its manufacture, for distribution in commerce...as part of an article..."

42 U.S.C. § 11023(b)(1)(C).

19.     EPA's regulations do not alter, or expand, on the statutory definitions of

"manufacture" or "process." 40 C.F.R. §372.3. EPCRA does not explicitly define the phrase

"otherwise use", and the meaning of "otherwise use" is not at issue in this matter.

20.     Under EPCRA terminology as defined by EPA, Koppers and members of Plaintiff

Associations "process" reportable chemicals when the chemicals are used to treat wood.

21.     EPA's EPCRA regulations have continuously exempted certain categories of

chemicals and emissions from TRI reporting altogether. One such exemption relates to

"articles." Under 40 C.F.R. § 372.38(b):

> *Articles*. If a toxic chemical is present in an article at a covered facility, a person
> is not required to consider the quantity of the toxic chemical present in such
> article when determining whether an applicable threshold has been met under §
> 372.25, § 372.27, or § 372.28 or determining the amount of release to be reported
> under § 372.30. This exemption applies whether the person received the article
> from another person or the person produced the article. However, this exemption
> applies only to the quantity of the toxic chemical present in the article. If the toxic
> chemical is manufactured (including imported), processed, or otherwise used at
> the covered facility other than as part of the article, in excess of an applicable
> threshold quantity set forth in § 372.25, § 372.27, or § 372.28, the person is
> required to report under § 372.30. Persons potentially subject to this exemption
> should carefully review the definitions of article and release in § 372.3. If a
> release of a toxic chemical occurs as a result of the processing or use of an item at
> the facility, that item does not meet the definition of article.

22.    40 C.F.R. § 372.3 defines the term "article" as:

*Article* means a manufactured item:  (1) Which is formed to a specific shape or design during manufacture; (2) which has end use functions dependent in whole or in part upon its shape or design during end use; and (3) which does not release a toxic chemical under normal conditions of processing or use of that item at the facility or establishments.

23.    Nowhere in its regulations does EPA define processing or use of a manufactured item for purposes of applying the article exemption's discussion of "processing or use of an item at the facility."

24.    A facility's failure to report all releases or emissions of threshold amounts of toxic chemicals under the TRI program can result in the imposition of civil penalties by EPA up to $32,500 per day per violation.  *See* EPCRA § 325, 42 U.S.C. § 11045.

## FACTUAL BACKGROUND

### The Treated Wood Industry and the Nature of Plaintiffs' Members' Operations

25.    Koppers, and certain members of each Plaintiff Association, manufacture and sell treated wood. "Treated wood" is manufactured through the use of pressure or thermal treatment to impregnate chemicals into wood to a depth that provides effective long-term resistance to attack by fungi, bacteria, insects, and marine borers, thereby significantly increasing the longevity of common species of wood.

26.    Pressure treatment begins when wood is moved into a horizontal steel cylinder or retort on trams.  The first treatment step may be the application of a vacuum, or alternatively, a small positive initial air pressure, depending upon the preservative used, wood species being treated and desired preservative retention. The cylinder is then filled with liquid preservative and pressure is used to impregnate the preservative into the wood.  Excess preservative is then drained from the retort for reuse and a final vacuum is applied to remove any excess preservative

from the wood and allow it to dry.  Once treatment is completed, a rail system moves the

finished product out of the retort.

27.    The rail system at most facilities includes a "Subpart W drip pad" where, in

accordance with regulations promulgated pursuant to the Resource Conservation and Recovery

Act, 42 U.S.C. §§6901-6992k, treated wood must be retained so that any remaining preservative

that drips from the wood, or the trams, may be captured and returned for reuse.  *See* 40 C.F.R. §

265.443(k).  Depending upon preservative type used and commodities produced, the Subpart W

drip pad may be limited to the track system or it may include a larger adjacent impermeable area

where material can be placed until quality assurance or temporary holding is complete.  As

appropriate, the product is then shipped or moved to storage.

28.    Some facilities are able to bypass the drip pads by keeping the wood product in

the retort until drippage ceases.  Treated wood manufacturers view the treated wood to be an

"article" at different points following removal of the wood from the retort based on company-

specific product lines and manufacturing techniques.  Plaintiffs universally agree, however, that

treated wood is an "article" under EPCRA when it enters storage or is shipped.

