## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CREOSOTE COUNCIL, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| STEPHEN L. JOHNSON, ) | **Civil Action No.**_____ |
| Administrator, ) | |
| U.S. Environmental Protection Agency, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs Creosote

Council, Koppers Inc., Southern Pressure Treaters' Association, Treated Wood Council, and

Western Wood Preservers Institute (collectively, "Plaintiffs"), by their undersigned counsel,

hereby move this Court to preliminarily enjoin defendants Stephen L. Johnson and the United

States Environmental Protection Agency ("EPA") from unlawfully amending the regulations

governing EPA's Toxics Release Inventory ("TRI") reporting program under the Emergency

Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq.* Without

first entering into notice and comment rulemaking, EPA acted arbitrarily and capriciously by

requiring the treated wood industry to report previously unreported emissions from stored

articles.

In support of this Motion, Plaintiffs submit the attached Memorandum of Points and Authorities, Declarations, and Exhibits.

Dated:  March 25, 2008                    Respectfully submitted,


                                          Douglas J. Behr (Bar No. 163998)
                                          behr@khlaw.com
                                          Peter L. de la Cruz (Bar No. 362358)
                                          delacruz@khlaw.com
                                          Jean-Cyril Walker (Bar No. 474498)
                                          walker@khlaw.com

                                          KELLER AND HECKMAN LLP
                                          1001 G Street, N.W.
                                          Suite 500 West
                                          Washington, D.C. 20001
                                          Tel.: 202-434-4100
                                          Fax: 202-434-4646

                                          Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiffs' Motion for a Preliminary Injunction was served on March

25, 2008 by hand on defendants, and pursuant to Fed. R. Civ. P. 4(i), to the United States

Attorney General and the United States Attorney for the District of Columbia at the addresses

listed below:


The Honorable Michael B. Mukasey
Attorney General
U.S. Department of Justice
Tenth Street and Constitution Avenue, N.W.
Washington, D.C. 20530

The Honorable Stephen L. Johnson
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

The Honorable Roger R. Martella, Jr.
General Counsel
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

The Honorable Jeffrey A. Taylor
United States Attorney
United States Attorney's Office  for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530



Douglas J. Behr

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CREOSOTE COUNCIL, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Civil Action No.**_____ |
| **STEPHEN L. JOHNSON,** | ) | |
| **Administrator,** | ) | |
| **U.S. Environmental Protection Agency,** | ) | |
| **et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

### [PROPOSED] ORDER

Having considered Plaintiffs' Motion for a Preliminary Injunction, Plaintiffs'

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary

Injunction, and Defendants' Opposition thereto, this Court herby finds:

1.      Plaintiffs are likely to succeed on the merits of their suit against EPA.  The

Administrative Procedure Act prohibits the U.S. Environmental Protection Agency ("EPA")

from changing its longstanding prior interpretation that releases from wood products in storage

are exempt from TRI reporting without first entering into notice and comment rulemaking.

Moreover, EPA acted arbitrarily and capriciously by failing to provide a reasoned analysis for

such change.

2.      Given the imminent July 1, 2008 reporting date, Plaintiffs will be irreparably

harmed if EPA is permitted to implement its policy change during the pendency of this action.

3.      The harm that may be suffered by other parties if a preliminary injunction is

granted is greatly outweighed by the irreparable harm to be suffered by the Plaintiffs and their

members.

4.    The public interest is served by requiring EPA to follow due process and analogous requirements under the Administrative Procedures Act.

IT IS on this _____ day of _____, 2008, hereby

**ORDERED** as follows

1.    Defendants are preliminarily enjoined from abandoning or changing EPA's 20-year policy that finished treated wood products that have completed treatment are exempt from TRI reporting.

2.    Defendants are preliminarily enjoined from requiring Plaintiffs' members to calculate and report emissions for TRI purposes from the areas of their facilities containing finished goods and articles in storage.

3.    The following schedule is established for briefing and an oral hearing on the issues in this matter:

4.    This Order shall expire upon the entry of a final judgment in this matter, unless otherwise ordered by the Court.

Dated this _____ day of March, 2008.


By the Court:

                                        _____
                                        District Judge

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CREOSOTE COUNCIL, et al.,     ) | |
|     ) | |
|         Plaintiffs,     ) | |
|     ) | |
|     v.     ) | |
|     ) | **Civil Action No.**_____ |
| STEPHEN L. JOHNSON,     ) | |
| Administrator,     ) | |
| U.S. Environmental Protection Agency,     ) | |
| et al.,     ) | |
|     ) | |
|         Defendants.     ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs Creosote Council, Koppers

Inc., Southern Pressure Treaters' Association, Treated Wood Council, and Western Wood

Preservers Institute (collectively, "Plaintiffs"), by their undersigned counsel, respectfully submit

this memorandum of points and authorities in support of their Motion for a Preliminary

Injunction.

## PRELIMINARY STATEMENT

This case concerns an attempt by the United States Environmental Protection Agency

("EPA") to reverse a regulatory interpretation that has been in effect for over twenty years and

thereby expand the reporting obligation of the treated wood industry without going through

notice and comment rulemaking.  Plaintiffs are Koppers Inc., a manufacturer of wood products,

and four trade associations (collectively "Plaintiff Associations") representing companies that

manufacture wood products that are treated with chemicals to provide resistance to degradation

and deterioration of these products by living organisms.  To prevent irreparable harm to the

businesses of Koppers and certain members of Plaintiff Associations, Plaintiffs seek to

preliminarily enjoin the United States Environmental Protection Agency ("EPA"), and its administrator, Stephen L. Johnson (collectively "Defendants"), from unlawfully amending the regulations governing EPA's Toxics Chemical Release Inventory ("TRI") reporting program under the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq.*, thereby requiring the reporting of previously unreportable emissions by July 1, 2008 even though there is no methodology for accurately calculating these emissions.

EPCRA's central purpose is to inform communities about potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control accidental releases.[1] Section 313 of EPCRA, 42 U.S.C. § 11023, and EPA's implementing regulations, require facilities to report information about releases of listed chemicals subject to certain scoping requirements.

For close to twenty years, EPA has taken the position that releases of reportable chemicals from finished goods and articles in the storage and holding areas of manufacturing facilities are exempt from TRI reporting even though reportable chemicals may be released from treated wood during storage. Relying on these pronouncements from EPA, treated wood manufacturers have reported releases from their wood treatment manufacturing activities but have not reported releases after the completion of the treatment process, when the treated wood products become "articles" exempt from EPCRA reporting under 40 C.F.R. § 372.38(b).

In an October 15, 2007, letter signaling its intent to enforce, EPA now claims that treated wood manufacturers must account for and report air releases from manufactured wood products in storage. However, once an agency has given its regulation a definitive interpretation, it cannot

---

[1] *See* H.R. REP. NO. 253, 99th Cong., 2d Sess., pt. 1, at 60; *Emergency Planning and Community Right to Know Programs, Interim Final Rule*, 51 FED. REG. 41,570, 41,570 (1986).

later significantly revise that interpretation, without notice and comment.[2] Thus, EPA lacks authority to change its long-standing policy without first entering into notice and comment rulemaking which it has failed to do.

Koppers and members of Plaintiff Associations face irreparable injury from EPA's illegal actions. The Agency threatens enforcement action against those companies that fail to report emissions from finished goods by July 1, 2008, which is not sufficient time to develop reliable methods by which to comply. Thus, absent the requested preliminary injunction, Koppers and members of Plaintiff Associations face three untenable choices: (1) knowingly file an inaccurate TRI report; (2) do not report until emissions methodologies have been developed to file a late but accurate TRI report; or (3) do not report the emissions from stored articles. In all cases, treated wood manufacturers face potential liability and civil penalties for violating EPCRA. Moreover Plaintiffs collectively would be forced to incur significant financial expenses to develop emission methodologies to comply with an illegal EPA reporting obligation.

## STATEMENT OF FACTS

**I.      Regulatory Overview**

      **A.      EPCRA Background**

---

[2] *Alaska Professional Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999) (once an agency has given its regulation a definitive interpretation, it cannot later significantly revise that interpretation, without notice and comment); *see also Syncor International Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (modification of an interpretive rule construing an agency's substantive regulation "will likely require a notice and comment procedure"). *Nebraska Dep't of HHS v. U.S. Dep't of HHS*, 340 F. Supp. 2d 1, 22 (D.D.C. 2004) (Sullivan, J.) ("Because the agency's authoritative interpretation of a regulation has changed without opportunity for notice and comment, the Agency has disregarded its requirements under the APA."); *Iyengar v. Barnhart*, 223 F. Supp. 2d 5, 15 (D.D.C. 2002) (Huvelle, J.) (where the Agency takes a position that is diametrically opposed to a previous "express, direct and uniform interpretation," notice and comment rule making is required).

Congress enacted the Emergency Planning and Community Right-to-Know Act

("EPCRA") in October of 1986 as a separate provision of the Superfund Amendments and

Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11002-11050).

EPCRA's central purpose is to inform communities about potential chemical hazards within their

boundaries and to foster state and local emergency planning efforts to control accidental

releases.[3]

Section 313 of EPCRA, 42 U.S.C. § 11023, establishes a program requiring facilities that

manufacture, process, or otherwise use threshold quantities of listed chemicals to report annually

information about those chemicals and their releases to EPA.[4] This program establishes

minimum threshold quantities of the reportable chemicals that a company must have

"manufactured, processed, or otherwise used" before reporting as required.[5] Facilities subject to

Section 313 must report all required information to both EPA and the appropriate state

environmental agency by July 1 for the preceding calendar year. The data is then compiled, and

used, in a publicly-available EPA database known as the Toxics Release Inventory, or TRI.[6]

TRI reporting is required only if a facility has "manufactured, processed, or otherwise

used" toxic chemicals in amounts that exceed minimum threshold quantities. EPCRA expressly

defines "manufacture" of a reportable chemical as "to produce, prepare, import, or compound"

---

[3] *See* H.R. REP. NO. 253, 99th Cong., 2d Sess., pt. 1, at 60; *Emergency Planning and Community Right to Know Programs, Interim Final Rule*, 51 FED. REG. 41,570, 41,570 (1986).

[4] EPCRA designates a list of chemicals that are subject to Toxic Release Inventory ("TRI") reporting. *See* EPCRA § 313(c), 42 U.S.C. § 11023(c).

[5] The threshold quantity for reportable chemicals (as defined by EPCRA) that are manufactured or processed is 25,000 pounds per year, and 10,000 pounds per year for toxic chemicals that are otherwise used. 42 U.S.C. § 11023(f)(1).

[6] EPA maintains the database and information about its compilation and use on its Internet site at **http://www.epa.gov/tri**.

the chemical, and "processing" of a reportable chemical as the preparation of a reportable

chemical "after its manufacture, for distribution in commerce...as part of an article..." 42 U.S.C.

§ 11023(b)(1)(C).  EPA's regulations do not alter, or expand, on the statutory definitions of

"manufacture" or "process."  40 C.F.R. §372.3.  Under EPCRA terminology as defined by EPA,

Plaintiffs "process" reportable chemicals when the chemicals are used to treat wood.[7]

The data collected under the TRI program is intended to inform the public about releases

of toxic chemicals to the environment, and to assist government and other researchers in their

data gathering efforts, whether in the aid of developing regulations, standards guidelines or for

similar purposes.  *See* 42 U.S.C. § 11023(h).  Notwithstanding that purpose, scoping provisions

in EPA's EPCRA regulations have continuously exempted certain categories of chemicals and

emissions from TRI reporting altogether.  One such exemption relates to "articles."  Under the

regulations:

> (b) *Articles*.  If a toxic chemical is present in an article at a covered facility, a
> person is not required to consider the quantity of the toxic chemical present in
> such article when determining whether an applicable threshold has been met
> under § 372.25, § 372.27, or § 372.28 or determining the amount of release to be
> reported under § 372.30.  This exemption applies whether the person received the
> article from another person or the person produced the article.  However, this
> exemption applies only to the quantity of the toxic chemical present in the article.
> If the toxic chemical is manufactured (including imported), processed, or
> otherwise used at the covered facility other than as part of the article, in excess of
> an applicable threshold quantity set forth in § 372.25, § 372.27, or § 372.28, the
> person is required to report under § 372.30. ...If a release of a toxic chemical
> occurs as a result of the processing or use of an item at the facility, that item does
> not meet the definition of article.

40 C.F.R. § 372.38(b) (emphasis added).  EPA's regulations further define the term "article" as:

---

[7] EPCRA does not explicitly define the phrase "otherwise use", and the meaning of "otherwise use" is not at issue in this matter.

5

a manufactured item: (1) Which is formed to a specific shape or design during manufacture; (2) which has end use functions dependent in whole or in part upon its shape or design during end use; and (3) which does not release a toxic chemical under normal conditions of processing or use of that item at the facility or establishments.

40 C.F.R. § 372.3. Importantly, nowhere in its regulations does EPA define, processing or use of a manufactured item, for purposes of applying the article exemption's discussion of "processing or use of an item at the facility."

## B.    Wood Treatment Operations

Koppers, and members of Plaintiff Associations, manufacture and sell treated wood. Treated wood is manufactured by pressure or thermal treatment to impregnate chemical preservatives into wood to a depth that provides effective long-term resistance to attack by fungi, bacteria, insects, and marine borers, thereby significantly increasing the longevity of common species of wood. *See* Declaration of H. Martin Rollins, President of H.M. Rollins Company, Inc. ("Rollins Decl.") at ¶ 8, attached as Exhibit 1.

Pressure treatment begins when wood is moved into a horizontal steel cylinder or retort on trams. The first step may be the application of a vacuum, or alternatively, a small positive initial air pressure, depending upon the preservative used, wood species being treated and desired preservative retention. The cylinder is then filled with liquid preservative and pressure is used to impregnate the preservative into the wood. Excess preservative is then drained from the retort for reuse and a final vacuum is applied to remove any excess preservative from the wood and allow it to dry. Thermal treatment accounts for only 1% of utility poles manufactured in the U.S. and consists of the alternative application of a hot and cooler bath to draw the liquid preservative into the wood cell. Regardless of the treatment used, once completed, the finished product is moved out of the retort on a rail system. Rollins Decl. at ¶¶ 9-12, Ex. 1.

6

The rail system at most facilities includes a "Subpart W drip pad" where, in accordance with regulations promulgated pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. §§6901-6992k, treated wood must be retained so that any remaining preservative that drips from the wood or the trams may be captured and returned for reuse in the process.[8] *See* 40 C.F.R. § 265.443(k). Depending upon preservative type used and commodities produced, the Subpart W drip pad may be limited to the track system or it may include a larger adjacent impermeable area where material can be placed until quality assurance or temporary holding is complete. As appropriate, the product is then shipped or moved to storage. Rollins Decl. at ¶ 13, Ex. 1

Modern wood treating methods are designed to reduce post-treatment drippage of preservative. Accordingly, some facilities are able to bypass the drip pads by keeping the wood product in the retort until drippage ceases. Rollins Decl. at ¶¶ 14-17, Ex. 1. Plaintiffs do not take a collective position on whether releases of a reportable chemical from the drip pads, or other locations prior to storage, are reportable as different manufacturers may view the treated wood to be an article at different points following removal of the wood from the retort based on company-specific product lines and manufacturing techniques. Plaintiffs universally agree, however, that treated wood is an article under EPCRA when it enters storage or is shipped.

Facilities that manufacture industrial commodities such as railroad ties, utility poles and foundation piling may maintain a significant amount of inventory (up to 90 days of production inventory) in on-site "storage yards" to meet specific market requirements or respond to episodic

---

[8] These drip pads are commonly referred to as "Subpart W drip pads" after the provisions at 40 C.F.R. Part 265, Subpart W which set out the design and operational requirements for the drip pads.

demand stemming from natural disasters and other emergencies. Reportable chemicals may be emitted from treated wood during storage.

Treated wood production does not involve the "manufacture" or "otherwise use" of reportable chemicals under EPCRA. Rather, treated wood production is considered "processing" of the treatment chemicals due to the impregnation of wood with the chemicals. Reportable chemicals may be released to the environment at varying points, and to varying degrees, during the production and post-production of treated wood. Plaintiffs' member companies, and others in the treated wood industry report releases during production of the wood, but not after.

Until recently, EPA concluded that releases from finished products are exempt from TRI reporting obligations. Relying on this determination, Koppers, certain members of Plaintiff Associations, and other companies within the treated wood industry have never reported such releases from finished product as part of their EPCRA compliance activities since EPCRA reporting began almost 20 years ago. Indeed, until March 2007, after the EPA Region 6 inspections of the Koppers facilities in Logansport, Louisiana, Somerville, Texas and North Little Rock, Arkansas, EPA had never indicated in a compliance inspection at any treated wood industry facility that air releases (emissions) from finished products resting in storage were subject to TRI reporting. Declaration of Leslie Hyde, Vice President Safety and Environmental Affairs for Koppers Inc. ("Hyde Decl.") at ¶ 5, attached as Exhibit 2.

### C.    EPA's Longstanding Exemption of Emissions During Storage

EPA has addressed the regulatory status of releases from the storage of finished goods and articles on several occasions since it promulgated its initial EPCRA regulations. From 1988 until 2006, EPA consistently determined, and publicly advised, that chemicals migrating from

finished goods in the storage areas at facilities were exempt from TRI reporting under EPA's articles exemption.

Particularly germane to this case is EPA's *Title 111 Section 313 Release Reporting Guidance – Estimating Chemical Releases from Wood Preserving Operations* (EPA 560/4-88-004p) (February 1988)("1988 TRI Treated Wood Guidance"), attached as Exhibit 3. Although the agency's guidance indicates that emissions from the treating cylinder are to be reported, nowhere does it indicate that emissions occurring after the treating cylinder need to be reported under TRI.[9] For 20 years, the wood preserving industry has relied on this specific guidance and the consistent guidance described below in reporting TRI emissions.

Additionally, advice given by EPA to other industries has been consistent with the treated wood industry's understanding of the article exemption. Shortly after promulgating its initial EPCRA regulations, EPA was asked to address the article status of goods in storage, specifically the potential post-production releases of a plasticizer present in a plastic film. In an October 24, 1988, letter, Charles L. Elkins, then Director of EPA's Office of Toxics Substances ("OTS"), which at the time oversaw the TRI program, stated:

> OTS notes the distinction between continuous low-level releases that occur over the life of the product from those releases that are the direct result of processing and use of the film. OTS recognizes that the first type of release is analogous to weathering or natural deterioration of an article and agrees that such releases should not be considered releases that negate the article exemption. OTS also agrees that the normal low-level migration of DEHA [a reportable chemical] from the plastic film does not constitute a release reportable under Section 313.

---

[9] We are aware of a subsequent draft EPA guidance document developed for the treated wood industry, but that document was never finalized. *Emergency Planning and Community Right-to-Know Act Section 313 Reporting Guidance for Wood Preserving Operations*, EPA 745-R-99-012 (November 12, 1999).

*See* Letter from Charles L. Elkins, Director EPA Office of Toxic Substances, to the Chemical

Manufacturers Association, October 24, 1988 ("Elkins Letter") at 1, attached as Exhibit 4

(emphasis added).

Shortly after the Elkins letter, EPA revised its written instructions for completing the TRI

Form R, which facilities must utilize to submit their annual TRI data. From 1989 until its

deletion in 2001, the Form R instructions explicitly directed facilities in pertinent part:[10]

> You are not required to count as a release, quantities of an EPCRA section 313
> chemical that are lost due to natural weathering or corrosion, normal/natural
> degradation of a product, or normal migration of an EPCRA section 313 chemical
> from a product. For example, amounts of an EPCRA section 313 chemical that
> migrate from plastic products in storage do not have to be counted in estimates of
> releases of that EPCRA section 313 chemical from the facility....

*See e.g.,* excerpted pages from Toxic Chemical Release Inventory Form R and Instructions for

1989, 1995, 1996 and 2000, attached as Exhibit 5.

This instruction merely restates EPA's article exemption at 40 C.F.R. Section 372.38(b)

and is consistent with EPA's longstanding view that "storage in itself of a toxic chemical is not

considered a manufacturing, processing, or otherwise use activity." EPCRA Section 313

Questions and Answers, Revised 1998 Version, Question 89, EPA 745-B-98-004 (Dec. 1998) at

27, attached as Exhibit 6.

Other EPA guidance documents similarly embody EPA's conclusion that the normal

migration of EPCRA 313 chemicals from articles in storage is not reportable. In 1987, EPA

---

[10] EPA claims that it removed the language in question from the 2002 version of the TRI
guidance because the language "could cause confusion among reporting facilities." Letter from
Michael Petruska, Director, TRI Program (October 15, 2007) at 2, attached as Exhibit 9.
However, EPA provided no support for this claim, did not explain why it only presented ex post
facto rationales in 2007 for its actions in 2002, or why it failed to provide explicit guidance in the
revised Form R instructions to alleviate the alleged "confusion."

published guidance for estimating releases for TRI reporting purposes. *Estimating Releases and Waste Treatment Efficiencies for the Toxic Chemical Release Inventory Form*, EPA 560/4-88-002 (Dec. 1987), excerpts from which are attached as Exhibit 7. The manual addresses process-related releases that may occur at industrial facilities subject to TRI reporting, including releases from raw material handling and storage. Importantly, however, it does not discuss at all how to estimate releases occurring due to migration of chemicals from finished goods in storage. *See* Exhibit 7 at 3-1 to 3-5, 3-17 to 3-20.

Based on all of these factors, Koppers Inc., certain trade association members, and the treated wood industry generally, relied on EPA's determination that finished goods in storage are articles from which releases of reportable chemicals are exempted from TRI reporting. Accordingly, since EPCRA's inception certain trade association members have conducted their TRI reporting in compliance with that conclusion.

### D.  EPA Attempted Amendment of EPCRA's Articles Exemption

In a letter dated October 15, 2007, EPA abruptly, and improperly, reversed course, informing Plaintiffs for the first time that releases from finished treated wood in the storage areas operated by wood treaters must be reported in order to comply fully with the strictures of the TRI program. EPA reportedly also sent letters or e-mails to every single facility in the industry. The genesis of this reversal appears to stem from a set of facility inspections conducted by one of EPA's regional offices.

Specifically, from 2005 to 2006 EPA Region 6 officials conducted multimedia[11] compliance inspections of three facilities owned and operated by Plaintiff Koppers, Inc.

---

[11] In the environmental field and within EPA, regulation is typically categorized by the media in which environmental contamination typically occur -- the most common media being air, water,

11

("Koppers").[12]  Nearly a year after completing these inspections, on March 30, 2007, EPA

Region 6 sent a letter to Koppers asserting that Koppers committed several EPCRA reporting

violations at all three facilities.  Among the alleged violations was Koppers' "failure to include

air releases from the storage yard in its Form R's for creosote, benzo (g,h,i) perylene, and

PAC's."  Letter from Morton E. Wakleand, Jr., Ph.D, EPCRA 313 Enforcement & TRI Program

Coordinator, U.S. EPA Region 6, attached as Exhibit 8.  EPA had never before indicated in a

compliance inspection at a facility of any of Koppers, or certain trade association members that

air releases from products resting in the storage yard were subject to TRI reporting.