Historical EPCRA Regulation of Emissions from Drying and Storage Operations

29.    EPA has addressed the regulatory status of releases during the storage of finished

goods and articles on several occasions since it promulgated its initial EPCRA regulations.  From

1988 until 2006, EPA consistently determined, and publicly advised, that chemicals migrating

from finished goods in the storage areas at facilities were exempt from TRI reporting under

EPA's articles exemption.

30.    In its initial guidance to the treated wood industry following the promulgation of

the EPCRA regulations, although EPA indicates that emissions from the treating cylinder are to

8

be reported, EPA nowhere indicates that emissions after the treating cylinder need to be reported under TRI. *Title 111 Section 313 Release Reporting Guidance – Estimating Chemical Releases from Wood Preserving Operations* (EPA 560/4-88-004p (February 1988) ("1988 TRI Treated Wood Guidance"). Advice given by EPA to other industries has been consistent with the treated wood industry's understanding that pursuant to the article exemption emissions of reportable chemicals from treated wood in storage were not subject to TRI reporting.

31.     Shortly after promulgating its initial EPCRA regulations, EPA was asked to address the article status of goods in storage, specifically the potential post-production releases of a plasticizer present in a plastic film. In an October 24, 1988, letter, Charles L. Elkins, then Director of EPA's Office of Toxics Substances ("OTS"), which at the time oversaw the TRI program, stated:

> OTS notes the distinction between continuous low-level releases that occur over the life of the product from those releases that are the direct result of processing and use of the film. <u>OTS recognizes that the first type of release is analogous to weathering or natural deterioration of an article and agrees that such releases should not be considered releases that negate the article exemption.</u> OTS also agrees that the normal low-level migration of DEHA from the plastic film does not constitute a release reportable under Section 313.

32.     Shortly after the Elkins letter, EPA revised its written instructions for completing the TRI Form R, which facilities must utilize to submit their annual TRI data. From 1989 until its unexplained deletion in 2001, the Form R instructions explicitly directed facilities in pertinent part:

> You are not required to count as a release, quantities of an EPCRA section 313 chemical that are lost due to natural weathering or corrosion, normal/natural degradation of a product, or normal migration of an EPCRA section 313 chemical from a product. For example, amounts of an EPCRA section 313 chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that EPCRA section 313 chemical from the facility....

33.     This instruction merely restated EPA's article exemption at 40 C.F.R. Section

372.38(b) and was consistent with EPA's longstanding view that "storage in itself of a toxic

chemical is not considered a manufacturing, processing, or otherwise use activity." *See* EPCRA

Section 313 Questions and Answers, Revised 1998 Version, Question 89, EPA 745-B-98-004

(Dec. 1998). The TRI form instruction remained in the TRI instruction manual for 13 years until

2001 when it was removed without notice or explanation.

34.     Other EPA guidance documents reflected EPA's position that the normal

migration of EPCRA 313 chemicals from articles in storage is not reportable. In 1987, EPA

published guidance for estimating releases for TRI reporting purposes. *Estimating Releases and*

*Waste Treatment Efficiencies for the Toxic Chemical Release Inventory Form*, EPA 560/4-88-

002 (Dec. 1987). The manual addresses process-related releases that may occur at industrial

facilities subject to TRI reporting, including releases from raw material handling and storage.

Importantly, however, it does not discuss at all how to estimate releases occurring due to

migration of chemicals from finished goods in storage.

35.     On the basis of these Agency pronouncements, Koppers Inc., certain of Plaintiffs'

members, and the treated wood industry generally, understood that finished goods in storage are

articles from which releases of reportable chemicals are exempted from TRI reporting.

Accordingly, since EPCRA's inception Koppers and certain of Plaintiffs' members have

conducted their TRI reporting in compliance with this conclusion.

EPA's Arbitrary and Capricious Re-Interpretation of the Article Exemption

36.     In a letter dated October 15, 2007, EPA abruptly, and improperly, reversed

course, informing Plaintiffs for the first time that releases to the air from finished treated wood in

storage areas operated by wood treaters must be reported in order to comply fully with the

strictures of the TRI program. EPA reportedly sent letters or e-mails to this effect to every facility in the industry.