 As a result of the Wakeland letter, Plaintiffs corresponded and met with EPA to discuss

the Agency's apparent reversal.  In a letter dated October 15, 2007, Michael Petruska, Director

of EPA's TRI Program Division ratified EPA Region 6's contention, *inter alia*, that storage of

treated wood products from their treatment cylinders are "processing" activities not meeting the

strictures of the articles exemption, and thus are reportable under EPCRA section 313.  Letter

from Michael Petruska, Director, TRI Program ("Petruska Letter"), attached as Exhibit 9.

 EPA took the position that treated wood is not an article.  To support that view, EPA

arbitrarily selected an operation that occurs at the treating facility – removal of treated wood

from the treatment cylinder and temporary placement on a drip pad prior to transfer of the wood

to storage – as one involving "processing of the treated wood" sufficient to defeat the article

---

and waste.  Accordingly, the term "multimedia" in this context refers to the fact that EPA Region 6 inspected these facilities for compliance with regulations in multiple areas as opposed to, for example, an air compliance inspection.  EPA, Multimedia Inspection Manual (March 1992), at 2, available at http://epa.gov/compliance/resources/publications/civil/mmmall.pdf.

[12] EPA conducted the first inspection on June 7 and 8, 2005 at the Koppers facility in North Little Rock, Arkansas.  Inspections at the Koppers Logansport, Louisiana and Somerville, Texas facilities were conducted on March 7, 2006.

exemption. Based on its conclusion that treated wood on a drip pad is not an article, EPA

asserted that all on-site releases of TRI chemicals from the treated wood during the entire post-

drip pad period were reportable—including releases from finished product stored in inventory:

> [t]he toxic chemicals that are released from the treated wood once it has left the
> treatment cylinder and is placed on the drip pad are released as a result of the
> processing of the wood. Thus, the wood cannot be considered an article under the
> articles exemption because there is a release of a toxic chemical as a result of the
> processing of the wood at the facility. Because the wood is not an article, releases
> from it are not eligible for the articles exemption regardless of where they take
> place. The Elkins letter also mentions, as a comparison to the issue at hand, that
> normal, low-level migration of a toxic chemical from plastic film does not negate
> the articles exemption and therefore does not constitute a release reportable to
> TRI. But as stated above, whether natural weathering can be exempted is
> irrelevant for treated wood because the treated wood does not qualify for the
> articles exemption.

Ex. 9, at 3. EPA offered no explanation whatsoever as to how, or why, the act of moving the

treated wood from the treatment cylinder constitutes "processing" of the wood under the article

exemption.

Additionally, EPA stated that all treated wood facilities, including those operated by

Plaintiffs' member companies must apply EPA's new policy starting with their calendar year

2007 TRI reporting, which is due no later than July 1, 2008. EPA has provided no clarification,

instructions or guidance on how facilities should calculate emissions and releases from storage

areas—an aspect of the operations of Plaintiffs' member companies that have never before been

reported.

### ARGUMENT

For over twenty years, EPA has taken the position that releases of reportable chemicals

from finished goods in the storage and holding areas of manufacturing facilities are exempt from

TRI reporting. EPA so advised Plaintiffs and their members to this effect through EPA's own

13

TRI guidance documents and its TRI form instructions. Relying on those pronouncements, Plaintiffs' member companies have not reported such releases from finished treated wood products because they occur from "articles" that are exempt from EPCRA reporting under 40 C.F.R. § 372.38(b).

Now, without the required notice and comment, EPA has changed its position. EPA now contends that Plaintiffs' member companies must account for, calculate, and report releases from wood products that have completed the treatment process. EPA's about-face is illegal and invalid. Thus, Plaintiffs are likely to prevail on the merits of their suit. Because Plaintiffs and their members clearly will be irreparably harmed if EPA's new determination is allowed to stand, this Court must issue a preliminary injunction.

## I.    Criteria for a Preliminary Injunction

A preliminary injunction is available in this Circuit when a party demonstrates: "(1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the requested injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citing *City-Fed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). *See also Nat'l Treasury Employees Union v. U.S.*, 927 F.2d 1253, 1254 (D.C. Cir. 1991); *Sea Containers, Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 943 (D.C. Cir. 1977); *Va. Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). A plaintiff is not required to prevail under each of these factors; rather, "the factors must be viewed as a continuum, with more of one factor compensating for less of another." *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27

14

(D.D.C. 1997). Indeed, "[a] stay may be granted with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. NRC,* 772 F.2d 972, 974 (D.C. Cir. 1985). In this case, however, each factor strongly favors the award of injunctive relief.

## II.   Plaintiffs are Substantially Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of their suit against EPA. The Agency may not change its longstanding prior interpretation that releases from wood products in storage are exempt from TRI reporting without first entering into notice and comment rulemaking and providing a reasoned analysis of such change. Because EPA failed to do so, its reversal of its longstanding policy is both illegal and invalid.

### A.   <u>Administrative Procedure Act Context</u>

Under the Administrative Procedure Act ("APA"), a federal agency must provide affected parties and the public with notice and an opportunity to comment on any rule that it proposes. 5 U.S.C. § 553. An agency also must afford the same opportunity with regard to "repeals" or "amendments" of rules. 5 U.S.C. § 551(5). An agency rule issued without public notice and comment will be set aside as unlawful unless it falls within one of the exceptions enumerated in the APA. 5 U.S.C. § 706(2)(D). Enjoining a rule that is issued without notice and comment is an appropriate remedy. *See, e.g., World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000).

The notice and comment rulemaking requirement also applies to "administrative common law." *See Alaska Professional Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1043 (D.C. Cir. 1999). "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am.*, 117 F.3d at 586. In fact, an agency has less

15

leeway in changing the interpretation of a regulation than in altering its construction of a statute. *Alaska Professional Hunters*, 177 F.3d at 1043. "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Id. See also Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 - 95 (D.C. Cir. 1997); *Nebraska Dep't of H.H.S. v. U.S. Dep't of H.H.S.*, 340 F. Supp.2d 1, 22 (D.D.C. 2004) (Sullivan, J.) ("Because the agency's authoritative interpretation of a regulation has changed without opportunity for notice and comment, the Agency has disregarded its requirements under the APA."). "As such, 'characterization as an interpretive rule does not relieve the [agency] of notice and comment requirements when a valid interpretation exists." *Iyengar v. Barnhart*, 223 F. Supp. 2d 5, 14 (D.D.C. 2002) (Huvelle, J.) (quoting *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814 (D.C. Cir. 2001)). Where the Agency takes a position that is diametrically opposed to a previous "express, direct and uniform interpretation" notice and comment rule making is required. *Iyengar, supra*, 257 F. Supp. 2d at 15.

### B.    EPA May Not Revise Its Longstanding Policy Without Notice and Comment Rulemaking.

EPA's longstanding exemption from TRI reporting of releases from finished goods and articles generally is rooted in EPA's interpretation of ambiguous statutory terms, and cannot be reversed without notice and comment rulemaking. *See Alaska Professional Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999). Because of the factual and regulatory background discussed above, this case is clearly controlled by the Court of Appeals' decision in *Alaskan Professional Hunters Ass'n, Inc. v. F.A.A.*, 177 F.3d 1030 (D.C. Cir. 1999). In that case, "FAA, through its Alaskan Region, consistently advised guide pilots that they were not governed by

16

regulations dealing with commercial pilots." *Id.* at 1031. The Alaskan Region never put its

interpretation in writing, and it was unclear whether FAA officials in Washington were aware of

that interpretation. *Id.* But in 1998, FAA published in the Federal Register a "Notice to

Operators" informing Alaskan pilots that they were subject to the regulations for commercial

pilots under certain circumstances. Alaskan pilots sought review of that Notice, claiming that it

"altered FAA's well-established interpretation of its regulations and should have been

promulgated pursuant to notice and comment rule making." *Id.* at 1033.

In finding that FAA must employ notice and comment rulemaking, the Court of Appeals

rejected the FAA's assertion that the Alaska Region's interpretation of the regulations

"represented simply a local enforcement omission, in conflict with the agency's policy in the rest

of the country." *Id.* at 1035. The Court, in finding the Notice invalid, noted:

> Agency officials in the Alaskan Region uniformly advised all guides, lodge
> managers and guiding services in Alaska that they could meet their regulatory
> responsibilities by complying with the requirements of part 91 only. FAA
> officials gave that advice for almost thirty years. . . .
>
> Even if the FAA as a whole somehow had in mind an interpretation different from
> that of its Alaskan Region, guides and lodge operators in Alaska had no reason to
> know this. Those regulated by an administrative agency are entitled to 'know the
> rules by which the game will be played.' Alaskan guide pilots and lodge
> operators relied on advice FAA officials imparted to them - they opened lodges
> and built up business dependent on aircraft, believing their flights were subject to
> part 91's requirements only. That advice became an authoritative departmental
> interpretation, an administrative common law applicable to Alaskan guide pilots.
> The FAA's current doubts about the wisdom of the regulatory system followed in
> Alaska for more than thirty years does not justify disregarding the requisite
> procedures for changing that system.

*Id.* at 1035 - 36 (internal citations omitted).

The findings of the *Alaskan Professional Hunter* court are equally applicable here. First,

as in *Alaskan Professional Hunters*, EPA is trying to reverse a regulatory interpretation that has

17

been in effect for over twenty years. Second, and unlike the situation in *Alaskan Professional*

*Hunters*, the regulatory interpretation issued by EPA came directly from EPA Headquarters at

the level of the Director of the Office of Toxic Substances. Given that EPA's headquarters

division is charged with the responsibility of interpreting and implementing the regulations

relating to EPCRA nationwide, this ratification becomes even more significant. Finally, just as

in *Alaskan Professional Hunters,* the treated wood industry, and other manufacturing sectors

have operated since EPCRA's inception based in reliance on EPA's interpretation.

This case is also similar to *Iyengar v. Barnhard*, 233 F. Supp.2d 5 (D.D.C. 2002). In

*Iyengar*, aliens, who were not eligible to work, challenged the decision of the Social Security

Administration ("SSA") to stop issuing social security numbers to them for the purpose of

obtaining state driver's licenses. In enjoining the agency's action, the District Court observed:

> [A]s early as 1980 SSA interpreted the phrase "nonwork purpose" in 20 C.F.R. §
> 422.104 to include a legal alien's need for a state driver's license. The agency
> specifically affirmed this position on at least two subsequent occasions, in 1991
> and again in 1996. These interpretations all appeared in SSA's operating
> manuals, the same place that the disputed March 2002 interpretation was
> published. There is no suggestion that these previous interpretations were
> somehow invalid or not definitive.
>
> Nor is there any question that the agency's new understanding of its regulation
> is fundamentally inconsistent with the interpretations that preceded it. . . . In this
> case, therefore, there can be no serious dispute that prior to March 2002, SSA had
> adopted an 'express, direct, and uniform interpretation' of the operating
> regulations that was diametrically opposed to the interpretation now at issue.
> These previous interpretations amounted to at least 20 years of 'administrative
> common law' permitting aliens to obtain SSNs in order to get state driver's
> licenses. Thus, while the agency may ultimately have the discretion to change its
> policy, it must do so through notice and comment.

*Id.* at 14 - 15. Like the SSA in *Iyengar*, EPA has tried to reverse course thereby effectively

rescinding over twenty years of consistent interpretation of its articles exemption as excluding

treated goods in storage from the articles exemption. Like the SSA, EPA may not change its

18

"administrative common law" without prior notice and comment. *Id.*; *see also Nebraska Dept. of H.H.S. v. U.S. Dep't of H.H.S.*, 340 F. Supp.2d 1 (D.D.C. 2004).

On the facts of this case, and in light of the applicable case law, Plaintiffs are likely to succeed on the merits of their claims that EPA may not reclassify as non-exempt releases from finished goods and articles without engaging in notice and comment rulemaking.

### C.    Alternatively, EPA Failed to Provide a Reasoned Analysis for its Reversal

Even if EPA was not required to go through notice and comment rulemaking prior to changing its longstanding exemption from TRI reporting of releases from finished goods and articles, its decision to treat such releases as reportable is arbitrary and capricious. When an agency adopts a rule that changes the agency's prior position, the agency "is obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Although judicial review of Agency action under the APA is highly deferential,

> ...[A]gency action is arbitrary and capricious if it departs from agency precedent
> without explanation. Agencies are free to change course as their expertise and
> experience may suggest or require, but when they do so they must provide a
> reasoned analysis indicating that prior policies and standards are being
> deliberately changed, not casually ignored"

*Ramaprakash v. FAA*, 346 F.3d 1121, 1124-25 (D.C. Cir. 2003) (internal quotation and citation omitted).

Since 1988, the letter from Charles Elkins has articulated the principle that releases or the normal migration of reportable chemicals from finished goods that have completed the manufacturing process are exempt from TRI reporting. Again, from 1989 through 2001, EPA reiterated this view in the instructions for completing the TRI Form:

19

> You are not required to count as a release, quantities of an EPCRA section 313
> chemical that are lost due to natural weathering or corrosion, normal/natural
> degradation of a product, or normal migration of an EPCRA section 313 chemical
> from a product. For example, amounts of an EPCRA section 313 chemical that
> migrate from plastic products in storage do not have to be counted in estimates of
> releases of that EPCRA section 313 chemical from the facility....

*See e.g.,* Ex. 5, at 2. This instruction remained in the TRI instruction manual for thirteen years

until 2002, when EPA removed it without notice or explanation. Nonetheless, by that point the

exemption from TRI reporting for finished goods in storage or treated wood products that have

completed the treatment process was well established. More importantly, the Elkins letter

remained in effect and has ever been rescinded by EPA. *See* Petruska Letter, Ex. 9, at 3. Rather,

the Agency attempts through some contortion of logic to argue that because the wood is not an

article during processing, it can never be an article. Such an approach swallows the entire

articles exemption because from an EPCRA perspective, materials only become articles after

processing with reportable chemicals. The mere physical movement of a finished product into

storage or shipping should not be allowed to defeat the article exemption as EPA has previously

interpreted and enforced it:

> [t]he toxic chemicals that are released from the treated wood once it has left the
> treatment cylinder and is placed on the drip pad are released as a result of the
> processing of the wood. Thus, the wood cannot be considered an article under the
> articles exemption because there is a release of a toxic chemical as a result of the
> processing of the wood at the facility. Because the wood is not an article, releases
> from it are not eligible for the articles exemption regardless of where they take
> place.

In this instance, the Agency's omissions are more instructive. Having failed to ever define what

constitutes the processing or normal condition of use of an item sufficient to defeat the article

exemption, EPA offers no explanation as to how or why removal of the wood from the treatment

cylinder meets the definition of "processing of an item."

20

We note that EPA cannot (nor does it) rely on the statutory definition of "processing" to support its position that treated wood products are not articles. As noted above, EPCRA defines manufacturing and processing in the context of manufacturing or processing of a reportable chemical, rather than an article. Specifically, "processing" of a reportable chemical is the preparation of a reportable chemical "after its manufacture, for distribution in commerce...as part of an article..." As the reportable chemicals were "processed" when impregnated into the wood to be treated, applying EPCRA's definition goes against the purposes of the article exemption and would lead to an incongruous result. Indeed, the manufacture of an item may involve the processing of a chemical. 40 C.F.R. § 372.3 ("Process means the preparation of a toxic chemical...[a]s part of an article containing the toxic chemical....").

As the article exemption applies "whether the person received the article from another person or the person produced the article," the plain language of the article exemption intends for the manufacture of an item to mean something distinct from, and occurring prior to, the processing of that item. Although not applicable here, the statutory definition does suggest that "processing" involves more than passivity. In the absence of any specific Agency definition or guidance, the plain meaning of "processing" must apply. *Exportal Ltda v. U.S.*, 902 F.2d 45, 51 (D.C. Cir. 1990) (Agency cannot be permitted to rely on its unexpressed intentions to trump the ordinary import of its regulatory language). That meaning contemplates an affirmative act performed on the treated wood beyond its mere transport throughout the facility. *See, e.g., U.S. v. Midwest Suspension & Brake*, 49 F.3d 1197, 1203 (6th Cir. 1995) ("the definition of 'processing' includes operations which 'cut, shape, assemble, mix, or otherwise alter' a manufactured product

that contains commercial asbestos") (citing to the preamble of an EPA Clean Air Act notice at 39 Fed. Reg. 15396, 15397 (May 3, 1974)).

As previously noted, plaintiffs do not take a position on when manufacturing ends and treated wood becomes an article following its removal from the retort because of vagaries in individual product lines and processing procedures. Plaintiffs do agree that the only affirmative act following such removal involves the occasional quality control inspection, but submit that this inspection is an integral part of manufacturing—inspected products are either passed and moved into storage or failed and returned to the retort for further treatment. Rollins Decl. at ¶ 15, Ex. 1. Plaintiffs universally agree that the treated wood is an article when it enters storage.

In this regard, the Agency's logic is remarkably circular—the wood cannot be an exempt article because it releases a toxic chemical as a result of processing, and natural weathering (as contrasted from "processing") is irrelevant to the discussion because the wood is not an article. This train of thought plainly ignores the concept that natural weathering, which is more akin to releases from stored goods than anything else, is not a "processing" step in the creation of goods; as a result, a good of this character then should regain its status as an exempt article once placed into storage.

## III. Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief.

The immediate application of EPA's policy change concerning the reportability of releases from finished treated wood products that have completed the treatment process will irreparably harm Koppers and members of Plaintiff Associations. These companies have long relied on EPA guidance that they were not required to report such releases. EPA has failed to recognize the impossibility of gathering, assembling, and accurately reporting emissions from finished products for calendar year 2007 no later than July 1, 2008 or the costs involved.

22

In order to comply with EPA's new reporting obligation, Plaintiff Associations will, on behalf of their members, incur significant expenses, to try to develop adequate estimation methodologies. Rollins Decl. at ¶¶ 30-40, Ex. 1. Emissions from various combinations of treated wood commodities and preservatives must be sampled for 90 days over a year to account for seasonal variations and differences in product surface areas, volume, product stacking configurations and other factors. *Id.*

The fact that a significant part of the harm to Plaintiff is monetary is not dispositive. Adequate compensatory relief is not available to Plaintiffs at a later date because monetary damages are not available for a violation of the APA. *Iyengar v. Barnhart*, 233 F. Supp.2d 5, 15 (D.D.C. 2002). Since Plaintiffs or their members can never recover from the government the money they will lose without an injunction, they will suffer irreparable injury without injunctive relief. *See Woerner v. U.S. Small Business Admin.*, 739 F. Supp. 641, 650 (D.D.C., June 15, 1990); *Wisconsin v. Stockbridge-Munsee Cmty.*, 67 F. Supp. 2d 990, 1019-20 (E.D. Wis. 1999); *Glendale Neighborhood Ass'n v. Greensboro Housing Auth.*, 901 F. Supp. 996, 1002 (M.D.N.C. 1995).

Moreover, EPA's selection of July 1, 2008, as the reporting date condemns the industry to an untenable choice from a compliance perspective. Depending on the wood product and preservative used, data currently available to Plaintiffs and other industry members will lead to either overestimating or underestimating emissions from finished treated wood products. Those treated wood manufacturers that underestimate emissions from finished wood products are potentially subject to civil penalties of $32,500 per day per violation for inaccurate reporting of TRI data. *See* 42 U.S.C. § 11045. Facilities that overestimate TRI emissions may, in addition to

the public stigma of being identified improperly as larger polluters than previously reported, be subject to more stringent and unnecessary regulatory requirements under other environmental statutes.

## IV.    There Is No Cognizable Harm to Others.

The harm that may be suffered by other parties if an injunction is granted is greatly outweighed by the irreparable harm to be suffered by the Plaintiffs and their members. EPA can suffer no cognizable harm as a result of an injunction imposed on account of its violation of its own regulations and the APA. Nor will the public be harmed by an injunction. Changes in TRI reporting requirements do not change actual emission levels nor does EPCRA regulate emission levels from manufacturing operations. EPA has been well aware of how the treated wood industry manufactured and stored its products when it opined on the proper classification of these products for TRI reporting purposes, and raised no question of its safety at any time since EPCRA's inception. Indeed, EPA has not required that the facilities revise their prior Form R reports to include this new information. As such, this new information has not been before the public for the past 18 years and there would be no cognizable harm to the public's right to know should injunctive relief be granted.

## V.    The Public Interest Strongly Favors Granting Injunctive Relief.

As a general matter, "there is a strong public interest in meticulous compliance with law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993). The public interest is served by requiring an agency to follow due process and analogous requirements in the Administrative Procedures Act. Additionally, other persons who sell products that have relied on EPA's longstanding policy relating to the reporting of finished goods in storage will benefit if EPA is required to comply with the APA and to conduct its

24

business in a fair and unbiased manner in accordance with the APA's strictures. *See Woerner,* 739 F. Supp. at 650. Without the injunction, these other companies will be required to both develop a new method of estimating or calculating emissions from finished goods that have completed the treatment process, but also in turn calculate and report said emissions annually as part of the TRI program.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request the issuance of a Preliminary Injunction in the form submitted with this Motion.

Dated:  March 25, 2008                                  Respectfully submitted,

Douglas A. Behr (Bar No. 163998)
behr@khlaw.com
Peter L. de la Cruz (Bar No. 362358)
delacruz@khlaw.com
Jean-Cyril Walker (Bar No. 474498)
walker@khlaw.com

KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
Tel.: 202-434-4100
Fax: 202-434-4646

Attorneys for Plaintiffs

25

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs' Memorandum of Points and Authorities in

Support of Plaintiffs' Motion for a Preliminary Injunction was served on March 25, 2008 by

hand on defendants, and pursuant to Fed. R. Civ. P. 4(i), to the United States Attorney General

and the United States Attorney for the District of Columbia at the addresses listed below:

The Honorable Michael B. Mukasey
Attorney General
U.S. Department of Justice
Tenth Street and Constitution Avenue, N.W.
Washington, D.C. 20530

The Honorable Stephen L. Johnson
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

The Honorable Roger R. Martella, Jr.
General Counsel
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

The Honorable Jeffrey A. Taylor
United States Attorney
United States Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

Douglas J. Behr

**EXHIBIT 1**

**Declaration of H. Martin Rollins, President of H.M. Rollins Company, Inc.**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CREOSOTE COUNCIL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.**_____ |
| | ) | |
| **STEPHEN L. JOHNSON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF H. MARTIN ROLLINS
### Pursuant to 28 U.S.C. § 1746

I, H. Martin Rollins, declare under penalty of perjury that the following is true and correct:

1.     I am President of H. M. Rollins Company, Inc, in Gulfport, Mississippi. My firm provides engineering services to a variety of treated wood product manufacturers and other industrial clients across the United States, and has done so for over 25 years.