37.    The Agency's reversal originated with EPA Region 6 inspections of Koppers' Logansport, Louisiana and Somerville, Texas facilities on or about March 6, 2006, and of Koppers' North Little Rock, Arkansas facility on or about June 7-8, 2006.

38.    On March 30, 2007, nearly a year after completing those inspections, EPA Region 6 sent a letter to Koppers asserting all three facilities had violated EPCRA's reporting requirements, including Koppers' alleged "failure to include air releases from the storage yard in its Form R's for creosote, benzo (g,h,i) perylene, and PAC's."

39.    On information and belief, EPA had never before indicated in a compliance inspection at any treated wood industry facility that releases from finished products resting in storage were subject to TRI reporting. Plaintiffs corresponded and met with EPA to discuss the Agency's apparent reversal.

EPA's October 15, 2007 Letter

40.    In a letter dated October 15, 2007, Michael Petruska, Director of EPA's TRI Program Division ratified EPA Region 6's contention, *inter alia*, that storage of treated wood products from their treatment cylinders are "processing" activities not meeting the strictures of the articles exemption, and thus are reportable under EPCRA section 313.

41.    EPA took the position that treated wood is not an article. To support that view, EPA arbitrarily, and capriciously, selected an operation that occurs at the treating facility – removal of treated wood from the treatment cylinder and temporary placement on a drip pad prior to transfer of the wood to storage – as one involving "processing of the treated wood" sufficient to defeat the article exemption.

11

42.    Based on its conclusion that treated wood on a drip pad is not an article, EPA asserted that all on-site releases of TRI chemicals from the treated wood during the entire post-drip pad period were reportable—including releases from finished product stored in inventory:

> [t]he toxic chemicals that are released from the treated wood once it has left the treatment cylinder and is placed on the drip pad are released as a result of the processing of the wood. Thus, the wood cannot be considered an article under the articles exemption because there is a release of a toxic chemical as a result of the processing of the wood at the facility. Because the wood is not an article, releases from it are not eligible for the articles exemption regardless of where they take place. The Elkins letter also mentions, as a comparison to the issue at hand, that normal, low-level migration of a toxic chemical from plastic film does not negate the articles exemption and therefore does not constitute a release reportable to TRI. But as stated above, whether natural weathering can be exempted is irrelevant for treated wood because the treated wood does not qualify for the articles exemption.

43.    EPA offered no explanation whatsoever as to how, or why, the act of moving the treated wood from the treatment cylinder constituted "processing" of the wood under the article exemption.

44.    Additionally, EPA stated that all treated wood facilities, including those operated by Koppers and certain of Plaintiffs' member companies must apply EPA's new policy starting with their calendar year 2007 TRI reporting, which is due no later than July 1, 2008.

### Impact on the Wood Treating Industry

45.    Immediate application of EPA's new policy concerning the reportability of releases from finished treated wood products that have completed treatment will irreparably harm Koppers and certain members of Plaintiff Associations. These companies have long relied on EPA guidance that they were not required to report such releases. EPA has failed to recognize the impossibility of gathering, assembling, and accurately reporting emissions from finished products for calendar year 2007 no later than July 1, 2008.

12

46.    Existing emissions calculation methods are inadequate to calculate the type of

emissions that may emanate from drip pad and storage areas at facilities operated by Plaintiffs'

member companies.   Due to EPA's position reversal, and July 2008 compliance deadline,

Plaintiffs, their members, and the treated wood industry now must create from scratch, a

complex emissions model to accurately estimate the amount of emissions from finished goods

present in post-treatment areas at wood treating facilities.

47.    Plaintiff Associations must, on behalf of their members, incur significant financial

expenses in sampling and engineering costs to develop reasonably accurate estimation

methodologies that account for variation in seasons, product surface areas, volume, product

stacking configurations and other factors.

48.    There simply is insufficient time to develop adequate estimation methodologies

by the July 1, 2008, reporting deadline.  As a result, EPA condemns the industry to an untenable

choice from a compliance perspective.