2.     I received my Bachelor of Science degree in Mechanical Engineering from Texas A&M University in 1968, and received my Master of Science degree in Business Administration from the University of South Alabama in 1976.

3.     I am a Registered Professional Engineer in Alabama, Georgia and Mississippi, and a member of the National Society of Professional Engineers (NSPE), the American Society of Civil Engineers (ASCE), the American Wood Protection Association, and the Southern Pressure Treaters' Association (one of the plaintiffs in this matter).

4.     For over 25 years I have provided technical, engineering and compliance assistance to wood treaters, manufacturers of wood products, and other industrial clients on a host of environmental regulatory requirements. My relevant experience includes preparing environmental permits and required reports for submission to state and Federal agencies; conducting environmental investigations and workplace monitoring; reviewing and preparing comments on rulemakings at the state and Federal levels; and similar regulatory projects. For example, I recently acted as the technical interface with EPA on behalf of a coalition of wood preserving industry groups, including those that are participating in this action, during promulgation of national emission standards for hazardous air pollutants from wood preserving area sources under the Clean Air Act. Part of this work involved compilation, review, and analysis of reported air emissions from the wood preserving industry.

5.     I have particular expertise in the area of emissions estimating and reporting required by the Emergency Planning and Community Right-to-Know Act (EPCRA). My firm prepares the EPCRA 313 Form R Report for many wood preserving facilities and other industrial facilities on an annual basis. For facilities that require air permits, we also prepare annual emissions inventories for submittal to the permitting agency.

6.     I have also assisted various wood treating industry associations such as the now defunct American Wood Preservers Institute, the Pentachlorophenol Task Force and the Southern Pressure Treaters' Association and individual companies in responding to, and commenting on, various EPA guidance documents setting out how treated wood manufacturers should characterize and report emissions to the Toxics Chemical Release Inventory, or TRI.

7.      The H. M. Rollins Company has been retained on several occasions to prepare industry-wide TRI emissions estimating guidance for both pentachlorophenol and creosote wood preservers. We were also retained by Environment Canada, the Canadian equivalent of the U.S. EPA, to prepare guidance for the Canadian pentachlorophenol wood treating industry in preparing emissions estimates for reporting on the NPRI report, the Canadian equivalent of the TRI Form R report.

<u>The Wood Treating Industry and Treated Wood Manufacturing</u>

8.      Treated wood is manufactured by pressure or thermal treatment to impregnate chemicals into wood to a depth that will provide effective long-term resistance to attack by fungi, bacteria, insects, and marine borers. Preservative treatment significantly increases the longevity of many common species of wood.

9.      The wood treating industry is highly diverse industry which is segmented by product, wood species, preservative type and wood treatment technique. Wood treaters manufacture many different variations of products, both commercial (such as railroad crossties, utility poles, foundation and marine pilings, and industrial lumber) and residential (such as wood used in residential construction, playground equipment, decks, picnic tables, landscaping timbers, residential fencing, patios, and walkways/boardwalks). Companies in the wood treatment industry create this broad spectrum of products using a number of different preservatives, including oil-borne preservatives such as pentachlorophenol and creosote, and water-borne preservatives such as chromated copper arsenate and newer copper-based systems.

10.     The vast majority of treated wood products are pressure treated. Pressure treatment begins when wood is moved into a horizontal steel cylinder, or retort, on trams traveling on a rail system. The wood must first be sufficiently dry to accept the liquid

preservative treatment. Depending upon the preservative type and wood product being produced the first step may be the application of a vacuum, or alternatively, a small positive initial air pressure. The cylinder is then filled with liquid preservative.

11.    Once the wood is immersed in the preservative, pressure pumps force the liquid preservative into the wood, replacing the previously-extracted water. For some categories of preservatives, heat is also applied to facilitate treatment. Excess preservative is then drained from the retort for reuse and a final vacuum is applied to remove any excess preservative from the wood and allow it to dry.

12.    During thermal treatment, the wood is immersed at atmospheric pressure in liquid preservative, first in a hot bath, and then a cooler bath. The hot bath expands the wood cells and the air in the cells, and the cool bath causes the air to contract, which draws the liquid preservative into the wood. The cycle may be repeated, depending upon preservative penetration and retention requirements. Thermal treatment is used primarily to treat western red cedar utility poles with pentachlorophenol, and accounts for about 1% of utility pole treatments in the U.S.

13.    Once treatment is completed, a rail system moves the finished product out of the retort. The rail system at most facilities includes a "Subpart W drip pad" where, in accordance with regulations promulgated pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. §§6901-6992k, treated wood must be retained so that any remaining preservative that drips from the wood or the trams may be captured and returned to the preservative tank for reuse. Depending upon preservative type and commodities produced, the Subpart W drip pad may be limited to the track system or it may include a larger adjacent impermeable area where material can be placed until quality assurance or temporary holding is complete.

14.    Modern wood treating methods are designed to reduce post-treatment drippage of preservative to minimal amounts. While wood treating facilities are required to have a "drip pad" in place as part of their rail system if any post-treatment drippage occurs, some facilities are able to avoid this requirement by keeping the wood product in the retort until drippage ceases. For example, some utility pole manufacturers do not have Subpart W drip pads based on their ability to produce wood that has no drippage of free preservative upon exiting the treating cylinder.

15.    Aside from moving the treated wood along the rail system, the only action following removal of the wood from the retort may involve a quality control inspection, if required by the product specifications and standards. For instance, utility poles may undergo a quality control inspection which entails taking core samples for testing of preservative penetration and retention. This inspection generally occurs immediately after the material exits the retort as it sits in the trams on the rail system. This inspection is an integral part of manufacturing—inspected products are either passed, and shipped or moved into storage, or failed, and subsequently returned to the retort for further treatment.

16.    Other products, such as most railroad crossties, may not require such inspections and are moved directly to storage or out for shipment once the facility documents that no drippage is occurring. Dimension lumber treated with water borne preservatives may need to stay on the drip pad for a period of time from a few hours to a day or more until the liquid preservative trapped between the board faces fully drains. All preservative is reused in the process and there are insignificant air emissions of TRI chemicals during this time.

17.    To the extent operationally feasible, treated wood products are shipped immediately. However, all facilities maintain some finished product in on-site storage areas.

Facilities that manufacture industrial commodities such as railroad ties, utility poles and

foundation piling may maintain a significant amount of inventory (up to 90 days of production

inventory) in on-site "storage yards" to meet specific market requirements or respond to episodic

demand stemming from natural disasters and other emergencies. Nothing is done to the finished

products during this storage period.

EMISSIONS CALCULATIONS BY THE TREATED WOOD INDUSTRY

18.     As I indicated previously, some facilities are able to avoid the need for drip pads

by keeping the wood product in the retort until drippage ceases, whereas other facilities may

need to hold the product at the drip pad until drippage ceases. The end result is that some wood

treating facilities report releases of TRI chemicals from the drip pads or other locations prior to

storage, while other companies do not report any releases following the removal of the wood

from the retort. These differences stem from variations in company-specific product and

manufacturing lines which lead wood treating facilities to view treated wood as an article at

different points following the retort. Based on my experience, however, facilities in the wood

treating industry universally agree that treated wood is an article under EPCRA when it enters

storage and do not report air releases from that point on.

19.     I have reviewed the October 15, 2007 letter from EPA which states that removal

of treated wood from the retort and placement on a drip pad constitutes processing of the treated

wood and so defeats the TRI article exemption. I disagree. The activities that take place on the

drip pad are either totally passive or limited to the taking of small samples for quality control

purposes. In my opinion neither of these constitutes post-manufacturing processing, and, if

anything, these activities would be part of the manufacturing process. As discussed above, if

considered part of the manufacturing process, the facilities are generally reporting estimates of

any environmental releases during this period on the TRI report. This position was fully discussed with EPA as part of the development of new wood preserving industry-specific guidance being developed in 1999 by EPA and the industry. This guidance was never finalized, in part because of the additional work that would have been required to incorporate the reporting of persistent, bioaccumulative and toxic substances that was added to the TRI in 2000.

20.     The letter also contains a directive that wood treatment facilities must estimate and report such emissions "for the 2007 reporting year and beyond." Facility TRI reports for the 2007 reporting year are due to EPA and the appropriate states no later than July 1, 2008. Based on my experience in the industry, there is insufficient time to prepare and accurately report releases from finished products in storage by that date.

21.     Whereas estimating emissions from treated wood manufacturing involves calculations that are a function of vapor pressures, liquid preservative composition and fluid movement in accordance with procedures established under EPA's "TANKS" estimating program, these calculations can not be used to estimate emissions from finished treated wood products. Neither the industry nor EPA is aware of any reliable method for making purely engineering estimates of these emissions. The treated wood industry lacks sufficient data to allow companies to accurately estimate emissions from treated wood products after they exit the retort (e.g. in storage, on "drip pads," or being moved for transport in commerce). The only existing data on which to base emissions calculations dates back to limited sampling by the treated wood industry in the early 1990s and a single laboratory study of pentachlorophenol-treated wood conducted about 1980.

22.     I am familiar with attempts by the treated wood industry to develop data modeling and an estimation methodology for treated goods in storage in response to reporting requirements under the Clean Air Act amendments. Although not directly applicable to TRI reporting, the problems encountered with these methods illustrate the difficulties the industry will experience in reporting emissions to the TRI.

23.     The data modeling effort was based on limited sampling from four utility poles treated with creosote, with no considerations for product stacking or seasonal variations. Obviously, this test could not take into account differences in preservatives used, wood species treated, or type of finished product.

24.     The estimation methodology attempted to describe a means for estimating the surface area of treated wood products that is open and free to release volatile compounds from creosote-treated wood. The industry proposed to estimate the effective surface area as the visible surface area of a stack of treated wood products, assuming specific stacking configurations for crossties and poles.

25.     EPA evaluated this methodology for its *Compilation of Air Pollutant Emission Factors* more commonly referred to as the AP-42 document, and determined that it was not reliable. An emission factor is "a representative value that attempts to relate the quantity of a pollutant released to the atmosphere with an activity associated with the release of that pollutant." The AP-42 is the means by which EPA documents the process details and supporting reference used to develop emission factors.

26.     According to the report prepared by EPA's consultant and incorporated into the AP-42 document:

Using the total surface area of each piece of treated wood would undoubtedly provide an overestimate of fugitive emissions from yard storage. However, the effective surface area proposed in References 16 and 19 [estimation methodology] appears to result in an unreasonably low estimate of fugitive emissions. In the absence of a substantiated method for estimating the effective surface area, the equations presented in Table 4-5 have not been incorporated into the AP-42 section .

*Emission Factor Documentation for AP-42, Section 10.8 Wood Preserving, Final Report*

EPA Purchase Order No. 8D-1933-NANX MRI Project No. 4945 (August 1999)

27.    As the AP-42 document indicates, current information available to the treated wood industry, if used to comply by the July 1, 2008 reporting date, will lead treated wood facilities to either overestimate or underestimate emissions from finished treated wood products.

28.    Gathering and developing adequate data to create a reasonably accurate estimation model will require significant effort. Specifically, the industry will need to obtain air samples from finished treated wood products at varying points following the retort over several months in order to account for the large inventories often retained on site by treated wood facilities. As emissions from treated wood products decline exponentially over time, the average age of inventory and emission trends from the time period between when the wood exits the retort to product shipment must be accounted for.

29.    Emissions modeling data also must consider the various possible configurations of wood stacked in storage, because the ratio of surface area to volume will fluctuate depending on positioning in storage, thereby affecting the quantity of calculated emissions. Seasonal variations are also critical data points to consider, because emission rates are a function of temperature – and such differences might necessitate testing over an annual period in order to develop complete data.

30.    Based on my experience, I have prepared a conservative, rough order of magnitude estimate for developing reasonably accurate emission methodologies for various finished treated wood products based on the assumption that eight  samples per type of preservative would be needed for each preservative type and stacking configuration.  These samples would need to be taken in a somewhat logarithmic time sequence in order to be able to define the shape of the exponentially declining emissions curve.

31.    Three samples should be taken on day one, one as soon as possible after the material exits the retort, one at six hours and another at 24 hours.  Each of these tests would be an hour or more in duration in order to ensure that detectable levels were obtained in the samples.  Other tests should be conducted on day 3 , day 7, day 14, day 45 and day 90, in order to cover the expected inventory period.  Testing in these later time periods may need to be for extended durations in order to get quantifiable results.

32.    A temporary enclosure would have to be built for each test, and this will not be a insignificant undertaking since the products are stored in large stacks.  Based on the above, a total of eight tests would be required for each preservative and for each tested commodity and stacking configuration.  For creosote it would be necessary to run at least two different tests, one for crossties in a normal stacking configuration and one for poles in a normal stacking configuration.  Ideally, it would be better to run different stacking configurations of each in order to quantify differences in emissions between various stacking geometries (for example, large stacks versus small stacks).  However, I only considered one test for crossties and one for poles in order to provide a conservatively low cost estimate.

33.    For pentachlorophenol, at least two commodities would have to be tested, poles and crossarms.  Again, although it would be better to sample at least two stacking configurations

for each commodity, this estimate is based on only one per product. Based on my everyday experience with stack testing contractors the typical rate for a testing crew is approximately $3,000 per 10-hour test day. Both of the first two tests could be accomplished in one ten hour day. Beyond that, each test will require the expenditure of one test crew day. Therefore, the eight tests for each preservative and stacking configuration could be conducted in a total of seven test crew days.

34.    There would be some expense associated with the construction of the temporary enclosure for each test. A lump sum of $500 would be a conservatively low estimate. For the very large stacks the number could be much higher. The enclosure must be removed after each test so that ambient conditions can be restored.

35.    The costs for analyzing the samples would be substantial. For creosote we would need to analyze for volatile organic compounds, polynuclear aromatic hydrocarbons and naphthalene since there is no test for "creosote" and we mathematically estimate creosote based on product chemistry. We would also need to do an analysis on the preservative itself for product chemistry purposes. In addition, we would need to do background testing to take into account the ambient concentrations that may be found at the facility during each test, but no cost for theses analyses is included in this estimate. Analytical costs are estimated at $1,500 to $2,000 per sample depending on the sampling train used and the extraction and sample cleanup required.

36.    For pentachlorophenol, the analyses would have to include pentachlorophenol, polynuclear aromatic hydrocarbons, hexachlorobenzene, and speciated dioxins and furans. Due to the high cost of dioxin/furan analyses the total cost for the analyses at pentachlorophenol plants will be higher, estimated to be in the range of $2,500 to $3,000 per sample.

37.     The total exercise for creosote would entail 14 test crew days, 14 temporary enclosures, and a total of 17 analyses, for a total, using the low end analytical range, of $74,500. Using the same assumptions, the total cost for the pentachlorophenol testing would be $91,500. The total for the two preservative systems would be $166,000. In order to develop data on the effect of seasonal temperature changes on the emission rates, the testing would ideally be conducted twice, once in the summer months and once in the winter months. Sampling to address seasonal variations would double the preceding estimate to $332,000.

38.     In addition to sample collection and analysis, significant engineering effort would be needed to evaluate the resulting data and develop appropriate emissions models. Based on our experience developing prior industry guidance, I would estimate engineering costs at approximately $15,000 per preservative. These models would then have to be incorporated into the interactive spreadsheets that the industry is presently using to perform the emissions estimates for TRI reporting purposes. Again, having developed the existing spreadsheets for the industry, I would estimate this additional cost at about $25,000 per preservative.

39.     In short, the industry will need to spend between $246,000 and $412,000 to develop reasonably accurate methods of estimating emissions from products manufactured only with these two preservative systems. Costs not covered by this estimate include those to educate the industry on the new methods. Critically, this work cannot be completed by the July 1, 2008 deadline and I question whether this project could be completed in time for the reports due on July 1, 2009, (assuming the industry had the resources to conduct the work) because it would take some time to develop the full test protocols, solicit bids for the work, conduct the work, evaluate the data and ultimately produce a workable guidance document and estimating

spreadsheet. The above estimate is based on the assumption that none of the waterborne preservatives would require testing, and that may not be a valid assumption.

40.    The total estimated cost of $246,000 to $412,000 for developing an estimation methodology is due largely to the high volume of on-site testing needed to generate data sufficient to create appropriate emissions models. In short, developing a reasonably accurate estimating methodology may take over a year to complete at an approximate cost of $246,000 to $412,000 . Any emissions reported to EPA before such a method is developed are likely to be grossly inaccurate. Given the data available today and the uncertainty in effective surface area it is unlikely that estimates based on this data would be within an order of magnitude of actual emissions.

I HEREBY DECLARE, under penalty of perjury, that the foregoing is true and correct.

_3/20/08_
Date

H. Martin Rollins, P.E.

**Exhibit 2**

**Declaration of Leslie Hyde, Vice President Safety and Environmental Affairs for Koppers Inc.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CREOSOTE COUNCIL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| STEPHEN L. JOHNSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

DECLARATION OF LESLIE HYDE
Pursuant to 28 U.S.C. § 1746

I, Leslie Hyde, declare under penalty of perjury that the following is true and correct:

1.      I am the Vice President, Safety and Environmental Affairs for Koppers Inc. ("Koppers"), and as such, am authorized to speak on behalf of the Company.

2.      I have been with Koppers Inc for nine years; three years in my current position and six years as the Manager of Environmental Affairs. I have a Bachelor's Degree in Civil Engineering from the U.S. Military Academy and a Juris Doctor degree from Duquesne University.

3.      Koppers is a global integrated producer of carbon compounds and treated wood products for use by the utility, construction, railroad, aluminum, chemical and steel industries. Koppers operates 30 facilities in the United States, Europe, Australia, China and the Philippines, employing more than 2,000 people worldwide. Koppers is a member of Plaintiffs Creosote Council, Southern Pressure Treaters' Association and Treated Wood Council.

4.      Koppers manufactures treated wood by using a pressure treatment to impregnate wood with creosote, pentachlorophenol and chromated copper arsenate ("CCA") to a depth that provides effective long-term resistance to pests. Since the inception of the Toxic Chemical

Release Inventory ("TRI") program, Koppers has reported to the TRI releases of reportable chemicals that occur during the manufacture of the treated wood but has not reported such releases once manufacturing is complete.

5.     Koppers has long understood that air releases from finished treated wood products that have completed treatment were not reportable to the TRI as the treated wood products had become "articles" exempt from EPCRA reporting under the "article exemption" at 40 C.F.R. § 372.38(b).

6.     From 2005 to 2006, officials from Region 6 of the Environmental Protection Agency ("EPA") inspected three of our facilities; beginning on or about June 7 and 8, 2005 at our facility in North Little Rock, Arkansas, and followed on March 7, 2006 at our facilities in Logansport, Louisiana and Somerville, Texas.

7.     In a letter dated March 30, 2007, Morton E. Wakeland, Jr., Ph.D, EPCRA 313 Enforcement & TRI Program Coordinator, U.S. EPA Region 6, alleged that our facilities had committed several EPCRA reporting violations, including among others, that our facilities had failed "to include air releases from the storage yard in its Form R's for creosote, benzo (g,h,i) perylene, and PAC's."

8.     As of the date of this Declaration, to my knowledge, EPA had never before the inspections at our facilities or others in the industry held that wood treating facilities must report air releases from finished products in storage.

9.     Following correspondence between EPA and the treated wood industry, Koppers received a letter from Michael Petruska, Director of EPA's TRI Program Division dated October 15, 2007, which confirmed the Region 6 position.  Although EPA states in the letter that it did not expect treated wood facilities to revise previously submitted TRI reports, the letter makes

clear that companies must apply EPA's new policy starting with their calendar year 2007 TRI reporting, which is due no later than July 1, 2008.

10.     However, there is simply insufficient time for Koppers to prepare and accurately report air releases from finished products following the completion of manufacture or in storage by that date. There simply is insufficient data for Koppers to accurately estimate emissions from treated wood products after they exit the retort (e.g. in storage, on "drip pads," or being moved for transport in commerce).

11.     In the early 1990s, Koppers attempted to develop estimation methodologies for treated goods in storage in response to reporting requirements under the Clean Air Act amendments. The data modeling effort was based on limited sampling at our facility in Feather River, California, using four utility poles treated with creosote. Given the limited scope of the effort, the model did not address product stacking or seasonal variations. Nor did it take into consideration variations in preservatives used, wood species, or the type of finished commodity.

12.     EPA evaluated our approach in its *Compilation of Air Pollutant Emission Factors* more commonly referred to as the AP-42 document. The Agency determined that as Koppers' sampling data encompassed emissions from the entire surface area of the poles, the model would overestimate releases from stacked wood products. *Emission Factor Documentation for AP-42, Section 10.8 Wood Preserving, Final Report* EPA Purchase Order No. 8D-1933-NANX MRI Project No. 4945 (August 1999)

13.     As EPA notes, this data model, if used to comply by the July 1, 2008 reporting date, would overestimate emissions from our facilities. Moreover, the sampling data is inapplicable to Koppers' pentachlorophenol and CCA-treated products. Accordingly, a more accurate methodology must be developed. Based on the cost of prior sampling and monitoring

work Koppers has commissioned, we would estimate at several hundred thousand dollars, the cost of developing a reasonably accurate TRI emission model.

I HEREBY DECLARE, under penalty of perjury, that the foregoing is true and correct.

3/24/08
Date

Leslie Hyde

**Exhibit 3**

**Title 111 Section 313 Release Reporting Guidance – Estimating Chemical Releases from Wood Preserving Operations (February 1988)**

| United States Environmental Protection Agency | Office of Pesticides and Toxic Substances | EPA 560/4-88-004p February 1988 |
|---|---|---|

**♻EPA**

# Title 111 Section 313 Release Reporting Guidance

## *Estimating Chemical Releases From Wood Preserving Operations*

# Estimating Chemical Releases From Wood Preserving Operations

Facilities engaged in wood preserving operations may be required to report annually any releases to the environment of certain chemicals regulated under Section 313, Title III, of the Superfund Amendments and Reauthorization Act (SARA) of 1986. If your facility is classified under SIC codes 20 through 39 (wood preserving facilities generally fall under SIC code 2491) and has 10 or more full-time employees, for calendar year 1987 you must report all environmental releases of any Section 313-listed chemical or chemical category manufactured or processed by your facility in an amount exceeding 75,000 pounds per year or otherwise used in an amount exceeding 10,000 pounds per year. For calendar years 1988 and 1989 (and beyond), the threshold reporting quantity for manufactured or processed chemicals drops to 50,000 and 25,000 pounds per year, respectively.

This document has been developed to assist facilities engaged in wood preserving operations in the completion of Part III (Chemical Specific Information) of the Toxic Chemical Release Inventory Reporting Form. Included herein is general information on toxic chemicals used and process wastes generated, along with several examples to demonstrate the types of data needed and various methodologies available for estimating releases. If your facility performs other operations in addition to wood preserving, you must also include any releases of toxic chemicals from these operations.