49.    Depending on the wood product and preservative used, data currently available to

Plaintiffs and other industry members will lead to either overestimating or underestimating

emissions from finished treated wood products.  Treated wood manufacturers that underestimate

emissions from finished wood products are potentially subject to civil penalties of $32,500 per

day per violation for inaccurate reporting of TRI data.  See 42 U.S.C. § 11045.

50.    Conversely, facilities that overestimate TRI emissions may, in addition to the

public stigma of being identified improperly as larger polluters than previously reported, be

subject to more stringent and unnecessary regulatory requirements under other environmental

statutes.

51.    In sum, EPA has for close to 20 years advised consistently that the normal migration of an EPCRA 313 chemical from finished goods in storage does not defeat EPCRA's article exemption and is thus not reportable for TRI purposes. As EPA may not change its longstanding prior interpretation without first entering into notice and comment rulemaking and providing a reasoned analysis of such change, this reversal is both illegal and invalid.

## FIRST CLAIM FOR RELIEF

52.    Plaintiffs incorporate Paragraphs 1-52 as if fully set forth herein.

53.    EPA's abandonment and change of its 20-year policy that finished treated wood products that have completed treatment are exempt from TRI reporting without notice and comment rulemaking violates the Administrative Procedure Act.

## SECOND CLAIM FOR RELIEF

54.    Plaintiffs incorporate Paragraphs 1-54 as if fully set forth herein.

55.    EPA's actions are arbitrary, capricious, an abuse of discretion and not in accordance with law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment against Defendants Stephen L. Johnson and the EPA as follows:

56.    DECLARING that EPA and its Administrator may not abandon or change the Agency's 20-year policy that finished treated wood products that have completed treatment are exempt from TRI reporting without notice and comment;

57.    DECLARING that EPA's actions are arbitrary, capricious, an abuse of discretion and not in accordance with law;

58.    PRELIMINARILY, AND PERMANENTLY, ENJOINING Defendants from requiring Plaintiffs' members to calculate and report emissions for TRI purposes from the areas of their facilities containing finished goods and articles in storage unless, and until, a rule to that effect is adopted through notice and comment rulemaking; and

59.    GRANTING such other and further relief as this court deems appropriate, including but not limited to reasonable attorneys' fees.

Dated: March 25, 2008

Respectfully submitted,

Douglas J. Behr (Bar No. 163998)
behr@khlaw.com
Peter L. de la Cruz (Bar No. 362358)
delacruz@khlaw.com
Jean-Cyril Walker (Bar No. 474498)
walker@khlaw.com

KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
Tel.: 202-434-4100
Fax: 202-434-4646

Attorneys for Plaintiffs

*08-512 JR*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Creosote Council, Koppers Inc., Southern Pressure Treaters' Association, Western Wood Preservers Institute, Treated Wood Council

*88668*

## DEFENDANTS

Stephen L. Johnson and the United States Environmental Protection Agency

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Butler County, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Douglas J. Behr, Peter L. de la Cruz, Jean-Cyril Walker
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 W
Washington, D.C. 20001   Telephone: (202) 434-4100

Case: 1:08-cv-00512
Assigned To : Robertson, James
Assign. Date : 3/25/2008
Description: TRO/PI

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

O  1 U.S. Government Plaintiff

O  3 Federal Question
(U.S. Government Not a Party)

⊙  2 U.S. Government Defendant

O  4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

# IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**O C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**⊙ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**O E. General Civil (Other)**      OR      **O F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255*<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ○ H. *Employment Discrimination*<br><br>☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ○ I. *FOIA/PRIVACY ACT*<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ○ J. *Student Loan*<br><br>☐ 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |
|---|---|---|---|
| ○ K. *Labor/ERISA (non-employment)*<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ○ L. *Other Civil Rights (non-employment)*<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ○ M. *Contract*<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ○ N. *Three-Judge Court*<br><br>☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Suit for declaratory and injunctive relief under Administrative Procedure Act, 5 U.S.C. §§ 701-706 and Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ [_____] Check YES only if demanded in complaint

JURY DEMAND:    YES ☐    NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  March 25, 2008    SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.