## Step One

**Determine if your facility processes or uses any of the chemicals subject to reporting under Section 313.**

A suggested approach for determination of the chemicals your facility uses that could be subject to reporting requirements is to make a detailed review of the chemicals and materials you have purchased. If you do not know the specific ingredients of a chemical formulation, consult your suppliers for this information. If they will not provide this information, you must follow the steps outlined to handle this eventuality in the instructions provided with the Toxic Chemical Release Inventory Reporting Form.

The list presented here includes chemicals typically used in wood preserving operations that are subject to reporting under Section 313. This list does not necessarily include all of the chemicals your facility uses that are subject to reporting, and it may include many chemicals that you do not use. You should also determine whether any of the listed chemicals are created during processing at your facility.

**Compounds found in wood preserving agents:** Arsenic compounds, copper compounds, chromium compounds, zinc compounds, anthracene, benzene (in petroleum solvents), o-cresol, pentachlorophenol, dibenzofuran, naphthalene, quinoline

**Vapor drying agents:** Various solvents

**Preserving carriers:** Various solvents

A listed chemical may be a component of several formulations you purchase, so you may need to ask your supplier for information on the concentration (percentage) of the chemical in each. For chemical categories (for example, chromium compounds). your reporting obligations are determined by the total amounts of all chemicals in the category.

You must complete a report for each chemical for which a threshold is exceeded. The thresholds apply separately: therefore, if you both process and use a chemical and either threshold is exceeded, you must report for both activities. If neither threshold is exceeded, no report is needed.

# Step Three

**Identify points of release for the chemical(s) subject to reporting.**

An effective means of evaluating points of release for listed toxic chemicals is to draw a process flow diagram identifying the operations performed at your facility. The figure below is an example flow diagram of a pressurized wood-treating process in which vapor is conditioned. Because each facility is unique. you are strongly urged to develop a flow diagram for your particular operations that details the Input of materials and chemicals and the waste sources resulting from the operation of each unit.



**Example Flow Diagram of a Wood Preserving Facility Using the Boulton Conditioning Process**

Engineering assumptions and calculations can be used to estimate toxic releases in a variety of situations. Information such as the water solubility and vapor pressure of a chemical can be used in conjunction with process parameters such as treatment cylinder size, vacuum exhaust rate, and wastewater evaporation temperature to develop engineering calculations of releases. This method of estimation relies heavily on process operating parameters: thus, the techniques developed are very site-specific.

Emission factors are usually not available for wood preserving operations: however, the reference sources presented at the end of this document contain considerable information on wood preserving wastes. You may be able to use this information to develop emission factors or waste characteristics applicable to your facility to serve as a basis for release estimates. You may also be able to develop emission factors for your particular facility m-house by performing detailed measurements of wastes at different production levels.

## Toxic Releases Via Wastewater

Most wood preserving facilities do not discharge wastewater. Instead, the wastewater is either completely recycled or evaporated. Some facilities. however, discharge wastewater to publicly owned treatment works (POTWs) or dispose of it by land application, and a few facilities discharge wastewater directly into navigable waters. If you dispose of wastewater by landspreading. the toxic chemicals contained in the wastewater are considered "released to land." The same is true for those facilities who discharge to onsite lagoons that have no discharge; however, the quantities of chemicals that evaporate into the air or are removed as sludge from these lagoons must be accounted for.

Facilities that use steam conditioning or the Boulton process must monitor wastewater discharged to POTWs for copper,

chromium. and arsenic to comply with pretreatment standards set for this portion of the industry. These monitoring data can be used to estimate releases of these toxic chemicals via wastewater. Release amounts should be estimated for the parent metal, even though the facility is processing and reporting for the metal compound. For other toxic chemicals, m-house monitoring data can be used. If such data are unavailable. a different release estimation technique must be used.

Although wastewater is not discharged at most wood preserving facilities, estimates of the toxic chemical content in wastewater streams within a facility can be useful for estimating releases as air emissions or solid waste. Most process pollutants can be found in the wastewater generated within the facility. and they are released as solid waste or air emissions during recycling. treatment. or evaporation. The following example demonstrates the use of an engineering calculation to estimate toxic releases via wastewater.

Example: *Using an engineering calculation to estimate releases of pentachlorophenol via wastewater.*

*A wood preserving facility uses open steaming to condition wood before it undergoes pressure treatment with a pentachlorphenol (PCP) preservatiue. The condensed steam used during this con- -generates wastewater containing excess presavative. This preservative is recycled to the work tank after the wastewater flows through an oil/water separator. The wastewater exiting the oil/ water separator is discharged to a POTW.*

*No direct measurement data for PCP are generated at this facility. The quantity of PCP discharged can be estimated by use of an engineering calculation that assumes thePCP concentration in the wastewater exiting the oil/water separator is equal to the PCP's solubility in water (0.002 percent*

*This example addresses only PCP releases in wastewater sludge. The landfill would likely also have analytical data on other toxic chemicals in this sludge. which could be used to calculate releases for those compounds.*

When no direct measurement data are available, another method of estimating releases is needed. A toxic chemical entering wastewater treatment or an evaporation device may be subject to numerous fates (for example, air emission, sludge residue, recycling to work tank). This makes it difficult to estimate releases of the chemical in sludge unless the content of the influent wastewater is known. In this case, a mass balance combined with an engineering assumption might be used.

## Toxic Releases to Air

Your facility probably does not make direct measurements of fugitive air emission sources. In the absence of such measurements, a mass balance might be used to estimate releases of organic chemicals during wastewater evaporation if sufficient information is available on the content of wastewater entering and sludge exiting the evaporation device. A mass balance would be difficult to apply to releases from the treating cylinder during loading/unloading or from the vacuum vent during the treating cycle, however. and the results generated would be unreliable. Another possible approach to determining fugitive toxic releases would be to derive emission factors from the considerable information on air emissions from wood preserving operations contained in the material referenced at the end of this pamphlet. Engineering calculations can also be used to estimate releases from these sources.

To estimate air releases from wastewater treatment and evaporation devices, you must know the concentration of the toxic chemical of concern in the wastewater. As discussed earlier, this concentration can be determined by direct measurement or engineering calculation. Air releases can then be calculated by applying mass transfer principles to the process parameters of the wastewater treatment and/or evaporation devices. The EPA's Wood Preserving Industry Multimedia Emission Inventory and its Hazardous Waste Treatment, Storage and Disposal Facilities (TSDF)-Air Emission Models provide the theoretical background information you need to perform this engineering calculation. For some organic chemicals commonly found in creosote and pentachlorophenol preservative solutions, you can use the information in the following table for quick determination of the approximate fraction of chemical released to the atmosphere from evaporation devices.

### Effect of Wastewater Treatment and/or Evaporation on Organic Constituents[a]

| Preservative component | Percent emitted during evaporation at ambient temperature | Percent emitted during evaporation at elevated temperature (>60° C) |
|---|---|---|
| **Penta** | | |
| Benzene | 100 | 100 |
| Ethylbenzene | 100 | 100 |
| Toluene | 100 | 100 |
| Phenol | 100 | 100 |
| Pentachlorophenol | 0 | 0 |
| Trichlorophenol | 0 | 0 |
| | | |
| **Creosote** | | |
| Naphthalene | 0 | 95 |
| Phenanthrene/ anthracene | 0 | 40 |

[a]  Data obtained from Wood Preserving Industry Multimedia Emission Inventory

*Example: Using an emission factor to estimate air releases of naphthalene from a wastewater evaporator.*

*Wastewater entering a thermal (PAN) evaporator is sampled to characterize its toxic chemical content. The results of the sampling program show that the average naphthalene content of wastewater is 5 mg/liter. The wastewater flow rate*

exhausted through the vacuum vent can be estimated as follows:

Vapor pressure $(P°)$ = 10 mm Hg at 85.8 °C

Partial pressure $(P_A)$ = 0.0076 x 10 = 0.076 mm Hg

Total pressure $(P_T)$ = 760 mm Hg (barometric pressure)

$\frac{P_A}{P_T} = \frac{0.076}{760} = 0.0001$ mole fraction of naphthalene in exhaust air

Assuming 250 operating days per year, the amount of naphthalene released through the exhaust vent would be calculated as follows:

Amount of naphthalene released through vent =

0.0001 lb-mole naphthalene/lb-mole exhaust gas x

1 lb-mole exhaust gas/2387 cubic feet x

128 lb naphthalene/lb-mole naphthalene x

400 cubic feet/minute x

240 minutes/day x

250 days/year

= 129 lb

Using this approach, the facility in this example could report air emissions of 130 pounds of naphthalene.

The assumption used in the preceding example (that the exhaust air from the vacuum vent is in equilibrium with the preservative liquid) is not entirely appropriate. A better assumption would be that the exhaust air is in equilibrium with the condensate liquid in the accumulator. It is highly unlikely, however, that the mole fraction of a particular chemical in the condensate liquid is known or could be estimated.

## Other Toxic Releases

Other wastes in wood preserving operations from which toxic chemicals may be released include:

- **Residues from pollution control devices**
- **Wash water from equipment cleaning**
- **Product rejects**
- **Used equipment**
- **Empty chemical containers**

Releases from these sources may already have been accounted for, depending on the release estimation methods used. These items (and any other of a similar nature) should be included in your development of a process flow diagram.

The contribution of sources of wastes such as cleaning out vessels or discarding containers should be small compared with process losses. If you do not have data on such sources (or any monitoring data on overall water releases), assume up to 1 percent of vessel content may be lost during each cleaning occurrence. For example, if you discard (to landfill) "empty" drums that have not been cleaned, calculate the release as 1 percent of normal drum content. If the drums are washed before disposal, this may contribute 1 percent of the content to your wastewater loading.

# For More Information

| Emergency Planning and Community Right-to-Know Hotline | (800) 535-0202 or (202) 479-2449 (in Washington, D.C. and Alaska) |

| Small Business Ombudsman Hotline | (800) 368-5888 or (703) 557-1938 (in Washington, D.C. and Virginia) |

The EPA brochure, Emergency Planning and Community Right-to-Know Act, Section 313 Release Reporting Requirements (EPA 560/4-88-001) presents an overview of the new law. It identifies the types of facilities that come under the provisions of Section 313, the threshold chemical volumes that trigger reporting requirements, and what must be reported. It also contains a complete listing of the chemicals and chemical categories subject to Section 313 reporting. The EPA publication, Estimating Releases and Waste-Treatment Efficiencies for the Toxic Chemical Release Inventory Form (EPA 560/4-88-002), presents more detailed information on general release estimation techniques than is included in this document.

## Additional Sources of Information on Releases From Wood Preserving Operations

U.S. Environmental Protection Agency. Wood Preserving Industry Multimedia Emission Inventory. EPA 600/2-81-066. NTIS PB81-205999. April 1981.

U.S. Environmental Protection Agency. Emission and Residue Values From Waste Disposal During Wood Preserving. EPA-600/2-82-062. NTIS PB82 234246. April 1982.

U.S. Environmental Protection Agency. Development Document for Effluent Limitations Guidelines, New Source Performance Standards for the Timber Products Processing Point Source Category. EPA 440/1-81/023. NTIS PB81-227282. January 1981.

U.S. Environmental Protection Agency. Multimedia Pollution Assessment of the Wood Products Industries. EPA-600/2-81-008. NTIS PB84-160366, February 1984.

U.S. Environmental Protection Agency. Hazardous Waste Treatment, Storage and Disposal Facilities (TSDF)–Air Emission Models. EPA Draft Report. April 1987.

Exhibit 4


**Letter from Charles L. Elkins, Director EPA Office of Toxic Substances, to the Chemical Manufacturers Association, October 24, 1988**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C. 20460

⁻ 24 ⁞⁞⁞.

Geraldine V. Cox, Ph.D.
Vice President – Technical Director
Chemical Manufacturers Association
2501 M St. NW
Washington, DC  20037

**OFFICE OF
PESTICIDES AND TOXIC SUBSTANCES**

Dear Ms. Cox:

This letter is in response to your written request of
August 1, 1988 regarding clarification of the Section 313
article definition as it applies to polyvinylchloride wrapping
film containing di-(2-ethylhexyl) adipate (DEHA).  We have
reviewed the basis for your request and the accompanying
technical information.  From the submitted data, it appears that
DEHA is volatilized during the hot cutting of the plastic wrap
and is emitted into the air in small quantities.  Your letter
made several points regarding the applicability of the article
definition to the processing and use of the wrap that EPA would
like to address.

OTS agrees with CMA that PVC film meets the first two
criteria of the article definition, it is:  (1) formed to a
specific shape and design during manufacture and (2) has end use
functions dependent in whole or in part upon its shape or design
during end use.  This is consistent with article interpretations
under TSCA.  For example, we interpret such items as sheet metal,
rolls of carpet, etc. to be articles if as a result of further
processing or end use their basic thickness or other dimensional
characteristics are not altered.

CMA states that during use there are no environmental
releases of consequence.  The release criteria of the article
definition does not distinguish between significant and
insignificant/negligible amounts of release as a condition of the
article exemption.  There exists no explicit de minimus release
exemption policy under Section 313.  In this sense, many articles
"release" chemicals during use.  OTS notes the distinction
between continuous low-level releases that occur over the life of
the product from those releases that are the direct result of
processing and use of the film.  OTS recognizes that the first
type of release is analogous to weathering or natural
deterioration of an article and agrees that such releases should
not be considered releases that negate the article exemption. OTS
also agrees that the normal low-level migration of DEHA from the
plastic film does not constitute a release reportable under
Section 313.

CMA's argument, "that the releases are not intentional, are not necessary to the proper functioning of the article and do not enhance that function", in OTS's view, is not relevant.   These circumstances are not conditions for meeting the article exemption, nor are they implicitly intended.  In the case of cutting the PVC film, it is interesting to note that the purpose of using the hot wire is to produce an intentional deformation or phase change (and thus release) which results in a cut.

OTS believes CMA's statement "Section 313 is concerned only with releases beyond facility boundaries" is incorrect.  For example, spills and on-site land disposal are reportable releases under Section 313.  Reportable releases are not confined to those that occur beyond the facility fenceline.

OTS does not agree with CMA's contention that the amounts of DEHA volatilized during hot cutting "are not releases under normal conditions of use."  Even though the amount of the chemical present in the workplace air is small, this amount, together with the quantity condensed onto processing equipment or ventilation hoods (perhaps destined for further disposal during cleanup), still constitutes a release, since it is not recognizable as the processed article, nor is it 100% recycled.

As was stated in the final rule, disposal of an article does not constitute a release which would disqualify the product from the article exemption, but OTS does not agree that cutting of plastic wrap with a hot wire is the same as disposal of lead-acid batteries.  Processing or use is not the same activity as disposal.

OTS does share the concern of creating an excessive reporting burden that generates little useful data.  The basic issue raised here seems to be how should very small releases be reported.  In the final rule, no guidance was given on how to report releases of less than one pound per year.  In the proposed rule, it was suggested that reporters round off the release amount to the nearest pound.  Thus, a facility could implicitly interpret that releases below 0.5 pounds may either be reported as that fraction or rounded to zero.  Comments received on the proposal focused on the fact that rounding to the nearest pound was too precise a requirement.  EPA's response in the final rule was to allow rounding to two significant figures.  The rule did not focus on the issue of releases less than one pound. The range values that facilities may use also do not encompass values between zero and one pound.  It seems reasonable to OTS that any annual aggregate releases estimated below 0.5 pounds per year can be reported as zero, following conventional roundoff rules.

Specifically regarding DEHA releases from hot cutting of PVC wrap, data in the technical articles indicate that an average of 36 ug ($10^{-6}$ gram) of DEHA per cut is generated.  To put this number into perspective, on the order of six million cuts would

have to be made per year for a facility to release 0.5 lb of DEHA, or more. It is possible that a facility would make this many cuts given that some meat and poultry processors may process and wrap several million packages per year.

If a processor of this film estimates that they release less than 0.5 pound of DEHA over a year's time, then OTS would allow such release amounts to be rounded to zero. Therefore the article status of the film would not be breached and the processing facility would not have to report for DEHA. This still leaves open the question of supplier notification on the part of the producer of the DEHA-containing film. If the manufacturer/supplier can reasonably document that none of his customers are likely to release 0.5 pounds or more annually, then that supplier would be justified in asserting that the film is an article and thus no supplier notification would be required.

Therefore, to summarize, OTS agrees that the wrapping film prior to processing meets the first two criteria of the article definition and that normal migration of DEHA from the film does not constitute a release reportable under Section 313. OTS reaches the inescapable conclusion, however, that hot wire cutting of the film releases DEHA. As your letter points out, annual releases from such hot wire cutting may be small and OTS interprets annual aggregate releases below 0.5 pounds as the equivalent of zero releases, with consequent retention of the article status of the film.

Sincerely yours,

Charles L. Elkins
Director
Office of Toxic Substances

**Exhibit 5**

**Excerpted Pages From Toxic Chemical Release Inventory Form R and Instructions for 1989, 1995, 1996 and 2000**

United States
Environmental Protection
Agency

Office of Toxic
Substances
Washington, D.C. 20460

January 1990
EPA 560/4-90-001

# ♻EPA Toxic Chemical Release Inventory Reporting Package for 1989



**Toxic Chemical Release Inventory Reporting Form R and Instructions**

**Toxic Chemical Release Inventory Questions and Answers**

**40 CFR Part 372 Toxic Chemical Release Reporting; Community Right-to-Know; Final Rule**

**Toxic Chemical Release Inventory Magnetic Media Submission Instructions**

*Printed on Recycled Paper*

**4.    Maximum Amount of the Chemical On-Site at Any Time During the Calendar Year**

Insert the appropriate code (see below) that indicates the maximum quantity of the chemical (e.g., in storage tanks, process vessels, on-site shipping containers) at any time during the calendar year. If the chemical was present at several locations within your facility, use the maximum total amount present at the entire facility at any one time.

Weight Range in Pounds

| Range Code | From... | To.... |
|---|---|---|
| 01 | 0 | 99 |
| 02 | 100 | 999 |
| 03 | 1,000 | 9,999 |
| 04 | 10,000 | 99,999 |
| 05 | 100,000 | 999,999 |
| 06 | 1,000,000 | 9,999,999 |
| 07 | 10,000,000 | 49,999,999 |
| 08 | 50,000,000 | 99,999,999 |
| 09 | 100,000,000 | 499,999,999 |
| 10 | 500,000,000 | 999,999,999 |
| 11 | 1 billion | more than 1 billion |

If the toxic chemical present at your facility was part of a mixture or trade name product, determine the maximum quantity of the chemical present at the facility by calculating the weight of the toxic chemical only. Do not include the weight of the entire mixture or trade name product. See section 372.30(b) of the reporting rule for further information on how to calculate the weight of the chemical in the mixture or trade name product. For chemical categories (e.g., copper compounds), include all chemicals in the category when calculating the weight of the toxic chemical.

**5.    Releases of the Chemical to the Environment On-Site**

In Section 5, you must account for the total aggregate releases of the toxic chemical to the environment from your facility for the calendar year. Releases to the environment include emissions to the air, discharges to surface waters, and on-site releases to land and underground injection wells. If you have no releases to a particular media (e.g., stack air), enter not applicable, NA; do not leave any part of Section 5 blank. Check the box on the last line of this section if you use Part IV, the supplemental information sheet.

You are not required to count, as a release, quantities of a toxic chemical that are lost due to natural weathering or corrosion, normal/natural degradation of a product, or normal migration of a chemical from a product. For example, amounts of a covered toxic chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that chemical from the facility. Also, amounts of listed metal compounds (e.g., copper compounds) that are lost due to normal corrosion of process equipment do not have to be considered as releases of copper compounds from the facility.

All air releases of the chemical from the facility must be accounted for. Do not enter information on individual emission points or releases. Enter only the total release. If there is doubt about whether an air release is a point or non-point release, you must identify the release as one or the other rather than leave items 5.1 and 5.2 blank. Instructions for columns A, B, and C follow the discussions of Sections 5.1 through 5.5.

**5.1    Fugitive or Non-Point Air Emissions**

Report the total of all releases to the air that are not released through stacks, vents, ducts, pipes, or any other confined air stream. You must include (1) fugitive equipment leaks from valves, pump seals, flanges, compressors, sampling connections, open-ended lines, etc.; (2) evaporative losses from surface impoundments and spills; (3) releases from building ventilation systems; and (4) any other fugitive or non-point air emissions.

**5.2    Stack or Point Air Emissions**

Report the total of all releases to the air that occur through stacks, vents, ducts, pipes, or other confined air streams. You must include storage tank emissions. Air releases from air pollution control equipment would generally fall in this category.

**5.3    Discharges to Receiving Streams or Water Bodies**

Enter the applicable letter code for the receiving stream or water body from Section 3.10 of Part I of the form. Also, enter the total annual amount of the chemical released from all discharge points at the facility to each receiving stream or water body. Include process outfalls such as pipes and open trenches, releases from on-site wastewater treatment systems, and the contribution from stormwater runoff, if applicable (see instructions for column C below). Do not include discharges to a POTW or other off-site wastewater treatment facilities in this section. These off-site transfers must be reported in Part III, Section 6 of the form.

Discharges of listed acids (e.g., hydrogen flouride; hydrogen chloride; nitric acid; phosphoric acid; and sulfuric acid) may be reported as zero if the discharges have been neutralized to pH 6 or above. For discharges of listed bases, a zero release may be reported if the discharge has been neutralized to pH 9 or below.

United States
Environmental Protection
Agency

Office of Pollution
Prevention and Toxics
Washington, DC 20460

March 1996
EPA 745-K-96-001

## ♻EPA  Toxic Chemical Release Inventory Reporting Form R and Instructions

*Revised 1995 Version*









## Section 313
### of the Emergency Planning and Community Right-to-Know Act
(Title III of the Superfund Amendments and Reauthorization Act of 1986)

♻ Recycled/Recyclable
Printed with Soy/Canola Ink on paper that
contains at least 50% recycled fiber

| Weight Range in Pounds | | |
|---|---|---|
| Range Code | From... | To.... |
| 01 | 0 | 99 |
| 02 | 100 | 999 |
| 03 | 1,000 | 9,999 |
| 04 | 10,000 | 99,999 |
| 05 | 100,000 | 999,999 |
| 06 | 1,000,000 | 9,999,999 |
| 07 | 10,000,000 | 49,999,999 |
| 08 | 50,000,000 | 99,999,999 |
| 09 | 100,000,000 | 499,999,999 |
| 10 | 500,000,000 | 999,999,999 |
| 11 | 1 billion | more than 1 billion |

If the toxic chemical present at your facility was part of a mixture or trade name product, determine the maximum quantity of the toxic chemical present at the facility by calculating the weight percent of the toxic chemical only.

Do not include the weight of the entire mixture or trade name product. This data may be found in the Tier II form your facility may have prepared under Section 312 of EPCRA. See Part 40, Section 372.30(b) of the *Code of Federal Regulations* for further information on how to calculate the weight of the toxic chemical in the mixture or trade name product. For toxic chemical categories (e.g., nickel compounds), include all chemical compounds in the category when calculating the maximum amount, using the entire weight of each compound.

## Section 5. Releases of the Toxic Chemical to the Environment On-Site

In Section 5, you must account for the total aggregate releases of the toxic chemical to the environment from your facility for the calendar year.

Do not enter the values in Section 5 in gallons, tons, liters, or any measure other than pounds. You must also enter the values as whole numbers. Numbers following a decimal point are not acceptable.

Releases to the environment include emissions to the air, discharges to surface waters, and on-site releases to land and underground injection wells. If you have no releases to a particular media (e.g., stack air), you must check the "NA" box or enter zero; **do not** leave any part of Section 5 blank. Check the box on the last line of this section if you use the additional space for Section 5.3 on page 5 of the Form.

You are not required to count, as a release, quantities of a toxic chemical that are lost due to natural weathering or corrosion, normal/natural degradation of a product, or normal migration of a toxic chemical from a product. For example, amounts of a listed toxic chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that toxic chemical from the facility. Also, amounts of listed metal compounds (e.g., copper compounds) that are lost due to normal corrosion of process equipment do not have to be considered as releases of copper compounds from the facility.

---

**Example 7: Activities and Uses of Toxic Chemicals**

In the example below, it is assumed that the threshold quantities for manufacture, process, or otherwise use (25,000 pounds, 25,000 pounds, and 10,000 pounds, respectively) have been exceeded and the reporting of listed toxic chemicals is therefore required.

Your facility manufactures diazomethane. Fifty percent is sold as a product. The remaining 50 percent is reacted with alpha-naphthylamine, forming N-methyl-alpha-naphthylamine and also producing nitrogen gas.

o    Your company manufactures diazomethane, a listed toxic chemical, both for sale/distribution as a commercial product and for on-site use/processing as a feedstock in the N-methyl-alpha-naphthylamine production process. Because the diazomethane is a reactant, it is also processed. See Figure 3 for how this information would be reported in Part II, Section 3 of Form R.

o    Your facility also processes alpha-naphthylamine, as a reactant to produce N-methyl-alpha-naphthy-lamine, a chemical not on the section 313 list.

---

United States
Environmental Protection
Agency

Office of Pollution
Prevention and Toxics
Washington, DC 20460

May 1997
EPA 745-K-97-001

 **EPA**

# Toxic Chemical Release Inventory Reporting Form R and Instructions

*Revised 1996 Version*









# Section 313
## of the Emergency Planning and Community Right-to-Know Act
(Title III of the Superfund Amendments and Reauthorization Act of 1986)

| Weight Range in Pounds | | |
|---|---|---|
| Range Code | From... | To.... |
| 01 | 0 | 99 |
| 02 | 100 | 999 |
| 03 | 1,000 | 9,999 |
| 04 | 10,000 | 99,999 |
| 05 | 100,000 | 999,999 |
| 06 | 1,000,000 | 9,999,999 |
| 07 | 10,000,000 | 49,999,999 |
| 08 | 50,000,000 | 99,999,999 |
| 09 | 100,000,000 | 499,999,999 |
| 10 | 500,000,000 | 999,999,999 |
| 11 | 1 billion | more than 1 billion |

If the toxic chemical present at your facility was part of a mixture or trade name product, determine the maximum quantity of the toxic chemical present at the facility by calculating the weight percent of the toxic chemical only.

Do not include the weight of the entire mixture or trade name product. This data may be found in the Tier II form your facility may have prepared under Section 312 of EPCRA. See Part 40, Section 372.30(b) of the *Code of Federal Regulations* for further information on how to calculate the weight of the toxic chemical in the mixture or trade name product. For toxic chemical categories (e.g., nickel compounds), include all chemical compounds in the category when calculating the maximum amount, using the entire weight of each compound.

## Section 5.  Quantity of the Toxic Chemical Entering each Environmental Medium

In Section 5, you must account for the total aggregate releases of the toxic chemical to the environment from your facility for the calendar year.

Do not enter the values in Section 5 in gallons, tons, liters, or any measure other than pounds. You must also enter the values as whole numbers. Numbers following a decimal point are not acceptable.

Releases to the environment include emissions to the air, discharges to surface waters, and on-site releases to land and underground injection wells. If you have no releases to a particular media (e.g., stack air), you must check the "NA" box or enter zero; do not leave any part of Section 5 blank.

You are not required to count, as a release, quantities of a toxic chemical that are lost due to natural weathering or corrosion, normal/natural degradation of a product, or normal migration of a toxic chemical from a product. For example, amounts of a listed toxic chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that toxic chemical from the facility. Also, amounts of listed metal compounds (e.g., copper compounds) that are lost due to normal corrosion of process equipment do not have to be considered as releases of copper compounds from the facility.

---

**Example 7: Activities and Uses of Toxic Chemicals**

In the example below, it is assumed that the threshold quantities for manufacture, process, or otherwise use (25,000 pounds, 25,000 pounds, and 10,000 pounds, respectively) have been exceeded and the reporting of listed toxic chemicals is therefore required.

Your facility manufactures diazomethane. Fifty percent is sold as a product. The remaining 50 percent is reacted with alpha-naphthylamine, forming N-methyl-alpha-naphthylamine and also producing nitrogen gas.

❑    Your company manufactures diazomethane, a listed toxic chemical, both for sale/distribution as a commercial product and for on-site use/processing as a feedstock in the N-methyl-alpha-naphthylamine production process. Because the diazomethane is a reactant, it is also processed. See Figure 3 for how this information would be reported in Part II, Section 3 of Form R.

❑    Your facility also processes alpha-naphthylamine, as a reactant to produce N-methyl-alpha-naphthy-lamine, a chemical not on the section 313 list.

---

United States
Environmental Protection
Agency

Office of Information
Analysis and Access
Washington, DC 20460

February 2001
EPA 745-B-01-001

# ♲EPA  Toxic Chemical Release Inventory Reporting Forms and Instructions

*Revised 2000 Version*









# Section 313

## of the Emergency Planning and Community Right-to-Know Act

(Title III of the Superfund Amendments and Reauthorization Act of 1986)

On-site releases to the environment include emissions to the air, discharges to surface waters, and releases to land and underground injection wells.

For all toxic chemicals (except the dioxin and dioxin-like compound category), do not enter the values in Section 5 in gallons, tons, liters, or any measure other than pounds. You must also enter the values as whole numbers. Numbers following a decimal point are not acceptable for toxic chemicals other than those designated as PBT chemicals. For PBT chemicals facilities should report release and other waste management quantities greater than 0.1 pound (except the dioxin and dioxin-like compounds category) provided the accuracy and the underlying data on which the estimate is based supports this level of precision. For the dioxin and dioxin-like compounds category facilities should report at a level of precision supported by the accuracy of the underlying data and the estimation techniques on which the estimate is based. For the dioxin and dioxin-like compounds chemical category, which has a reporting threshold of 0.1 gram, facilities need only report all release and other waste management quantities greater than 100 micrograms (i.e., 0.0001 grams). (See example 12). Notwithstanding the numeric precision used when determining reporting eligibility thresholds, facilities should report on Form R to the level of accuracy that their data supports, up to seven digits to the right of the decimal. EPA's reporting software and data management systems support data precision up to seven digits to the right of the decimal.

**NA vs. a Numeric Value (e.g., Zero).** Generally, NA is applicable if the waste stream that contains or contained the EPCRA section 313 chemical is not directed to the relevant environmental medium, or if leaks, spills and fugitive emissions cannot occur. If the waste stream that contains or contained the EPCRA section 313 chemical is directed to the environmental medium, or if leaks, spills or fugitive emissions can occur, NA is not appropriate, even if treatment or emission controls result in a release of zero. If the annual aggregate release of that chemical was equal to or less than 0.5 pound, the value reported is zero (unless the chemical is a listed PBT chemical).

For Section 5.1, NA generally is not applicable for volatile organic compounds (VOCs). For Section 5.5.4, NA generally would not be applicable, recognizing the possibility of accidental spills or leaks of the EPCRA section 313 chemical.

An example that illustrates the use of NA vs. a numeric value (e.g., zero) would be nitric acid involved in a facility's processing activities. If the facility neutralizes the wastes containing nitric acid to a pH of 6 or above, then the facility reports a release of zero for the EPCRA section 313 chemical, not NA. Another example is when the facility has

no underground injection well, in which case NA should be entered in Part I, Section 4.10 and checked in Part II, Section 5.4.1 and 5.4.2 of Form R. Also, if the facility does not landfill the acidic waste, NA would be checked in Part II, Section 5.5.1.B of Form R.



Example 12. Reporting Dioxins and Dioxin-Like Compounds

If the total quantity for Section 5.2 in the Form R (i.e., Stack or point air emissions) is 0.00005 grams or less, then zero can be entered. If the total quantity is between 0.00005 and 0.0001 grams then 0.0001 grams can be entered or the actual number can be entered (e.g., 0.000076).

You are not required to count as a release, quantities of an EPCRA section 313 chemical that are lost due to natural weathering or corrosion, normal/natural degradation of a product, or normal migration of an EPCRA section 313 chemical from a product. For example, amounts of an EPCRA section 313 chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that EPCRA section 313 chemical from the facility.

All releases of the EPCRA section 313 chemical to the air must be classified as either stack or fugitive emissions, and included in the total quantity reported for these releases in Sections 5.1 and 5.2. Instructions for columns A, B, and C follow the discussions of Sections 5.1 through 5.5.

**5.1 Fugitive or Non-Point Air Emissions**

Report the total of all releases of the EPCRA section 313 chemical to the air that are not released through stacks, vents, ducts, pipes, or any other confined air stream. You must include (1) fugitive equipment leaks from valves, pump seals, flanges, compressors, sampling connections, open-ended lines, etc.; (2) evaporative losses from surface impoundments and spills; (3) releases from building ventilation systems; and (4) any other fugitive or non-point air emissions. Engineering estimates and mass balance calculations (using purchase records, inventories, engineering knowledge or process specifications of the quantity of the EPCRA section 313 chemical entering product, hazardous waste manifests, or monitoring records) may be useful in estimating fugitive emissions. Check the NA box in Section 5.1 if you do not engage in activities that result in fugitive or non-point air emissions of this listed toxic chemical. For VOCs, NA generally would not be applicable.

**Exhibit 6**

**Excerpted Pages from EPCRA Section 313 Questions and Answers, Revised 1998
Version, Question 89, EPA 745-B-98-004 (Dec. 1998**



**United States**
**Environmental Protection Agency**

Office of Pollution
Prevention and Toxics
Washington, DC  20460

December 1998
EPA 745-B-98-004

# EPCRA Section 313
# Questions and Answers

Revised 1998 Version



## Section 313 of the Emergency Planning and Community Right-to-Know Act

**Toxic Chemical Release Inventory**

**REPORTING CRITERIA**

must be considered toward threshold and *release* and other *waste management* calculations.

*Threshold Determina-tion, Activity Threshold, Storage, Maximum Amount On-site*

**87. If a *facility* has a chemical in storage but does not *process* or *otherwise use* it during the reporting year, is the owner/operator subject to reporting?**

No. Storage, in itself, would not meet an activity threshold under EPCRA Section 313 (Note: the *facility* may have reporting requirements under other portions of EPCRA such as Sections 311 and 312). However, if the *facility* exceeds the *manufacturing, processing,* or *otherwise use* threshold for the same *toxic chemical* elsewhere at the *facility,* the *facility* must consider *releases* from the storage of the *toxic chemical.* The *facility* must also consider the amount of the Section 313 chemical in storage when calculating the maximum amount on-site during the year.

*Threshold Determina-tion, Storage*

**88. Are materials in inventory (i.e., amounts on hand at year end) factored into threshold determinations?**

No. Only quantities of a *toxic chemical* actually *manufactured* (including *imported*), *processed,* or *otherwise used* during the reporting year are to be counted toward a threshold.

*Activity Threshold, Storage*

**89. A coal mine receives a flotation agent containing a Section 313 chemical in December of 1998, but does not use it until January of 1999. Is the amount of *toxic chemical* in the flotation agent considered for threshold determinations in the 1998 reporting year?**

No. Storage in itself of a *toxic chemical* is not considered a *manufacturing, processing,* or *otherwise use* activity and, therefore, is not subject to threshold determinations. However, the *facility* is required to include any amounts *released* or otherwise managed as waste that occur during storage of the listed *toxic chemical,* provided a threshold for the same chemical has been exceeded elsewhere at the *facility.* When the *toxic chemical* is used in 1999, the *facility* will include the amount of *toxic chemical* used towards the 10,000 pound *otherwise use* threshold, or the 25,000 pound threshold for *processing,* whichever is appropriate.

*Reuse System, Threshold Determination*

**90. If a *facility* employs a reuse system, how does it determine the amount that it must consider for threshold determinations?**

For reuse systems, the amount considered for threshold determination purposes is the amount added to the system during the reporting year. If the system is completely empty and is started up during the year, a *facility* makes its threshold determination by adding the total amount needed to charge the system to any amount which is added to the system during the reporting year.

27

**Exhibit 7**

**Excerpted Pages from Estimating Releases and Waste Treatment Efficiencies for the Toxic Chemical Release Inventory Form (Dec. 1987)**

United States
Environmental Protection
Agency

Office of Pesticides
and Toxic Substances
Washington DC 20460

EPA 560/4-88-002
December 1987



# Estimating Releases and Waste Treatment Efficiencies For the Toxic Chemical Release Inventory Form

Section 313,
Emergency Planning and
Community Right-to-Know Act of 1986



ESTIMATING RELEASES AND
WASTE-TREATMENT EFFICIENCIES FOR THE
TOXIC CHEMICAL RELEASE
INVENTORY FORM


Section 313 of the
Emergency Planning and Community
Right-to-Know Act of 1986


PN 3687-33, 3687-40, 3687-52
Contract No. 68-02-4248
Work Assignment No. P2-10, P2-17 and P3-4


U.S. ENVIRONMENTAL PROTECTION AGENCY
OFFICE OF PESTICIDES AND TOXIC SUBSTANCES
WASHINGTON, D.C.   20460


December 1987

## DISCLAIMER

This document has been reviewed and approved for publication by the Office of Toxic Substances, Office of Pesticides and Toxic Substances, U.S. Environmental Protection Agency. Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

For more information or assistance regarding Toxic Release Inventory Reporting, call:

Emergency Planning and Community
Right-to-Know Information Hotline
(800) 535-0202
(202) 479-2449 (in Washington, DC or Alaska)

or write to:

Emergency Planning and Community
Right-to-Know Information Hotline
WH-562A
401 M Street, SW
Washington, DC  20460

This document can be obtained by writing or calling:

Superintendent of Documents
Government Printing Office
Washington, DC 20402-9325
Phone: (202) 783-3238
GPO Stock No. 055-000-00270-3
Price $11.00

or

National Technical Information Service
5285 Port Royal Road
Springfield, VA 22161
Phone: (703) 487-4650
NTIS Accession No. PB 88-210380
Price: $25.95 (paper copy)   $6.95 (microfiche)

ii

## ERRATA LIST FOR EPA 560/4-88-002

**p. 3-14**    Example 3-7 illustrates use of an engineering
calculation, not an emission factor, to
estimate releases to air from material
storage.

**p. B-4**    Center of page under the Claussius-Clapeyron
equation.  Grams or pounds should be divided
by molecular weight, not multiplied, to
convert to g-moles.

**p. B-8**    The vapor pressure for 1,2-Dibromoethane, CAS
No. 106-93-4, should be 11.7 mm Hg instead of
1117 mm Hg.

**p. B-12**    The vapor pressure of 10 mm Hg at 31° C for sulfuric
acid, CAS No. 7664-93-9, is incorrect.  This
value was obtained from the 62nd edition of
the CRC Handbook of Chemistry and Physics.  A
more appropriate value is 0.0117 mm Hg at 30°
C for 90% $H_2SO_4$ concentrations (Perry's
Chemical Engineering Handbook) or less than
0.001 mm Hg for 93-98% concentrations at
ambient temperature (NIOSH Pocket Guide to
Chemical Hazards).

7-18-88

# CONTENTS

|  |  | Page |
|---|---|---|
| Figures |  | v |
| Tables |  | vi |
| 1. | Introduction | 1-1 |
| 2. | General Principles and Considerations | 2-1 |
|  | 2.1 Data to be reported | 2-1 |
|  | 2.2 Sources of wastes/releases | 2-2 |
|  | 2.3 An overview of the analysis | 2-3 |
|  | 2.4 Definitions of major approaches | 2-6 |
|  | 2.5 Some observations on the use of data | 2-7 |
|  | 2.6 Which approach to use | 2-8 |
| 3. | Estimating Releases to Air | 3-1 |
|  | 3.1 Sources of releases to air and release estimation methods | 3-1 |
|  | 3.2 Air pollution control equipment and treatment efficiency | 3-21 |
|  | Section 3 References | 3-32 |
|  | Section 3 Bibliography | 3-33 |
| 4. | Estimating Releases in Wastewater | 4-1 |
|  | 4.1 Sources of wastewater and methods for its disposal | 4-1 |
|  | 4.2 Calculating releases in wastewater | 4-4 |
|  | 4.3 Estimating treatment equipment efficiency | 4-16 |
|  | Section 4 Bibliography | 4-23 |
| 5. | Estimating Releases in Solid, Slurry, and Nonaqueous Liquid Wastes | 5-1 |
|  | 5.1 Sources and disposal methods for solid, slurry, and nonaqueous liquid wastes | 5-1 |
|  | 5.2 Methods for calculating releases in solid, slurry, and nonaqueous liquid wastes | 5-4 |
|  | 5.3 Estimating treatment equipment efficiency | 5-9 |
|  | Section 5 Bibliography | 5-14 |

CONTENTS (continued)

|  |  | Page |
|---|---|---|
| 6. | Estimating Accidental Releases | 6-1 |
|  | 6.1 General methods and considerations | 6-1 |
|  | 6.2 Equations for modeling release wastes | 6-2 |
|  | Section 6 Bibliography | 6-10 |
| 7. | An Overall Facility Example Release Calculation | 7-1 |
|  | 7.1 Atmospheric releases | 7-1 |
|  | 7.2 Wastewater column releases | 7-8 |

Appendices

| A | Wastewater Treatment Efficiency Data | A-1 |
| B | Chemical and Physical Data for the Listed Chemicals | B-1 |
| C | Estimating Atmospheric Releases From Storage of Organic Liquids | C-1 |
| D | Table of Uncontrolled Fugitive Emission Factors for the Synthetic Organic Chemicals Manufacturing Industry | D-1 |
| E | Table of Contents of EPA Publication AP-42, Volume I | E-1 |

## FIGURES

| Number | | Page |
|--------|--|------|
| 3-1 | Hypothetical Unit Process Using Chemical X | 3-5 |
| 3-2 | Percent Reduction Ranges for Add-On Control Devices | 3-25 |
| 3-3 | Venturi Scrubber Collection Efficiencies | 3-31 |
| 7-1 | Acrylonitrile Production Process | 7-2 |

TABLES

| Number | | Page |
|--------|--|------|
| 3-1 | Source Categories for Common Releases to Air | 3-2 |
| 3-2 | Calculating Loading Losses for Volatile Organic Liquids | 3-13 |
| 3-3 | Techniques for Controlling Selected Air Pollutants | 3-22 |
| 3-4 | Optimal Operating Conditions for Flares | 3-26 |
| 3-5 | Availability of Chemical-Specific Emission Factors for Various Processes | 3-36 |
| 4-1 | Typical Wastewater Sources | 4-2 |
| 4-2 | Methods of Wastewater Disposal | 4-2 |
| 4-3 | Unit Operations and Processes Used to Treat Wastewater | 4-17 |
| 4-4 | Development Documents for Effluent Limitation Guidelines for Selected Categories | 4-25 |
| 4-5 | EPA Regional Office Libraries | 4-30 |
| 5-1 | Some Solid, Slurry, and Nonaqueous Wastestream Sources | 5-2 |
| 5-2 | Summary of Residue Quantities From Pilot-Scale Experimental Study | 5-8 |
| 5-3 | Unit Operations and Treatment Processes Used to Treat Solid, Slurry, and Nonaqueous Wastes | 5-10 |

## SECTION 3

## ESTIMATING RELEASES TO AIR

Air emissions can originate from a wide variety of sources and therefore are usually not centrally collected before being discharged; as a consequence, each source or category of sources must be evaluated individually to determine the amount released. Often, releases to air are reduced by the use of air pollution control devices, and the effectiveness of the control devices must be accounted for in the calculation of the release estimate. This section provides various methods for estimating releases to air and for determining the efficiency of pollution control devices. A bibliography of reports pertaining to releases and efficiency of the various pollution control devices is provided at the end of this section. These reports present more specific emission data on various industries.

## 3.1  SOURCES OF RELEASES TO AIR AND RELEASE ESTIMATION METHODS

Releases to air from industrial processes can be broadly categorized as follows:  point sources, such as stacks and vents, and fugitive sources, which are not contained or ducted into the atmosphere.  Whether a source is considered a point or fugitive source depends on whether the release is contained in a duct or stack before it enters the atmosphere.  Table 3-1 lists common air emission sources that should be considered when estimating releases.  Examples in the following subsections illustrate the emission estimation methods described in Section 2 for air emission sources.  The examples presented in this section and throughout the manual are for purposes of illustration only; they are not meant to predict actual releases.

### 3.1.1  Process Vents

In general, process vents are the main air exhaust devices in a manufacturing or processing operation functioning under normal conditions; however, emergency venting devices on unit operations, such as relief valves, are also

3-1

TABLE 3-1.  SOURCE CATEGORIES FOR COMMON RELEASES TO AIR

| (1) Process vents | (2) Secondary sources | (3) Fugitive sources | (4) Handling, storage, and loading |
|---|---|---|---|
| Reactors | Pond evaporation | Flanges/connectors | Breathing losses |
| Distillation system | Cooling tower evaporation | Valves | Loading/unloading |
| Vacuum systems | Wastewater treatment | Pump seals | Line venting |
| Baghouses or precipi- | facilities | Compressor seals | Packaging/container loading |
| tators |  | Sample connections |  |
| Combustion stacks |  | Open-ended lines |  |
| Blow molding |  | Pressure relief |  |
| Spray drying |  | devices (e.g., |  |
|  |  | rupture disks) |  |
| Curing/drying |  | Lab hoods |  |
| Scrubbers/absorbers |  | Process sampling |  |
| Centrifuges |  | Equipment inspection |  |
| Extrusion operations |  | Equipment cleaning |  |
| Pressure safety valves |  | Equipment maintenance |  |
| Manual ventings |  | Blowing out pipelines |  |
|  |  | Storage piles |  |

NOTE:  Process vents are usually point sources.
       Secondary sources are usually not contained and are considered fugitive sources.
       Storage tank emissions are considered as point sources; other loading and unloading releases could
       be categorized as either point or fugitive sources, depending on whether the releases are ducted.

grouped under process vents. The methods that can be used to estimate releases to air from a process vent are discussed here; they include measurement, mass balance, emission factors, engineering calculations, or a combination of these methods. Several examples are given to illustrate the basic principles of each technique.

    Measurement. Measurement is the most straightforward means of estimating releases.* The pollutant concentration and flow rate from a process vent during typical operating conditions, if available, can be used to calculate releases. Total annual releases are based on the plant operating schedule for the year.

---

Example 3-1 - Use of measurement data to estimate releases to air from a process vent:

Step 1. Assemble data from emission measurement task.

    Measurements are taken at the oxychlorination vent of a plant producing dichloroethylene at its normal operating rate. The vent gas velocity is measured and an average of 26 ft/s is obtained. The measured average concentration of dichloroethylene is 0.22 gram/cubic meter (g/m³) after correction to 70°F. The vent gas temperature is measured to be 200°F. The diameter of the vent is 1 foot.

Step 2. Calculate volumetric flow of vent gas stream.

    The next step in estimating emissions using this information is to calculate the vent gas flow rate. The product of the velocity and the stack cross-sectional area will be the actual volumetric flow.

Volumetric flow = Gas velocity x area

Area = 3.14 x (diameter)²/4

Volumetric flow = $\frac{26 \text{ ft}}{\text{second}}$ x 3.14 (1 ft)²/4 = $\frac{20.41 \text{ ft}^3}{\text{second}}$ at 200°F

Step 3. Calculate annual releases.

    The dichloroethylene concentration, 0.22 g/m³, was reported at a standard temperature, 70°F. The actual emission rate is derived by making a volume correction to account for the difference between standard and actual

---

* Emission measurement is a complex procedure requiring specialized equipment and personnel trained in chemical analysis and flow measurement. The description of sampling procedures is beyond the scope of this document. The EPA emission test procedures for regulated compounds are described in the Code of Federal Regulations, 40 CFR 60, Appendix A, July 1986.

vent gas absolute temperatures and multiplying the concentration by the vent gas flow rate.

Actual emission rate = Volumetric flow x concentration

$$= \frac{20.41 \text{ ft}^3}{\text{second}} \times \frac{0.22 \text{ g}}{\text{cubic meter}} \times \frac{2.205 \times 10^{-3} \text{ lb}}{\text{gram}} \times \frac{0.028 \text{ m}^3}{\text{cubic foot}}$$

$$\times \frac{(70°F + 460)°R*}{(200°F + 460)°R} \times \frac{3600 \text{ seconds}}{\text{hour}} = 0.80 \text{ lb per hour}$$

During this test period, the average plant production was 10 tons of product per hour. From the calculated mass emission rate, the loss is 0.080 lb/ton of product (0.80 lb/h ÷ 10 tons/h). On an annual basis, the atmospheric release is determined for a production rate of 20,000 tons/year as follows:

$$\text{Annual release} = \frac{20,000 \text{ tons}}{\text{year}} \times \frac{0.08 \text{ lb}}{\text{ton}} = 1603 \text{ lb per year}$$

$$= 1600 \text{ pounds per year.}$$

NOTE:

This calculation assumes that the measured emissions are representative of the actual emissions at all times. This may not always be the case. Ideally, using a continuous emission monitor to measure and record releases would provide the most representative data and provide a basis for calculating an average concentration.

Gaseous concentrations also are frequently expressed in parts per million (ppm) by volume; i.e., a volume of the constituent in a million volumes of vent gas. In this case, the vent gas volume must be multiplied by the concentration and this value divided by the molar volume** (adjusted to the vent gas temperature) and multiplied by the compound's molecular weight to obtain the mass emission rate.

Some vent streams contain large amounts of water vapor (10 to 20 percent by volume), and the actual vent gas rate includes this volume of vapor. Concentrations of chemicals in the gas, however, are frequently expressed on a dry basis. For an accurate release rate, the vent gas rate should be corrected for its moisture content by multiplying by [1 minus the fraction of water vapor]. The resulting dry volume can then be multiplied by the chemical's concentration.

---

\* Absolute temperatures must be used in making volume-temperature corrections based on the ideal gas law. Thus, 460 must be added to degrees Fahrenheit and 273 to degrees Centigrade to obtain an absolute temperature expressed in degrees Rankine or Kelvin, respectively.

\*\* The molar volume of any gaseous compound is 359 ft$^3$/lb-mole at 32°F or 492°R.

Mass Balance. As defined in Section 2, mass balance provides a means of accounting for all the inputs and outputs of a chemical in a process. A mass balance is useful for estimating releases when measured release data are not available and when other inlet and output streams are quantified. The amounts entering and/or leaving a process are either measured or estimated. A mass balance can be performed on the process as a whole or on a subprocess. Individual operations within the process usually must be evaluated.

---

Example 3-2 - Use of a mass balance to estimate releases to air from a process vent:

Step 1. Draw a diagram, label all streams, and list input and output values.

Consider a unit process that uses Chemical X to produce a product. In a year, 10,000 lb of Chemical X is used to produce 24,000 lb of a product containing 25 percent of Chemical X by weight. The input consists of 8000 lb of purchased Chemical X and 2000 lb that is collected from recycling. This process generates 5 tons or 10,000 lb of solid waste containing 15 percent (1500 lb) of Chemical X. The only other unit process stream is a process vent, which emits an unknown amount of Chemical X to the atmosphere. Figure 3-1 presents a schematic of this hypothetical unit process.



Figure 3-1. Hypothetical unit process using Chemical X.

Step 2. Set up equations with input streams equal to ouput streams.

Considering the quantities of Chemical X in all streams that enter or leave the process, the amount of Chemical X that is lost through the process vent on an annual basis can be estimated as follows:

Input = Amount purchased (8000 lb)

Output = Product (24,000 lb x 25%) + waste (10,000 lb x 15%) + process vent loss (unknown)

Input = Output

8000 lb Chemical X = 6000 lb + 1500 lb + process vent loss

Process vent loss = 8000 - 6000 - 1500 = 500 lb Chemical X per year

NOTE:

In this example, suppose that an error of 5 percent was made in the quantity of materials purchased; i.e., the input of Chemical X into the process was thought to be 8400 lb rather than the actual 8000 lb. Substituting 8400 lb of Chemical X into the mass balance equation yields an air emission of 900 lb (i.e., an 80 percent error). This illustrates the sensitivity of emission estimates based on mass balances to small errors in raw material and product quantities. Care must be taken to ensure that accurate values of raw materials and product quantities are available before a mass balance is used to make release estimates.

Emission Factors. A third technique for estimating air releases from process vents involves the use of emission factors. One type of emission factor relates a quantity of a pollutant to some process-related parameter or measurement. The amount of pollutant per quantity of product is frequently used.

Example 3-3 - Use of an emission factor to estimate releases to air from a process vent:

Step 1. Assemble emission factor information from literature.

Hydrofluoric acid is being produced by reacting fluorspar with sulfuric acid. The emission factor given in EPA Publication AP-42[1] is 50 pounds of fluoride per ton of acid product. The plant produced 55,000 tons of acid in the past year.

Step 2. Calculate releases.

In the absence of more accurate information (such as measurement data, etc.), the uncontrolled fluoride emissions from the process would be calculated as follows:

$$\frac{55,000 \text{ tons}}{\text{year}} \times \frac{50 \text{ lb}}{\text{ton}} = 2,750,000 \text{ lb per year}$$

Based on information in AP-42, the use of a water scrubber to control releases would reduce emissions to 0.2 lb of fluorides per ton of acid. Emissions after control would thus be:

$$\frac{55,000 \text{ tons}}{\text{year}} \times \frac{0.2 \text{ lb}}{\text{ton}} = 11,000 \text{ lb per year}$$

3-6

NOTE:

    Releases from other unit processes could be calculated in a similar manner, and the amounts from all unit processes would be summed to estimate the total release from the plant. When emission control devices (i.e., air pollution control devices) are used to reduce emissions, atmospheric re- leases are estimated by multiplying the uncontrolled emission by the quan- tity (1 minus the fractional control efficiency).

Many air emission factors are expressed in terms of total volatile or- ganic compounds (VOC) or particulates rather than a single chemical compound. Emission factors for VOC's are available in "VOC Emission Factors for the NAPAP Emission Inventory," EPA 600/7-86-052, December 1986.[2] These data can be used with actual process vent measurements of volatile organics or partic- ulates to estimate emissions of a specific compound. The "Volatile Organic Compound (VOC) Species Data Manual"[3] also provides information on numerous air emission sources, which allows the user to estimate releases of specific toxic compounds based on the total amount of VOC's emitted from a particular source. Similarly, the "Receptor Model Source Composition Library" provides information relating metals emissions to total particulate emissions for different release sources.[4]

    Example 3-4 - Use of emission factors to determine releases of a specific chemical to air:

Step 1. Assemble emission factor information from literature.

    Air emissions from the blast furnace of a primary lead smelting facil- ity are controlled by a fabric filter system. In Section 7.6 of AP-42 (Primary Lead Smelting), an emission factor for uncontrolled releases of particulate is given as 361 lb per ton of lead produced. Also in this section, a particulate removal efficiency range of 95 to 99 percent is provided for fabric filter control devices used for primary lead smelting operations.

Step 2. Calculate particulate releases.

Assuming the fabric filter system is 97 percent efficient, the particulate emission factor is reduced to:

$$(1.00 - 0.97) \times \frac{361 \text{ lb particulate}}{\text{ton lead produced}} = 10.83 \text{ lb particulate per ton of lead}$$

    Thus, an annual production of 31,500 tons of lead will result in the emission of 341,145 lb of particulate (10.83 x 31,500).

Step 3.  Calculate specific chemical releases.

The "Receptor Model Source Composition Library" is used to determine the amount of toxic compounds emitted.  Source Profile  No. 29302 gives a typical chemical composition for particulate matter sampled downstream of a fabric filter controlling emissions from a primary lead smelting blast furnace.  Based on this information, annual emissions of individual toxic compounds can be calculated by multiplying the respective chemical composition by the total particulate 341,145 lb/yr.  The specific compounds found according to this data source, their respective percentages of the total particulate matter, and their resultant annual emissions are summarized below.

| Compound | Percentage of particulate | Annual emissions, lb | Report, lb |
|----------|---------------------------|----------------------|------------|
| Chromium | 0.02 | 68.2 | 70 |
| Nickel | 0.06 | 204.7 | 200 |
| Copper | 0.35 | 1,194.0 | 1,200 |
| Zinc | 15.2 | 51,854.0 | 52,000 |
| Cadmium | 23.1 | 78,804.5 | 79,000 |
| Lead | 30.7 | 104,731.5 | 105,000 |

Emission factors have been developed for a number of processes and pollutants.  The bibliography at the end of this section lists literature sources containing emission factors for some industries.  The source of an emission factor must be carefully evaluated to determine that it is applicable to the process vent in question at your facility.  The Journal of the Air Pollution Control Association deals primarily with the subject of air emissions and controls.  Appendix E lists industries for which emission factors have been published in EPA's Publication AP-42, "Compilation of Air Pollutant Emission Factors."[1]

Another good source of air emission factors is a series of reports published by the EPA on locating and estimating emissions for specific toxic chemicals.  Reports for 13 chemicals are currently available.  All are listed in the Bibliography under "U.S. Environmental Protection Agency" and are identifiable by the number series "EPA 450/4-84-007a through m."

Engineering Calculations.  When parameters related to emissions cannot be directly measured, emissions may be estimated or inferred through engineering calculations and/or measurement of other secondary parameters (i.e., physical/chemical properties of the materials involved, design information on the unit operation for which the estimate is being made, or

emission information from similar processes). Engineering calculations are generally used to "fill in" information needed for one of the other emission estimation methods.

Information derived from equipment design, such as fan curves, vessel capacities, operating temperatures, and operating pressures, can be used to estimate gaseous flow rates. Physical/chemical information derived from the ideal gas law, vapor pressure, and equilibrium relationships can frequently be applied when estimating gaseous concentrations of a particular compound.

A common approach to calculating the concentration of a compound in the vapor phase over a liquid is to determine its partial pressure. The partial pressure of a compound divided by the total pressure of the gas stream is equal to the mole fraction of the compound ($X_{AG}$) in the stream. The follow-ing paragraphs discuss two methods of determining the partial pressure of a compound in a gas stream at equilibrium. Even though equilibrium may not occur for the process under consideration at your facility, these methods can provide approximate results.

In dilute aqueous solutions (i.e., when gases are dissolved in low con-centrations in water), the partial pressure of the gas above the liquid sur-face ($P_A$) is equal to the mole fraction of the compound <u>dissolved in the liquid</u> ($x_{AL}$) multiplied by Henry's law constant (H); $P_A = x_{AL}H$. Thus, if the Henry's Law constant can be estimated or found in the technical literature for the solution temperature, the partial pressure of a gas above this liquid can be estimated by multiplying the mole fraction in solution by the constant H at the solution temperature. This relationship, however, is only valid for dilute aqueous solutions.

The partial pressure of a compound in the vapor phase over a solution (organic or aqueous) also may be estimated by multiplying its mole-fraction in the solution by the vapor pressure it exerts when it is pure; i.e.

$$P_A = x_{AL}P^O \qquad \text{(Raoult's Law)}$$

where   $P^O$ = vapor pressure of pure liquid

$x_{AL}$ = mole fraction of that liquid in solution

$P_A$ = partial pressure exerted by that compound in the vapor phase over the solution

This equation is valid only for ideal solutions, however, and should only be used to make an approximation. At equilibrium, the partial pressure divided by the total pressure ($P_T$) will give the mole fraction in the gas stream.

$$\frac{P_A}{P_T} = X_{AG} = \text{mole fraction of A in gas phase}$$

Example 3-5 - Use of engineering calculations to estimate releases to air from a process vent:

Step 1.  Assemble process composition information.

A process vessel containing 5 wt. percent A, 15 wt. percent B, and 80 wt. percent C is vented to the atmosphere. The discharge rate through the vent has been measured at 5 ft³ per minute at 70°F. The process tank is in service 200 days/yr. At 32°F, 1 lb-mole of the gas occupies 359 ft³.

Step 2.  Calculate composition of vented gas.

Assuming equilibrium between air and liquid in the tank, the emissions of A are calculated by using the following equations:

$$X_{AL} = \text{mole fraction}_A = \frac{\dfrac{\text{wt. \% A}}{MW_A}}{\dfrac{\text{wt. \% A}}{MW_A} + \dfrac{\text{wt. \% B}}{MW_B} + \dfrac{\text{wt. \% C}}{MW_C}} \qquad (1)$$

where MW = molecular weight of compound
   wt. % = percent by weight

$$P_A = X_{AL}\ P^O \qquad (2)$$

where $P^O$ = vapor pressure of A at ambient temperature

$$\frac{P_A}{14.7} = \text{fraction of A in gaseous phase, } X_{AG} \qquad (3)$$

Equation 3 calculates the fraction of A in the gaseous phase at standard temperature and pressure.

Step 3.  Calculate annual release.

To calculate the annual release, multiply the following factors:

$$X_{AG} \times \frac{5\ \text{ft}^3}{\text{min}} \times \frac{60\ \text{min}}{\text{h}} \times \frac{24\ \text{h}}{\text{day}} \times \frac{200\ \text{operating days}}{\text{yr}} \times \left(\frac{P_T}{14.7}\right) \times$$

3-10

$$\frac{\text{lb-mole}}{359 \text{ ft}^3} \frac{(32°F + 460)°R}{(70°F + 460)°R} \times \frac{(MW) \text{ lb}}{\text{lb-mole}} = \text{pounds of chemical A emitted per year}$$

where $P_T/14.7$ is a correction for the pressure at the vent. $P_T$ may be assumed to be 14.7 in the absence of pressure measurement data.

A combination of the previous methods often can be used to estimate air releases. The following example demonstrates the combined use of an emission factor, a mass balance, and an engineering calculation.

Example 3-6 - Use of an emission factor, mass balance, and an engineering calculation to estimate releases to air from a process vent:

Step 1. Layout process and obtain process information.

Perchloroethylene (PCE) is emitted from open-top vapor degreasing processes via evaporation. The emission factor for this process has been determined to be 0.78 lb per pound of PCE entering the degreaser.[5] The PCE entering the degreaser consists of recycled PCE and fresh PCE makeup. Spent PCE from the degreaser is sent to solvent recovery, where 75 percent is estimated to be recovered and subsequently recycled. The 25 percent that is not recovered is sent offsite for disposal.



To determine how much PCE is emitted from the degreaser, one needs to determine the pounds of PCE emitted per pound of fresh PCE used; the amount of fresh PCE used should be ascertainable from the facility's records. This factor can be calculated if the amount of PCE recycled per pound of fresh PCE used is known. A mass balance approach can be used to calculate the necessary emission factor.

Step 2. Set up mass balance around degreaser.

Using a basis of 1 lb of fresh PCE entering the degreaser and letting X = pounds of PCE recycled per pound of fresh PCE used, set up a mass balance around the degreaser. The total amount into the degreaser equals (1 + X). A material balance around the degreaser is made to determine the spent PCE rate.

```
                Input = Output
Fresh + recycled = emissions + spent solvent
          (1 + X) = 0.78 (1 + X) + spent solvent
     0.22 (1 + X) = spent PCE
```

Step 3.  Set up mass balance around solvent recovery system.

   Knowing that 75 percent of the spent PCE is recycled, a mass balance around the solvent recovery process can be expressed as follows:

```
            Input = Output
            Spent = recycled + nonrecoverable
     0.22 (1 + X) = 0.75 [0.22 (1 + X)] + nonrecoverable
  0.055 + 0.055X = nonrecoverable PCE
```

Step 4.  Set up mass balance around entire process.

   An overall mass balance around the entire process can be used to solve for X:



```
           Input = Output
       Fresh PCE = emissions + nonrecoverable PCE
               1 = 0.78 (1 + X) + 0.055 + 0.055X
               1 = 0.78 + 0.78X + 0.055 + 0.055X
               X = 0.2 lb of PCE recycled per pound of fresh PCE used
```

Step 5.  The PCE emitted per lb of fresh PCE can then be calculated.

```
PCE emissions = 0.78 (1 + X)
              = 0.78 (1 + 0.20)
              = 0.94 lb per pound of fresh PCE
```

   Total annual emissions of PCE would be 0.94 times the total amount of fresh PCE consumed annually.

### 3.1.2  Releases From Material Handling, Storage, and Loading

   Releases of chemicals from material handling, storage, and loading may result from both breathing and working losses.  Breathing losses are due to

vapor expansion and contraction, which force vapor from a tank or vessel. Expansion and contraction are caused by temperature and atmospheric pressure fluctuations. Working losses occur when the tank or vessel is filled or emptied.

These types of releases are generally estimated by the use of emission factors and engineering calculations. The U.S. EPA publication "Compilation of Air Pollutant Emission Factors" (AP-42)[1] provides equations for estimating air emissions from organic liquid storage and handling operations. These equations contain factors that depend on tank parameters and service conditions. For convenience, the storage tank equations and factors are provided in Appendix C. For emissions from loading operations (tank trucks, barges, etc.), use equations and factors in Table 3-2.

TABLE 3-2.  CALCULATING LOADING LOSSES FOR VOLATILE ORGANIC LIQUIDS[1]

$$L_L = 12.46 \frac{SPM}{T}$$

where
- $L_L$ = release in pounds/1000 gal of liquids loaded
- $P$ = liquid vapor pressure, psia (see chemical handbook or Appendix B)
- $M$ = molecular weight (see chemical handbook or Appendix B)
- $T$ = liquid temperature, °R (°F + 460)
- $S$ = Saturation factor depending on carrier and mode of operation as shown below:

| Cargo carrier | Mode of operation | S factor |
| --- | --- | --- |
| Tank trucks and tank cars | Submerged loading of a clean cargo tank | 0.50 |
| | Splash loading of a clean cargo tank | 1.45 |
| | Submerged loading: normal dedicated service | 0.60 |
| | Splash loading: normal dedicated service | 1.45 |
| | Submerged loading: dedicated vapor balance service | 1.00 |
| | Splash loading: dedicated vapor balance service | 1.00 |
| Marine vessels | Submerged loading: ships | 0.2 |
| | Submerged loading: barges | 0.5 |

3-13

Example 3-7 - Use of an emission factor to estimate releases to air from material storage:

Step 1.  Assemble tank and product data.

The following calculations are for a 10,000-gallon, white, fixed-roof tank that holds 1,1,1-trichloroethane at an average temperature of 60°F. The tank is 10 feet in diameter and 17 feet high.  On the average, the tank is half full and has a throughput of 2000 gallons per month, or 24,000 gallons per year.  The average diurnal (day and night) temperature change is 20°F.  Ambient pressure is 1 atmosphere or 14.7 psi.  Chemical handbook data[8] show that 1,1,1-trichloroethane has a molecular weight of 133 and a vapor pressure of 1.6 psi at 60°F.  The vapor pressure may be estimated by plotting temperature against vapor pressures obtained from handbooks and selecting the pressure at the given temperature.

Step 2.  Use Equation 1 for calculating breathing losses from Appendix C:

$$L_B = 2.26 \times 10^{-2} M_V \left(\frac{P}{P_A - P}\right)^{0.68} D^{1.73} H^{0.51} \Delta T^{0.50} F_P C K_C \tag{1}$$

where $L_B$ = fixed roof breathing loss (lb/yr)

$M_V$ = molecular weight of vapor in storage tank (lb/lb mole), see Note 1 in Appendix C

$P_A$ = average atmospheric pressure at tank location (psia)

$P$ = true vapor pressure at bulk liquid conditions (psia), see Note 2 in Appendix C

$D$ = tank diameter (ft)

$H$ = average vapor space height, including roof volume correction (ft), see Note 3 in Appendix C

$\Delta T$ = average ambient diurnal temperature change (°F)

$F_P$ = paint factor (dimensionless), see Table 4.3-1 in Appendix C

$C$ = adjustment factor for small diameter tanks (dimensionless), see Figure 4.3-4 in Appendix C

$K_C$ = product factor (dimensionless), see Note 4 in Appendix C

Step 3.  Calculate each of the factors and insert into Equation 1.

$M_V$ = 133

$P_A$ = 14.7 psia

$P$ = 1.6 psia

$D$ = 10 ft

$H$ = (17 ft)($\frac{1}{2}$) since the tank is half full

$\Delta T$ = 20°F

$F_p$ = 1 since tank is white

$C$ = 0.51 obtained from Figure 4.3-4 in Appendix C

$K_C$ = 1 since this is an organic liquid (as per Appendix C)

Substituting these values in Equation 1 yields

$$L_B = 2.26 \times 10^{-2}(133)\left(\frac{1.6}{14.7-1.6}\right)^{0.68}(10)^{1.73}(8.5)^{0.51}(20)^{0.5}(1)(0.51)(1) \quad (1)$$

$\quad$ = 262.5 pounds/year

Working losses can be estimated by using Equation 2 in Appendix C.

$$L_W = 2.40 \times 10^{-5} M_V P V N K_N K_C \quad (2)$$

where $L_W$ = fixed roof working loss (lb/year)

$\quad$ $M_V$ = molecular weight of vapor in storage tank (lb/lb-mole); see Note 1 to Equation 1 in Appendix C

$\quad$ $P$ = true vapor pressure at bulk liquid temperature (psia); see Note 2 to Equation 1 in Appendix C

$\quad$ $V$ = tank capacity (gal)

$\quad$ $N$ = number of turnovers per year (dimensionless)

$$N = \frac{\text{Total throughput per year (gal)}}{\text{Tank capacity, } V \text{ (gal)}}$$

$\quad$ $K_N$ = turnover factor

$\quad$ $K_C$ = product factor

Again, calculate each of the factors and insert into Equation 2:

$M_V$ = 133

P = 1.6 psia

V = 10,000 gallons

$N = \dfrac{24,000 \text{ gallons used}}{10,000\text{-gallon capacity}}$

$K_N$ = 1 obtained from Figure 4.3-7 in Appendix C

$K_C$ = 1 since this is an organic liquid (as per Appendix C)

Substituting these values into Equation 2 yields:

$$L_W = (2.40 \times 10^{-5})(133)(1.6 \text{ psia})(10,000 \text{ gallons})(\dfrac{24,000 \text{ gallons}}{10,000 \text{ gallons}})(1)(1)$$

= 122.6 pounds/year

Total losses due to handling = $L_B + L_W$ = 262.5 + 122.6 = 385.1 pounds/year

Report 390 lb/yr

The density of 1,1,1-trichloroethane is 11.2 pounds per gallon. Annual throughput is 24,000 gallons or 269,000 pounds. The calculated annual release is 385 pounds. A mass balance could not determine a 385-pound loss in 269,000 pounds handled. Consequently, the use of emission factors is an appropriate method for estimating tank releases.

NOTE:

If the storage tank in the this example contained a mixture of materials A and B, the air releases could be calculated in a similar manner given the mole fractions of the components in the liquid phase ($X_{AL}$ and $X_{BL}$) and the vapor pressure of the pure components ($P_A^o$ and $P_B^o$). The molecular weight and vapor pressure used in the calculation of breathing and working losses would be calculated as:

$$\text{Molecular weight} = M_V = (M_A) \times (\dfrac{P_A^o \, X_{AL}}{P_t^o}) + (M_B) \times (\dfrac{P_B^o \, X_{BL}}{P_t^o})$$

$$\text{True vapor pressure} = P_t^o = (P_A^o)(X_{AL}) + (P_B^o)(X_{BL})$$

These values would be used in the previous equation to calculate total emissions. Each component would be released in proportion to its mole fraction in the gas phase ($X_{AG}$ and $X_{BC}$) in the tank, which can be calculated as:

$$X_{AG} = \frac{P_A^0 \ X_{AL}}{P_t^0}$$

The gaseous mole fractions must be converted into weight fraction (in gas phase) by use of the following equation:

$$W_{AG} = \frac{X_{AG} \ M_A}{X_{AG} \ M_A + X_{BG} \ M_B}$$

The weight fraction of component A in the gaseous air emissions can then be multiplied by the total pounds of emissions per year as previously calculated.

### 3.1.3 Fugitive Emissions

Fugitive emissions are those emissions that are not released through a stack, chimney, vent, or other confined vent stream. These releases include process leaks, evaporation from open processes and spills, and raw material and product loading and unloading losses. Whenever possible, fugitive emissions should be calculated by the use of data available from direct measurement. Fugitive emissions, however, often have to be estimated by the use of emission factors or engineering calculations because they are too diffuse and/or dilute to be measured directly, or they are too small relative to the amounts of material processed to permit the use of a mass balance. This is particularly true of hazardous and/or toxic air pollutants. An EPA report entitled "Hazardous Waste Treatment, Storage, and Disposal Facilities (TSDF) - Air Emission Models" provides methods for the estimation of emissions from container loading, storage, and cleaning; waste treatment and disposal operations; and equipment leaks in the synthetic organic chemical manufacturing industry.

Uncaptured Process Releases. One basis for estimating process fugitive releases is the use of plant air measurement data. Health and safety regulations may require measurements of regulated air pollutant concentrations on

either an absolute or not-to-exceed basis. These data could provide a basis for determining fugitive emissions. Occupational standards themselves, however, should not be used to calculate emissions; only actual measurements taken to ensure compliance with the standards should be used.

---

<u>Example 3-8</u> - Use of measurement data to estimate the potential release to air from an uncaptured process:

Step 1.  Determine basis for estimating releases and assemble necessary data.

Employee exposure to benzene should not exceed 1 ppm as an 8-hour time-weighted average. A plant has an alarm system that responds to 0.2 ppm benzene and a ventilation system that exhausts 20,000 acfm of room air at 70°F. If the alarm has not sounded during the course of the year and the plant operates 24 hours per day, 330 days per year, a conservative estimation of benzene fugitive releases could be performed as follows:

Step 2.  Calculate releases.

Benzene releases per year would be calculated as follows:

$$\frac{20,000 \text{ ft}^3}{\text{minute}} \times \frac{60 \text{ minutes}}{\text{hour}} \times \frac{24 \text{ hr}}{\text{day}} \times \frac{330 \text{ days}}{\text{year}} \times \frac{0.2 \text{ ft}^3 \text{ benzene}}{10^6 \text{ ft}^3 \text{ air}} = 1900.8 \text{ ft}^3$$

The density of benzene vapor is 0.2 lb/ft³, and the annual release would be less than:

$$\frac{1900 \text{ ft}^3 \text{ benzene}}{\text{year}} \times \frac{0.2 \text{ lb}}{\text{ft}^3} = 380 \text{ lb of benzene per year}$$

Report 380 lb of benzene/year. This value thus serves as an upper limit of potential releases.

---

<u>Leaks in Vessels, Pipes, Valves, etc.</u> The accepted method of estimating releases from leaks in vessels, pipes, and valves is to use emission factors. Various factors are available to estimate releases due to leaks in process streams carrying hydrocarbon vapors, light liquids (more volatile than kerosene, i.e., a vapor pressure greater than 0.1 psia at 100°F), or heavy liquids (equal to or less volatile than kerosene). These factors can also be used to estimate fugitive emissions in other industries that process hydrocarbon streams.

For convenience, data to estimate releases from leaks are included in Appendix Tables D-1 and D-2. These data are based on information in EPA

Publication EPA-450/3-86-002, entitled "Emission Factors For Equipment Leaks of VOC and HAP." This report addresses fugitive emissions and reductions due to scheduled operation and maintenance procedures.

The EPA has also published a protocol for use in estimating emissions from equipment leaks entitled "Protocols for Generating Unit-Specific Emission Estimates for Equipment Leaks of VOC and HAP." This protocol provides for the use of EPA's average emission factors, along with equipment component counts or screening data for calculating fugitive emission rates. The emission factors used in this approach are based on typical refinery and synthetic organic chemical manufacturing plants.

---

Example 3-9 - Use of emission factors to estimate releases to air from leaks in vessels, pipes, and valves:

Step 1.  Compile an inventory of fittings and appurtenances that may leak organic compounds.

A chemical plant uses benzene (a light liquid with a vapor pressure greater than 2 psia) and has six pipe valves, three open-end valves, four flanges, two pumps, one compressor, and one pressure-relief valve. The plant operates 24 hours a day, 250 days a year. Average factors from Appendix D-1 are used to estimate fugitive emissions.

Step 2.  Review maintenance schedule and select appropriate emission factors based on leak rates.

The following calculation uses light liquid service factors and units of pounds per hour from Appendix D:

   (6 x 0.016)          (pipe valves)

+ (3 x 0.0037)          (open-end valves)

+ (4 x 0.0018)          (flanges)

+ (2 x 0.11)            (pumps)

+ (1 x 0.5)             (compressor in vapor service)

+ (1 x 0.23)            (pressure-relief valves in vapor service)

= 1.064 pounds per hour

$$\frac{1.064 \text{ lb}}{\text{hour}} \times \frac{24 \text{ h}}{\text{day}} \times \frac{250 \text{ days}}{\text{year}} = 6384 \text{ pounds per year}$$

Report 6400 lb/yr

---

> NOTE:
>
> In this example, an average value of the emission factors was used. The factors cover a range, and a higher or lower value might be more appropriate if the number of leaks are identified through a leak detection screening study.

### 3.1.4 Releases to Air From Wastewater Treatment and Solid Waste Disposal

Secondary emissions of volatile compounds to the air may occur from the onsite treatment of aqueous or solid waste. The bulk of secondary emissions are estimated to result from the handling, pretreatment, and final treatment (primarily biological treatment) of aqueous wastes. Other sources include surface impoundments, landfilling, and incineration of liquid and solid waste.

Estimating releases of volatile compounds from disposal is complex and requires detailed knowledge of the compound's parameters and the disposal procedure. Table A-2 in Appendix A presents data on the fate of some toxic compounds in secondary wastewater treatment plants, including the percentage of the compound in the influent that is volatilized to air. These data, however, should be used only when operating conditions are similar to those under which the data were derived.

Analytical models have been developed by EPA's Office of Air Quality Planning and Standards (OAQPS) to estimate emissions of volatile organic compounds via various pathways from emission sources at hazardous waste disposal sites. These models are discussed in a draft EPA report entitled "Hazardous Waste Treatment, Storage, and Disposal Facilities (TSDF) – Air Emission Models," dated December 1987. To make reasonable estimates of volatile releases, one must know which pathways predominate for a given chemical, type of waste site, and set of meteorological conditions. Models have been developed for the following emission sources:

° Nonaerated impoundments (which include quiescent surface impoundments and open-top tanks)

° Aerated impoundments (which include aerated surface impoundments and aerated tanks)

° Disposal impoundments (which include nonaerated disposal impoundments)

  °    Land treatment

  °    Landfills

Computerized methods for applying these emission models are being developed by EPA. Models for aerated and nonaerated impoundments, lagoons, landfills, wastepiles, and land treatment facilities have been installed in an integrated spreadsheet program, CHEMDAT4, which allows a user to calculate the partitioning of volatile compounds among various pathways depending on the particular parameters of the facility of interest. The EPA report includes a diskette containing the program for use on an IBM PC and a user's guide.

## 3.2  AIR POLLUTION CONTROL EQUIPMENT AND TREATMENT EFFICIENCY

Air pollutants entering an air control device may undergo one or more of the following: 1) they may be transferred from the air stream to another medium, 2) they may be modified to a less toxic state, 3) they may be destroyed through combustion and/or dissociation, or 4) they may pass through untreated. The physical characteristics of the pollutant to be removed generally determine which type of control device is used. Table 3-3 presents a summary of air pollution control techniques used to control some of the various pollutants of concern.

Estimates of releases to air must take into account the control equipment efficiency. This efficiency should be based on the amount of pollutant removed from the air inlet stream of the control device by destruction, by modification, or by transfer to another medium.

$$\text{Percent efficiency} = \frac{X \text{ inlet} - X \text{ outlet}}{X \text{ inlet}} \times 100$$

where X inlet = Total mass of pollutant X flowing to the air inlet of the control device in a given year

      X outlet = Total mass of pollutant X flowing from the air outlet of the control device in a given year

The amount of pollutant transferred to and subsequently released in another medium (solid or water) would be included in the releases of that particular pollutant in that medium.

TABLE 3-3.   TECHNIQUES FOR CONTROLLING SELECTED AIR POLLUTANTS[3]

| Catalytic incineration[a] | Thermal incineration[a] | Boilers/process heaters[a] | Flares[a] | Absorption |
|---|---|---|---|---|
| Acrylic acid | Acrolein | Butadiene[a] | Acetaldehyde | Acetaldehyde[c] |
| Acrylonitrile | Acrylonitrile | Cumene | Acrolein | Acrylonitrile |
| Benzene[b] | Aniline | Ethylbenzene/styrene | Acrylic acid | Acrylic acid |
| Butadiene[b] | Benzene | Ethylene oxide | Acrylonitrile | Allyl chloride |
| Cumene | Benzyl chloride[c] | Formaldehyde | Allyl chloride | Aniline |
| Ethylene dichloride | Butadiene[b] | Phenol | Butadiene[b] | Benzene |
| Ethylene oxide | Epichlorohydrin | Propylene oxide | Chloromethanes[d] | Benzyl chloride[c] |
| Phenol | Ethylene dichloride | | Chloroprene | Butadiene |
| | Formaldehyde | | Cumene | Carbon tetrachloride |
| | Methyl chloroform | | Ethylbenzene/ | Chlorobenzene |
| | Perchloroethylene/ | | styrene | Chloromethanes[c] |
| | trichloroethylene | | Ethylene oxide | Chloroprene |
| | Polychlorinated | | Formaldehyde | Epichlorohydrin |
| | bipheyhyls | | Methyl methacrylate | Ethylbenzene/ |
| | Toluene | | Propylene oxide | styrene |
| | Toluene diisocya- | | | Ethylene dichloride |
| | nate | | | Ethylene oxide |
| | Vinylidene chloride | | | Methyl chloroform |
| | | | | Perchloroethylene/ |
| | | | | trichloroethylene |
| | | | | Phenol |
| | | | | Phosgene |
| | | | | Propylene/oxide |
| | | | | Vinylidene chloride |
| | | | | Xylene |

(continued)

TABLE 3-3 (continued)

| Adsorption | Condensation | Fabric filters | Wet scrubbing | Electrostatic precipitators | Cyclones |
|---|---|---|---|---|---|
| Acrylonitrile | Acetaldehyde | Cadmium | Cadmium | Cadmium | Cadmium |
| Aniline | Acrylic acid | Chromium | Chlorobenzene | Chromium | Copper |
| Benzene | Acrylonitrile | Copper | Chromium | Copper | Nickel |
| Carbon tetrachloride/ | Allyl chloride | Nickel | Nickel | Nickel | |
| perchloroethylene | Aniline | | Toulene | | |
| Chlorobenzene | Benzene | | diisocyanate | | |
| Chloroform | Benzyl chloride[c] | | | | |
| Ethylene dichloride | Butadiene | | | | |
| Methyl chloroform | Carbon tetrachloride | | | | |
| Methyl methacrylate | Chlorobenzene | | | | |
| Methylene chloride | Chloromethanes[d] | | | | |
| Phenol | Chloroprene | | | | |
| Naphthalene | Ethylbenzene/sty- | | | | |
| Phosgene | rene | | | | |
| Styrene | Ethylene dichloride | | | | |
| Toluene | Ethylene oxide | | | | |
| Toluene diisocyanate | Formaldehyde | | | | |
| Trichloroethylene | Methyl chloroform | | | | |
| Vinyl chloride | Methyl methacrylate | | | | |
| Vinylidene chloride | Perchloroethylene/ | | | | |
| Vinyl chloride | trichloroethylene | | | | |
| Xylene | Phenol | | | | |
| | Toluene | | | | |
| | Toluene diisocyanate | | | | |
| | Vinylidene chloride | | | | |
| | Xylene | | | | |

[a] Combustion techniques.

[b] Refers to 1,3 butadiene.

[c] Possible control technique.

[d] Chloromethanes include methylene chloride, chloroform, and carbon tetrachloride.  Individual compound is listed whenever specific information is available.

3-23

The best basis for an efficiency estimate is a measurement or test, a mass balance calculation, or a combination of measurement and mass balance calculations. If such data are not available, comparison of "controlled" and "uncontrolled" emission factors for the pollutant (chemical) of concern, engineering calculations, data on the operating parameters of the control device, or vendor data and/or guarantees that reflect actual operating conditions may be used. It is important to use data that reflect efficiency achieved during typical operations, not the theoretical optimum efficiency.

In the absence of typical operating data, treatment efficiency data cited in the open literature for a similar process may be used as an approximate guide. Figure 3-2 can be used to help estimate treatment efficiencies by identifying the expected emission reduction from the application of each control technique on the basis of the total VOC (volatile organic compound) concentration in the inlet stream. Without actual source test data for a specific emission stream and control system, the removal efficiency can be assumed to equal total VOC removal efficiency if the chemical is a volatile organic compound (not a particulate, metal, PCB, etc.). For example, up to 95 percent reduction can be achieved for incineration of a gas stream containing 50 ppm styrene. Some potential sources of air efficiency data are listed in the bibliography at the end of this section. Other potential sources of information include air pollution journals. Unfortunately, many complex variables enter into the calculation of efficiency, and actual measurement is the best way to determine efficiency.

Adsorption, absorption, condensation, particulate collection (cyclones, fabric filters, electrostatic precipitators, and scrubbers), and combustion equipment are the major categories of control devices that can be used to reduce toxic air emissions. Each technique is briefly discussed in the following subsections.

3.2.1  Combustion

Combustion is widely applicable for control of air emissions of combustible organic compounds. The combustion device can be a thermal or catalytic incinerator, a boiler or process heater, or a flare. Combustion can destroy organic pollutants through oxidation, which forms water vapor and carbon



Figure 3-2.  Percent reduction ranges for add-on control devices.[7]
Represents <u>maximum</u> achievable reduction for the corresponding
inlet concentration.

dioxide. Any other elements in the organic compound will also be emitted as an oxide or acid gas; e.g., chlorine will be emitted as hydrogen chloride.

Thermal incinerators rely on high temperature, sufficient pollutant residence time, and adequate turbulence to ensure high destruction efficiencies. Catalytic incinerators operate at somewhat lower temperatures as a catalyst promotes the oxidation. Information on destruction efficiency of specific organic compounds is limited. Most volatile organic compounds are rapidly destroyed at temperatures over 1400°F; some compounds, however (e.g., halogenated hydrocarbons), require higher temperatures.

While destroying one air pollutant, incineration may create other pollutants that require further treatment for removal from flue gases. For example, an incinerator that effectively destroys trichloroethylene may create hydrogen chloride, which is then removed by flue gas scrubbing. The Toxic Release Inventory Form(s) should indicate the destruction of trichloroethylene and any resulting release, the release of hydrogen chloride, and the amount of HCl in any wastewater or slurry resulting from scrubbing.

Waste and purged gaseous organic compounds are also commonly destroyed by flaring when it is not economical to recover the heat value of the gases, and the control process upset vent gases. Although flaring is widely applied, information on the air pollutant destruction efficiencies is limited. A 98 percent destruction efficiency can be achieved for flares provided they operate under the conditions listed in Table 3-4.

TABLE 3-4. OPTIMAL OPERATING CONDITIONS FOR FLARES

| Type of flare | Exit velocity, $V$ (ft/sec) | Heating value, $H_T$ of gas stream[a] (Btu/scf) |
|---|---|---|
| Steam-assisted | $V < 60$ | $H_T \geq 300$ |
| | $60 \leq V < V_{max(1)}$ | $300 < H_T < 1000$ |
| | $V < 400$ | $H_T > 1000$ |
| Non-assisted | $V < 60$ | $H_T \geq 200$ |
| | $60 \leq V < V_{max(1)}$ | $200 < H_T < 1000$ |
| | $V < 400$ | $H_T > 1000$ |
| Air-assisted | $V < V_{max(2)}$ | $H_T > 300$ |

[a] Heating value of total gas stream (not just listed chemical).

3-26

Notes:
$$V_{max(1)} = e^{[1.424 + 0.00118 (H_T)]} \quad \text{or} \quad \log V_{max(1)} = 1.424 + 0.00118 (H_T)$$

$$V_{max(2)} = 28.54 + 0.087 H_T$$

$H_T$ should be calculated at conditions of 25°C (77°F) and 1 atmosphere (14.7 psia). For information on measurement and calculation of operating exit velocity and heating value of gas stream, consult 40 CFR 60.18 (July 1986).

Flares with values of less than 300 Btu/scf (steam- or air- assisted flares) or 200 Btu/scf (nonassisted flares) may or may not achieve 98 percent destruction. For example, a steam-assisted flare burning a volatile organic compound subject to reporting could be considered to have a 98 percent efficiency for that compound if its exit velocity and Btu value of the gas stream were within one of the three operating conditions listed for this type of flare. This would allow an estimate of the treatment efficiency in absence of other data for the compound.

Another combustion technique that may be used as a control device for toxic air pollutants is to inject the pollutants into process heaters or boilers. Waste streams may provide supplemental fuel or may even be the primary fuel in some operations.

### 3.2.2 Adsorption

In an adsorption process, a pollutant is adsorbed on the surface of the adsorbent until its capacity is reached. Common adsorbent materials used are activated carbon, resins, and molecular sieve materials. The adsorbent can then be regenerated. The pollutant is released in a more concentrated form, which is recovered or treated by further processing. The particular adsorption/regeneration process and the pollutant and its associated process parameters determine further processing steps, which can include incineration or condensation and decantation so that the chemical can be recovered for recycling or disposal. Although adsorption is effective in the removal of various toxic chemicals from air, the regeneration and further processing steps may transfer some of the toxic substance to water or to solid waste streams, which must be considered releases to these media. Typically, the adsorption capacity increases with the molecular weight of the VOC being adsorbed. In addition, unsaturated compounds are generally more completely adsorbed than saturated compounds, and cyclical compounds are more easily adsorbed than

linearly structured materials. Also, the adsorption capacity is enhanced by lower operating temperatures and higher concentrations. The VOC's character-ized by low vapor pressures are more easily adsorbed than those with high vapor pressures.

### 3.2.3 Absorption

Absorption as a method of treating an emission is a physical or chemical process that transfers a component(s) from a gas stream to a liquid. Al-though often used to recover products or raw materials, absorption can also serve as an emission control device. In this capacity, absorption has been used to control alcohols, acids, chlorinated and fluorinated compounds, aromatics, esters, and aldehydes.[6] Absorption devices can be used separately or in conjunction with other air pollution control equipment, e.g., to pro-vide additional pollutant removal after incineration or after condensation. Liquids are used as the absorbent; therefore, a media transfer of toxic pollutants can occur. In general, more soluble compounds are removed with greater efficiency. Liquid-to-gas ratios, liquid temperature, and column height are also important parameters affecting efficiency.

### 3.2.4 Condensation

Condensation is used as a control technique for some organic compounds. It cools the gas stream and transforms the gaseous compound to a liquid. Like absorption, condensation is one of the primary techniques used for product recovery; however, it is also used as an air-pollution-control de-vice. Control of storage and process emissions is a common application. Condensers are frequently used in series with other control equipment, in-cluding absorbers, incinerators, and adsorbers.

### 3.2.5 Particulate Collection Devices

Electrostatic precipitators (ESP's), fabric filters, wet scrubbers, and cyclones or mechanical collectors are the four devices commonly used to re-move particulate matter from air streams. These devices are widely applied in the metal processing industries, where they control many of the Title III, Section 313, metals and other solids. Gaseous compounds are not collected by these devices unless they adsorb on a solid particle or react with water in a scrubber. Vendors of particulate control equipment, when supplied with

sufficient data on flow rates, particle size distribution, etc., will guar-
antee the removal efficiency of their equipment. Any process variations that
affect particle size, particle density, and gas velocity, however, will gen-
erally affect the removal efficiency of particulate control devices. In some
applications, the solid particulate collected by these devices is recycled to
a process, in which case they may be considered part of a unit process as op-
posed to air-pollution-control equipment. Otherwise, the collected particu-
late is disposed of and has the potential to create liquid or solid waste
problems. Collection efficiency can be readily determined through a simple
mass balance if one knows the inlet flow rate and concentration of particu-
late and can measure the amount of material collected by the device. In this
case, the fractional efficiency is equal to the amount collected divided by
the amount entering.

Cyclones/Mechanical Collectors. Cyclones are seldom used as the sole or
primary means of particulate collection, but they often serve as "first
stage" air-cleaning devices that are followed by other methods of particle
collection. Cyclone collection efficiency is probably more susceptible to
changes in particulate characteristics (i.e., process variation) than are
other types of devices. Therefore, care should be taken in the use of design
efficiency to estimate actual operating conditions. Although very little
compound-specific collection data are available, cyclone operation is de-
pendent on physical parameters (particle size, density, velocity) as opposed
to the chemical nature or properties of the material being collected. Thus,
within reason, it may be possible to obtain and transfer efficiency data from
known applications to unknown applications on processes with physically
similar particulate and gas flows.

Fabric Filters. When properly designed and operated, fabric filters or
baghouses are efficient collection devices, even for small particles. Vendor
information is often a good source of collection efficiency information, as
most units are designed for specific applications. As in the case of cy-
clones, fabric filter performance is affected by process variations that
affect the gas stream and by other variables, such as temperature and gas dew
point. The particle collection mechanisms of these filters (like those of

cyclones) usually depend solely on physical as opposed to chemical prop-
erties; thus, data from known applications may be transferable.

Electrostatic Precipitators. Electrostatic precipitators remove from
gas streams particles that have been electrically charged. They are not used
to collect organic solids because of combustibility potential. Efficiency
data are limited with the exception of ESP's applied to combustion processes.
The collection efficiency of an ESP depends on the physical characteristics
of the particulate and the gas stream, as well as on the electrical resistiv-
ity of the pollutant to be collected. Electrical resistivity, in turn, can
be affected by temperature, which may vary in some processes.

Wet Scrubbers. Wet scrubbers are used to collect organic as well as
inorganic particulate matter and reactive gases. Scrubbers, which often use
water as the scrubbing medium, have the inherent potential of creating re-
leases in the liquid medium. Like some other particulate collection equip-
ment devices, scrubber designs are based on physical parameters, so available
efficiency data may be transferrable. The key factors in scrubber perform-
ance are particle size and scrubber pressure drop. As shown in Figure 3-3
for a venturi-type scrubber, a high particle removal efficiency can be
achieved for larger particles and at higher pressure drops across the device.



Figure 3-3.  Venturi scrubber collection efficiencies.[7]

## SECTION 3 REFERENCES

1.  U.S. Environmental Protection Agency.  Compilation of Air Pollutant
    Emission Factors, Volume I:  Stationary Point and Area Sources.  Fourth
    Edition.  AP-42, September 1985.

2.  U.S. Environmental Protection Agency.  VOC Emission Factors for NAPAP
    Emission Inventory.  EPA 600/7-86-052, December 1986.

3.  U.S. Environmental Protection Agency.  Volatile Organic Compound (VOC)
    Species Data Manual.  Second Edition.  EPA-450/4-80-015.  Research
    Triangle Park, North Carolina.  465 pp.  1980.

4.  Carl, J. E., et. al., Receptor Model Source Composition Library.
    EPA-450/4-85-002.  November 1984.

5.  U.S. Environmental Protection Agency.  Survey of Perchloroethylene Emis-
    sion Sources.  EPA-450/3-85-017, June 1985.

6.  U.S. Environmental Protection Agency.  Hazardous/Toxic Air Pollutant
    Control Technology, A Literature Review.  EPA-600/2-84-194, December
    1984.

7.  U.S. Environmental Protection Agency, Control Technologies for Hazardous
    Air Pollutants.  EPA/625/6-86/014.  September 1986.

8.  Perry, R. H., and C. H. Chilton.  Chemical Engineer's Handbook.  Fifth
    Edition.  New York.  McGraw-Hill.  1973.

SECTION 3 BIBLIOGRAPHY

Documents 4 through 17 contain detailed information on the certain process industries, their emission sources, development and use of emission factors, control devices and their efficiency, as well as qualitative data on other emission sources. Documents 4 through 16 are chemical-specific, whereas Document 17 covers mostly VOC's, particulates, and other criteria pollutants. It does have some chemical-specific emission factors.

Document 1 is a compilation summary of chemical-specific emission factors, which includes a summary of factors found in Documents 4 through 16. Document 18 is a summary of the criteria pollutant emission factors from Document 17 and other data sources.

Table 3-5 has been prepared to aid users of this guidance to find information on chemical-specific emission factors for their industry. Although specific chemicals mentioned in the industry categories may not be on the Section 313 list, the documents cover emissions of listed 313 chemicals from the process. The industries for which particulate and VOC emission factors are available in Document 17 are listed in Appendix E. Industries covered by Document 18 are too numerous to list here, but are similar to those covered by Document 17.

The NTIS documents can be obtained from:

National Technical Information Service (NTIS)
5285 Port Royal Road
Springfield, Virginia  22161
(703) 487-4650

| Document No. | Document | NTIS No. | NTIS price as of June 1987 |
|---|---|---|---|
| 1 | Preliminary Compilation of Air Pollutant Emission Factors for Selected Air Toxic Compounds. EPA 450/4-86-010a, April 1987 | PB 87-183414 | $13.95 |
| 2 | Hydrogen Chloride and Hydrogen Fluoride Emission Factors for the NAPAP Emission Inventory. EPA 600/7-85-041, January 1986 | PB 86-134020 | $13.95 |
| 3 | Ammonia Emission Factors for the NAPAP Emission Inventory. EPA 600/7-87-001, January 1987 | PB 87-152336 | $13.95 |

| Document No. | Document | NTIS No. | NTIS price as of June 1987 |
|---|---|---|---|
| | Locating and Estimating Air Emissions from Sources of: | | |
| 4 | Acrylonitrile.  EPA 450/4-84-007a, March 1984 | PB 84-200609 | $13.95 |
| 5 | Carbon Tetrachloride.  EPA 450/4-84-007b, March 1984 | PB 84-200625 | $18.95 |
| 6 | Chloroform.  EPA 450/4-84-007c, March 1984 | PB 84-200617 | $18.95 |
| 7 | Ethylene Dichloride.  EPA 450/4-84-007d, March 1984 | PB 84-239193 | $13.95 |
| 8 | Formaldehyde.  EPA 450/4-84-007e, March 1984 | PB 84-200633 | $18.95 |
| 9 | Nickel.  EPA 450/4-84-007f, March 1984 | PB 84-210988 | $18.95 |
| 10 | Chromium.  EPA 450/4-84-007g, July 1984 | PB 85-106474 | $24.95 |
| 11 | Manganese.  EPA 450/4-84-007h, September 1984 | PB 86-117587 | $18.95 |
| 12 | Phosgene.  EPA 450/4-84-007i, September 1985 | PB 86-117595 | $13.95 |
| 13 | Epichlorohydrin.  EPA 450/4-84-007j, September 1985 | PB 86-117603 | $13.95 |
| 14 | Vinylidene Chloride.  EPA 450/4-84-007k, September 1985 | PB 86-117611 | $13.95 |
| 15 | Ethylene Oxide.  EPA 450/4-84-007l, September 1986 | PB 87-113973 | $13.95 |
| 16 | Chlorobenzenes.  EPA 450/4-84-007m, September 1986 | PB 87-189841 | $18.95 |
| 17 | Compilation of Air Pollutant Emission Factors-AP-42, Volume 1.  Stationary Point and Area Sources, Fourth Edition.  (Also available from: Supt. of Documents Government Printing Office Washington, D.C.  20402 (202) 783-3238 GPO Stock No. 055-000-00251-7 Price:  $20.00) | PB 86-124906 | $60.95 |

**Exhibit 8**

**Letter from Morton E. Wakleand, Jr., Ph.D, EPCRA 313 Enforcement & TRI
Program Coordinator, U.S. EPA Region 6**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS, TX 75202-2733



March 30, 2007

**CERTIFIED MAIL RETURN RECEIPT REQUESTED # 7004 1160 0003 0352 1892**

Ms. Linda S. Paul
Environmental Manager
Koppers Inc.
436 Seventh Avenue
Pittsburgh, PA 15219

RE:     Findings from Compliance Inspections of Koppers, North Little Rock, Arkansas;
Logansport, Louisiana; and Somerville, Texas Pursuant to the Emergency Planning and
Community Right-to-Know Act (EPCRA) Section 313

Dear Ms. Paul:

On or about June 7 and 8, 2005, a multimedia inspection was conducted at the Koppers
facility in North Little Rock, Arkansas, followed by single media inspections at the
Logansport, Louisiana and Somerville, Texas facilities on or about March 7, 2006.

The EPCRA 313 inspection reports, along with additional information Koppers has
provided, has been reviewed and evaluated in coordination with the EPCRA 313 Enforcement
and Toxic Release Inventory Programs in Washington, DC. Based upon the findings of the
foregoing investigations, the alleged violations at the three (3) facilities for calendar years 2001
through 2005, except for the Logansport facility, which covers only 2001 through 2003, are as
follows:

1) failure to include air releases from the drip pad in its Form R's for creosote,
benzo (g,h,i) perylene, and PAC's (North Little Rock, Logansport, and Somerville),

2) failure to include air releases from the storage yard in its Form R's for creosote,
benzo (g,h,i) perylene, and PAC's (North Little Rock, Logansport, and Somerville),

3) failure to include amounts recycled on-site in its Form R's for creosote,
benzo (g,h,i) perylene, and PAC's (North Little Rock, Logansport, and Somerville),

4) incorrectly identified the manner of use of creosote, benzo (g,h,i) perylene, and PAC's
in its Form R's, (North Little Rock, Logansport, and Somerville), and

5) failure to include amounts of toxic chemicals released to surface impoundments
(North Little Rock).

To conserve both EPA's and Kopper's resources, we are proposing to meet with representatives from Koppers at EPA Region 6 Headquarters in Dallas, Texas to discuss resolution of the aforementioned alleged violations of EPCRA Section 313. In the event Koppers wishes to contest any of the alleged violations, then supporting evidence should be brought to the meeting for discussion and consideration

On or before April 13, 2007, please reply to set up a proposed meeting date. Thanks for your prompt attention to this matter.

Sincerely yours,

Morton E. Wakeland, Jr., Ph.D.
EPCRA 313 Enforcement & TRI Program
  Coordinator
U.S. EPA Region 6
Dallas, Texas

cc:  Jan Gerro, Senior Enforcement Counsel, Office of Regional Counsel
    Missy Milbeck, Section Chief, Toxics Section
    Steve Vagro, Associate Director, Pesticides, Toxics, and Underground Storage Tanks
    Beth Burchard, EPCRA 313 Enforcement, Washington, DC
    Marc Edmonds, TRI Program, Washington, DC

**Exhibit 9**

**Letter from Michael Petruska, Director, TRI Program**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OCT 15 2007

OFFICE OF
ENVIRONMENTAL INFORMATION

Martha E. Marrapese
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001

Dear Ms. Marrapese:

This is a response to your letter on June 5, 2007, written on behalf of the Treated
Wood Coalition (TWC), regarding the Toxics Release Inventory (TRI) reporting
requirements. In your letter you ask how the TRI reporting requirements apply to certain
activities conducted by the wood treating industry. In addition to your letter, facts
regarding the wood treating process were presented to the Agency in a follow-up meeting
with the TWC on July 18, 2007.

In your letter you discuss several areas of TRI reporting, including the
recirculation of wood preservatives, normal migration of chemicals from finished
products in storage and activity categories. Answers to the questions raised on these
issues are provided below.

### Is recirculation of wood preservatives considered recycling?

According to your letter and the July meeting, wood is placed in a cylinder
where preservative is applied under high pressure. Once the wood contains the desired
amount of preservative the wood is taken out of the cylinder. This activity generates an
oil and water stream that contains preservative and water from the wood. The stream
enters the oil/water separator where the preservative is removed. The preservative, which
may go through an additional filtering step, is then directed back into the wood treating
process and applied to another batch of wood. The water is either sent to waste water
treatment or used as cooling water. Your letter explains why you believe that this process
should not be considered recycling for TRI reporting purposes.

The Agency would like to emphasize that the TRI chemicals in the oil/water
mixture are considered recycled for TRI purposes when they are separated from water.
The TRI Program considers toxic chemicals "recycled" when the toxic chemicals are
recovered for reuse (*e.g.*, contaminants are removed). (*See* Q&A 588 in EPA 745-B-98-
004, December 1998.) If toxic chemicals are directly reused, without any intervening

reclamation or recovery steps, the toxic chemicals are not considered recycled for TRI reporting purposes (Dombrowski, John M. Letter to Stephen J. Axtell. June, 21, 2001). A recovery step would include removing toxic chemicals from a pollution control device or removing contaminants from the toxic chemical after it has been used and can no longer be used for its intended purpose.

In the case of treating wood, the preservatives in the oil/water mixture cannot be used for their intended purpose without a recovery step; they must be separated from the water before being applied to another batch of wood. Because the preservatives must be reclaimed from the oil/water mixture before they can be used again they are being recycled and thus are reportable as such on the Form R.[1] When calculating waste management quantities, facilities should consider the quantity of toxic chemical recycled onsite each time it is recycled, and report the aggregate total quantity in Part II, Section 8.4 of the Form R. For annual threshold determinations, however, the amount of the toxic chemical should be counted only once toward the processing threshold, regardless of how many times it is sent through the cylinder.

### Are releases from the drip pad and storage reportable?

With regard to releases from the drip pad and storage area, your letter states that releases of preservatives from wood after it comes out of the cylinder do not have to be reported on the Form R. You base this on guidance from the 1989 Form R Instructions (EPA 560/4-90-001, January 1990), the articles exemption at 40 CFR 372.38(b), a letter from Charles Elkins of the U.S. EPA to the Chemical Manufacturers Association on October, 24, 1988, and the 1998 TRI Questions and Answers document (EPA 745-B-98-004, December 1998). Each of these bases is discussed below. *Form R Reporting Instructions.* First, the Form R instructions that you cite state that facilities do not have "to count as a release, quantities of an EPCRA section 313 chemical that are lost due to natural weathering or corrosion, normal/natural degradation of a product, or normal migration of an EPCRA section 313 chemical from a product. For example, amounts of an EPCRA section 313 chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that EPCRA section 313 chemicals from the facility..." As was pointed out at the follow-up meeting, this and similar guidance was published in the Form R instructions through Reporting Year 2001 at which time it was removed. The current version of the reporting instructions, as well as other TRI guidance and regulations, can be found on the TRI Home page at www.epa.gov/tri.

When the above-quoted text was reviewed in preparation for the 2002 reporting forms and instructions, the Agency determined that it could cause confusion among reporting facilities because the guidance applied in limited circumstances that were not clearly explained. The reporting instructions are meant to assist facilities in understanding the TRI reporting requirements; thus, EPA deleted the confusing language for the 2002 and later versions of the instructions document. The text that was deleted can be found on page 41 of the 2001 version of the TRI reporting instructions (EPA-260-

---

[1] Quantities of toxic chemicals that are recycled must also be counted toward the Annual Reportable Amount when considering eligibility for Form A (40 CFR 372.27).

B-02-001, February 2002); however, facilities should no longer have relied on this guidance in RY 2002 and later years. Facilities should be aware that, once they determine they are subject to reporting, all releases and other waste management activities must be reported unless an exemption applies.

*Articles Exemption and Elkins Letter.* Additionally, you claim that the regulations for the articles exemption at 40 CFR 372.38(b) exclude reporting the releases of toxic chemicals that are not associated with the processing or use of an article at the facility. Because releases from wood occur while the wood is in storage, and storage is not a threshold activity, you believe that the releases do not need to be reported per the language of the articles exemption. But, the wood products at issue here do not meet the plain terms of the articles exemptions. The articles exemption specifically states that "[i]f a release of a toxic chemical occurs as a result of the processing or use of an item *at the facility,* that item does not meet the definition of article." 40 CFR 372.38(b) (emphasis supplied). The toxic chemicals that are released from the treated wood once it has left the treatment cylinder and is placed on the drip pad are released as a result of the processing of the wood. Thus, the wood cannot be considered an article under the articles exemption because there is a release of a toxic chemical as a result of the processing of the wood at the facility. Because the wood is not an article, releases from it are not eligible for the articles exemption regardless of where they take place. The Elkins letter also mentions, as a comparison to the issue at hand, that normal, low-level migration of a toxic chemical from plastic film does not negate the articles exemption and therefore does not constitute a release reportable to TRI. But as stated above, whether natural weathering can be exempted is irrelevant for treated wood because the treated wood does not qualify for the articles exemption.

*1998 Questions and Answers Document.* And finally you quote from TRI Question and Answer #89 that "storage in itself of a toxic chemical is not considered a manufacturing, processing, or otherwise use activity." EPA agrees that storage is not a threshold activity that would trigger reporting, however, the answer further explains that if an activity threshold is reached elsewhere at the facility, "the facility is required to include any amounts released or otherwise managed as waste that occur during storage of the listed chemical" (EPA 745-B-98-004, December 1998). Thus, this guidance clearly states that releases from storage are reportable given that activity thresholds have been met by the facility as a whole.

Releases of toxic chemicals from treated wood must be reported, including releases that occur on the drip pad and storage area, unless another exemption applies. As explained above, the guidance and regulations you cite in your letter do not apply to the wood treating process as you described it. The regulations for the articles exemption that you cite set out the criteria for that exemption by explaining how a toxic chemical would meet the exemption. They do not, however, exempt releases from all chemicals in storage. The language from the exemption highlighted in your letter applies only to the articles exemption and, as described above, not to treated wood in storage.

### Are the toxic chemicals processed as an article component or as a formulation component?

Finally, you ask in your letter how to report the activity category in Section 3.1 in Part II of the Form R when reporting for wood preservatives. You believe that the preservatives should be considered article components because they are incorporated into treated wood, which you consider to meet the TRI article definition. The treated wood at your facility clearly does not meet the article definition during the wood treating process because it releases toxic chemicals as a result of its processing. Another option for reporting these chemicals in Section 3.1 would be as a formulation component, which is a chemical that acts as a performance enhancer during use of the product. The wood preservatives prevent the wood from decaying which would be considered a performance enhancing function. Therefore, the preservatives should be considered a formulation component when reporting in Section 3.1.

In light of the confusion among the wood preserving industry with regard to the reporting requirements addressed in this letter, the Agency does not expect facilities to revise TRI reports they have already submitted. However, facilities should apply the guidance in this letter when reporting for the 2007 reporting year and beyond.

I hope you find this information helpful. If you would like to discuss this issue further please call Marc Edmonds of my staff at (202) 566-0758.

Sincerely,

Michael Petruska
Director, TRI Program Division

Encl: Letter from Dombrowski to Axtell, June 21, 2001.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

JUN 21 2001

OFFICE OF
ENVIRONMENTAL INFORMATION

Mr. Stephen J. Axtell
Thompson Hine & Flory, LLP
2000 Courthouse Plaza NE
P.O. Box 8801
Dayton, OH 45401-8801

Dear Mr. Axtell:

This letter responds to your April 11, 2001 letter requesting guidance regarding the reporting requirements of section 313 of the Emergency Planning and Community Right-to-Know Act (EPCRA). Specifically, you are asking for guidance about contaminant removal that constitutes recycling. Your letter cites Q&A 588 from the 1998 EPCRA Section 313 Questions and Answers document (EPA 745-B-98-004, December 1998):

> **If a covered facility sends metal scraps containing chromium off-site to be remelted and subsequently reused, does it report the amount of toxic chemical in the metal as recycled off-site?**
>
> **Assuming no contaminants are removed during the melting process, the chromium in the metal scraps is not actually being recovered but merely melted and reused. Therefore, the amount of the toxic chemical in the metal scraps would not be reportable in Part II, Sections 6.2 or 8 of the Form R. However, because the facility is repackaging and distributing the toxic chemicals in commerce, it should consider these amounts of the toxic chemical towards the facility's processing threshold. If the covered facility exceeds a chemical activity threshold, it is required to file a TRI Report for that chemical.**

Based on this Q&A you want to know how the Agency expects facilities to apply the phrase "assuming no contaminants are removed during the melting process" to a variety of typical scrap metal recycling scenarios. According to your letter, some of your client's scrap metal transferees report that some minimal amount of either the metal in question or associated materials attached to the scrap may come to rest in the transferee's baghouse or other air pollution control equipment upon melting. Therefore, they are reluctant to certify that "no contaminants are removed during the melting process." Your letter further asserts that any melting process is

likely to result "in the escape to the atmosphere of at least a few molecules of a given metal and/or attached materials." Accordingly, you are requesting specific guidance about contaminant removal. Further, you want to know if the mixing of more than one type of scrap metal, by either the facility or the facility transferee, prior to melting, affects the recycling analysis. Finally, you would like guidance on the degree of documentation facilities need in order to demonstrate whether a toxic chemical is being recycled or directly reused. According to your letter, the determination as to whether the scrap metal is being recycled or directly reused impacts whether your client is allowed to submit a Form A certification.

Pursuant to the Pollution Prevention Act (PPA) of 1990, facilities must report the quantities of toxic chemicals released, treated for destruction, combusted for energy recovery and recycled. As you know, EPA has not yet promulgated regulations defining these waste management activities. However, it is important to note that releases from an operation do not automatically preclude the consideration of whether a material is being directly reused. EPA considers toxic chemicals "recycled" when the toxic chemicals are recovered for reuse. If toxic chemicals are directly reused, without any intervening reclamation or recovery steps, the toxic chemicals are not considered recycled for Form R reporting purposes. Reclamation or recovery would not include simple phase changing of the toxic chemical before further reuse (e.g., simple remelting of scrap metal). A reclamation and recovery step, however, would include changing the relative amounts of the chemicals in an alloy. A recovery step would include removing toxic chemicals from a pollution control device or removing contaminants from the toxic chemical after it has been used and can no longer be used for its intended purpose. Accordingly, if the scrap metal is not mixed with other scrap and can be remelted and directly reused, without any recovery steps, then the toxic chemicals in the scrap metal are being directly reused. Facilities should use their best readily available information in determining if the scrap sent off-site is being directly reused or instead is recycled because of an intervening reclamation or recovery step prior to reuse. For documentation requirements, you should refer to 40 CFR section 372.10, which addresses the EPCRA section 313 recordkeeping requirements.

I hope this information is helpful to you in understanding the reporting requirements of section 313 of EPCRA. If you have any other questions, or desire further information, please call Larry Reisman, of my staff, at 202.260.2301.

Sincerely,

*John M. Dombrowski*

John M. Dombrowski, P.E., Chief
TRI Regulation Development Branch