IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
CREOSOTE COUNCIL, et al.                          )
                                                  )
            Plaintiffs,                           )          No. 08-CV-00512 (JR)
                                                  )
      v.                                          )
                                                  )
STEPHEN L. JOHNSON,                               )
Administrator, United States                      )
Environmental Protection                          )
Agency, and UNITED STATES                         )
ENVIRONMENTAL PROTECTION                           )
AGENCY                                            )
                                                  )
            Defendants.                           )
_____ )

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendants Stephen L. Johnson, Administrator, and United States Environmental

Protection Agency (collectively "EPA") hereby oppose plaintiffs Creosote Council et al.'s

("Plaintiffs'") Motion for Preliminary Injunction. Plaintiffs (who have waited nearly six months

to seek emergency relief) have failed to establish that (1) incorporating information concerning

undisputed releases of toxic chemicals into reports that they are already required to file will

cause them irreparable harm, (2) they are substantially likely to succeed on their claim that they

are not required to report these releases, or (3) the public interest would be furthered by the

continued omission of information concerning the extent of these releases.[1]  Plaintiffs' Motion

_____

[1] Plaintiffs' claim that a preliminary injunction would not cause cognizable harm to others is
indistinguishable from Plaintiffs' arguments concerning the other three preliminary injunction
factors, and thus is not separately addressed herein. See Pl. Mem. at 24.

for Preliminary Injunction should thus be denied.

## SUMMARY OF ARGUMENT

The Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq., ("EPCRA"), requires owners and operators of certain facilities to submit toxic chemical release reports (commonly known as "TRI reports") for certain chemicals "manufactured, processed or otherwise used" above threshold levels at their facilities. 42 U.S.C. § 11023(a). Plaintiffs acknowledge that they "process" toxic chemicals above threshold levels and that they file TRI reports. See Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pl. Mem.") at 2, 5. Plaintiffs also acknowledge that toxic chemical releases occur (through volatilization to the air) while treated wood is held in storage at Plaintiffs' facilities. See Pl. Mem. at 2, 8; see also Declaration of Leslie Hyde (Pl. Ex. 2) ("Hyde Decl.") ¶ 10.

Nearly six months after having received a letter clarifying that releases of toxic chemicals from processed wood in storage should be included in their TRI reports, Plaintiffs ask the Court for emergency relief from their obligation to file TRI reports on July 1, 2008. Plaintiffs' most prominent argument is that EPA had allegedly previously "taken the position that releases of reportable chemicals from finished goods and articles in the storage and holding areas of manufacturing facilities are exempt from TRI reporting even though reportable chemicals may be released from treated wood during storage," Pl. Mem. at 2, and that EPA has now improperly departed from that position without notice and comment. See generally Pl. Mem. at 1-3, 8-13, 15-19. To prevail on such a claim, Plaintiffs "must" show that EPA gave its regulation a "definitive" interpretation and later "significantly" revised that interpretation. Darrell Andrews

Trucking v. Fed. Motor Carrier Safety Admin., 296 F.3d 1120, 1125 (D.C. Cir. 2002) (emphasis added, citation omitted).  EPA had not previously taken a definitive position regarding releases from "finished goods in storage" generally, and still less had EPA made any definitive statement concerning reporting releases from treated wood in storage.  See 5-7, 10-15, infra.  In addition, EPA's clarification of reporting requirements has a minimal impact on Plaintiffs, who are already reporting releases of the same chemicals that are released from treated wood in storage.  See 15-17, infra.  Plaintiffs have thus failed to demonstrate that they are likely to succeed on the merits of their claim that EPA was required to undertake notice and comment before clarifying its interpretation of the articles exemption in this single industry-specific context.  Plaintiffs have also failed to show that they are likely to succeed in showing that EPA's interpretation of its own regulations is substantively arbitrary or capricious.  See 18-19, infra.

Plaintiffs take the position that incorporating these undisputed releases into their TRI reports for the 2007 reporting year represents such an intolerable burden that they are entitled to the extraordinary relief of a preliminary injunction.  Plaintiffs' delay in seeking relief counsels against granting their motion; indeed, Plaintiffs cannot show any real harm arising from the requirement that they report these releases, let alone harm of such immediacy that it could justify a preliminary injunction.  See 20-23, infra.

Plaintiffs have thus failed to establish two critical elements, i.e., the likelihood of success on the merits and the presence of irreparable harm.  Nor can plaintiffs demonstrate that the public interest would not be harmed by an injunction that would limit the amount of information the public receives concerning releases of toxic chemicals from Plaintiffs' facilities.  See 23-24, infra.  Plaintiffs' motion for preliminary injunction should therefore be denied.

**BACKGROUND**

**I.    REPORTING OF CHEMICAL RELEASES UNDER EPCRA.**

Congress enacted EPCRA in part to provide the public and government entities with information concerning releases of toxic chemicals to the environment. 42 U.S.C. § 11023(h). EPCRA does not restrict the manufacture, processing, use or disposal of any chemical, but it does require the reporting of certain information. Specifically, Section 313 of EPCRA requires certain facilities that manufacture, process or otherwise use listed toxic chemicals at above threshold levels to submit annual reports to EPA and state officials identifying any releases of those chemicals to the environment. 42 U.S.C. § 11023(a). These reports (commonly known as "TRI reports") must include, among other things, an estimate of the amount of each chemical entering each environmental medium at reporting facilities. 42 U.S.C. § 11023(g)(1)(C)(iv); see also Form R at 2-3 Box 5 (Ex. 1). With regard to air emissions in particular, all fugitive and non-point source air emissions from a single facility are reported as an aggregate figure. See id. at 2 box 5.1; see also Toxic Chemical Release Inventory Reporting Forms and Instructions, Revised 2007 Version (excerpts attached as Ex. 2) ("2007 Instr.") at 46.

To provide the required information, the owner or operator of a facility may use "readily available data" collected pursuant to other laws, or if such data is not available may provide "reasonable estimates of the amounts involved." 42 U.S.C. § 11023(g)(2). The statute specifically states, however, that "[n]othing in this section requires the monitoring or measurement of the quantities, concentration, or frequency of any toxic chemical released into the environment beyond that monitoring and measurement required under other provisions of law or regulation." Id.; see also 2007 Instr. at 48-49.

## II.    "ARTICLES" AND THE ARTICLE EXEMPTION

EPA has by regulation created limited exemptions to EPCRA reporting requirements.

See 42 C.F.R. § 372.38.  One of these exemptions applies to "articles," which are defined as

follows:

> *Article* means a manufactured item: (1) Which is formed to a specific shape or
> design during manufacture; (2) which has end use functions dependent in whole
> or in part upon its shape or design during end use; and (3) <u>which does not release
> a toxic chemical under normal conditions of processing or use of that item at the
> facility</u> or establishments.

40 C.F.R. § 372.3 (underlining added, italics in original).  The quantity of any toxic chemical

present in an "article," (<u>i.e.</u>, an item that meets all three of the above criteria) need not be

considered in determining, <u>inter alia</u>, the amount of chemical release to be reported.  40 C.F.R.

§ 372.38(b).  EPA's regulations caution, however, that "[i]f a release of a toxic chemical occurs

as a result of the processing or use of an item at the facility, <u>that item</u> does not meet the

definition of *article*."  <u>Id.</u> (underlining added, italics in original).[2]  Any item that does not qualify

as an article cannot, by definition, benefit from the articles exemption.

EPA has had limited occasion to interpret or apply the definition of "article" and the

articles exemption.  In 1988, EPA stated that it distinguishes between "continuous low-level

releases that occur over the life of [a] product" (in that case, plastic film), and "releases that are

the direct result of processing and use of the [product]." Letter of Oct. 24, 1988 from Charles

---

[2]  An item may remain eligible for the articles exemption if (1) the processing or use of that item
together with all like items results in the release of .5 pounds or less of a toxic chemical in a
given year (in which case EPA allows rounding down to zero), or (2) the amount of the chemical
released is completely recycled or reused.  <u>See</u> EPCRA Section 313 Questions and Answers
(Revised 1998 Version) (excerpts attached as Ex. 4) ("FAQ") at 110 No. 345; <u>see also</u> 2007
Instr. at 20.  Plaintiffs do not appear to contend that either condition is present here.

Elkins to Geraldine Cox ("Elkins Letter") (Pl. Ex. 4) at 1-2.   The former type of releases do not cause an item to lose its status as an article, but the latter do.   See id.; see also id. at 3.  The Elkins Letter does not draw any distinction based on whether an item is held in storage at a facility; rather, it (like the actual regulations) focuses on whether any releases result from the processing or use of that item.  Id. at 1, 3. A subsequent regulatory interpretation similarly indicates that a key discriminator is whether there is a release from an item processed at a facility, not simply whether an item can be said to be in storage.  See Memorandum of March 8, 2000 from Maria Doa to F. Kevin Reilly ("Doa Memo") (Ex. 3) at 1-2.  The Doa Memo states that the bundling of lead bars at defense stockpile facilities for purposes of sale constituted "processing" of the bars.  Id. at 1.  Thus, although the facilities "[had] not performed any activity involving the lead other than to store it" until it was readied for sale, if the bars released toxic chemicals the articles exemption would be unavailable.  Id. at 1, 2.  Until recently, EPA had not explicitly addressed the definition of "article" or the applicability of the articles exemption in the context of the wood preserving industry.  EPA's 1988 guidance on estimating releases from wood preserving operations, see Ex. 5, is silent on the topic, and EPA is unaware of any requests for further guidance from that industry prior to the inquiry that led to EPA's letter of October 15.

EPA's EPCRA Section 313 Questions and Answers make it clear that determining whether an item qualifies as an "article" and whether the articles exemption applies requires a careful, fact-specific inquiry.  See generally EPCRA Section 313 Questions and Answers (Revised 1998 Version) (excerpts attached as Ex. 4) ("FAQ") at 109-122; see also 40 C.F.R. § 372.38(b) (persons potentially subject to articles exemption "should carefully review the definitions of *article* and *release*") (italics in original). For a time, the TRI reporting instructions

contained a statement that "amounts of a covered toxic chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that chemical from the facility." See Pl. Ex. 5 (excerpts from reporting instructions dated 2000 or earlier). This language was, however, deleted beginning with the instructions for the 2002 reporting year. See Letter of October 15, 2007 from Michael Petruska to Martha Marrapese (Pl. Ex. 9) ("October 15 Letter" or "Letter") at 2-3. It thus no longer appears in the TRI reporting instructions, and has not done so for several years. See 2007 Instr. at 45-46; see also Ex. 6 (excerpts from 2006 and 2005 reporting instructions).

Inspections of wood treating facilities in EPA Region 6 in 2005 and 2006 led EPA to identify alleged violations of EPCRA reporting requirements, including in pertinent part the failure to include air releases from treated wood on drip pads and in storage yards on those facilities' TRI reports.[3] See Pl. Ex. 8; see also Hyde Decl. ¶¶ 6-7. The Treated Wood Coalition ("Coalition"), an industry group that includes the Plaintiffs, thereafter wrote to and met with EPA to discuss how TRI reporting requirements apply to, inter alia, migration of chemicals from treated wood on drip pads and in storage areas. See October 15 Letter at 1, 2-3; see also Pl. Mem. at 12-13. EPA explained that because there is a release of toxic chemicals as a result of the processing of wood at Plaintiffs' facilities, the treated wood cannot be considered an "article," and "releases from [treated wood] are not eligible for the articles exemption regardless of where they take place." October 15 Letter at 3. Because activity thresholds have been surpassed at Plaintiffs' facilities for the chemicals released from treated wood, all such releases

---

[3] A "drip pad" is where treated wood is held following its impregnation with preservative, so that any excess preservative that drips off may be captured. See Pl. Mem. at 7.

(including releases from treated wood in storage) must be reported.  Id.  EPA stated that facilities

are not expected to revise already-submitted TRI reports, but they do need to include releases

from treated wood on drip pads or in storage beginning with the 2007 reporting year.  See id. at

4.

On November 6, 2007, the Coalition wrote back to EPA, stating that its members had

"identified a number of issues and concerns in connection with" the October 15 Letter, and that

they "intend[ed] shortly to provide a detailed response seeking reconsideration."  November 6,

2007 Letter from Herbert Estreicher to Michael Petruska (Ex. 7).  No such "detailed response"

was ever received, and EPA is unaware of any further contact from the Coalition between the

November 6 letter and the filing of this lawsuit.

## ARGUMENT

A preliminary injunction is an extraordinary remedy that should not be granted unless the

movant clearly carries its burden of persuasion.  Sandoz v. Food & Drug Admin., 439 F. Supp.

2d 26, 30 (D.D.C. 2006) (preliminary injunction is "an extraordinary remedy and must be

sparingly granted," and is appropriate only when party seeking relief  "carries its burden of

persuasion by a clear showing") (citations omitted); see also Boivin v. US Airways, 291 F. Supp.

2d 110, 116 (D.D.C. 2003).  To be entitled to this extraordinary remedy, Plaintiffs must

demonstrate "1) a substantial likelihood of success on the merits, 2) that [they] would suffer

irreparable injury if the injunction is not granted, 3) that an injunction would not substantially

injure other interested parties, and 4) that the public interest would be furthered by the

injunction."  Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citation

omitted).  Because Plaintiffs can establish neither the likelihood of success on the merits nor

irreparable harm, and have failed to show that the public interest would be furthered by the requested injunction, their motion must be denied.

## I.    PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' challenge to the October 15 Letter is primarily based on Plaintiffs' assertion that EPA was required to undertake notice and comment before issuing the Letter.  See Complaint ¶ 53, 56, 58; see also Pl. Mem. at 1-3, 15-19.  Plaintiffs have failed to establish either that, prior to the October 15 Letter, EPA had taken a definitive position regarding the reporting of emissions from treated wood in storage, or that the Letter represents a significant change in EPA's interpretation of the term "article" or the articles exemption.  Plaintiffs' secondary argument that EPA's conclusion that treated wood in storage is not an "article" is arbitrary or capricious, see Pl. Mem. at 19-22, is insufficient to overcome the deference due EPA's interpretation of its own regulations.  Plaintiffs have therefore failed to demonstrate that they are likely to succeed on the merits.

### A.    Plaintiffs Have Failed to Demonstrate a Likelihood of Success on Their Claim That the October 15 Letter Required Notice and Comment.

The D.C. Circuit has stated that once an agency definitively interprets a regulation, "it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."  Paralyzed Veterans of Am. v. D.C. Arena, 117 F.3d 579, 586 (D.C. Cir. 1997).  Plaintiffs rely on Paralyzed Veterans and its progeny to argue that EPA should have undertaken notice and comment rulemaking before issuing the October 15 Letter.  Pl. Mem. at 15-19.  Plaintiffs have, however, failed to establish either that EPA had previously adopted a definitive interpretation of the term "article" or the articles exemption as

applied to Plaintiffs' industry, or that the October 15 Letter represents a fundamental change in position.  See Paralyzed Veterans, 117 F.3d at 586 (to allow agency to make "fundamental" change in interpretation without notice and comment would undermine APA requirements); see also Alaska Prof'l Hunters Ass'n v. Federal Aviation Admin., 177 F.3d 1030, 1034 (D.C. Cir. 1999) ("When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule . . . .") (emphasis added).  Plaintiffs thus have not demonstrated a substantial likelihood of success on the merits of this claim.

> **1.    EPA has not previously taken a definitive position concerning the application of the articles exemption to goods in storage in general, or to treated wood in particular.**

The cases principally relied on by Plaintiffs, Pl. Mem. at 16-19, are instructive regarding the sort of agency statements that constitute "definitive" regulatory interpretations.  In Alaska Professional Hunters, regional FAA officials had – for several decades – explicitly and consistently advised Alaskan guide pilots that they were not governed by regulations dealing with commercial pilots.  Alaska Prof'l Hunters, 177 F.3d at 1031-32.  And in Iyengar v. Barnhart, 233 F. Supp. 2d 5 (D.D.C. 2002), the Social Security Administration had stated in multiple official guidances that applying for a driver's license was a "valid nonwork purpose" for which legal aliens not authorized to work in the United States might obtain a social security number.  Iyengar, 233 F. Supp. 2d at 8.

Absent explicit (and typically repeated) agency pronouncements, however, courts have been reluctant to conclude that an agency has taken such a definitive position concerning the interpretation of a regulation that a change in position requires notice and comment.  For

example, in Association of American Railroads v. Department of Transportation, 198 F.3d 944

(D.C. Cir. 1999), the D.C. Circuit considered a claim that an agency was required to undertake

notice and comment before issuing a technical bulletin interpreting a safety regulation.  Ass'n of

Am. R.R., 198 F.3d at 945, 947.  The petitioners had identified a number of documents

(including letters from agency personnel and an agency manual) that the court found could –

"albeit sometimes vaguely" – support a claim that the agency, or at least some of its personnel,

might have previously interpreted its regulation inconsistently with the technical bulletin.  Id.  at

949.  The court nonetheless found that no notice and comment was required because the

materials identified by the petitioners did not "even come[] close to the express, direct, and

uniform interpretation present in Alaska Professional Hunters."  Id. at 949; see also id. at 948.

  Similarly, in Air Transport Associaton of America v. Federal Aviation Administration,

291 F.3d 49 (D.C. Cir. 2002), the petitioners claimed that an agency letter interpreting a

particular regulatory phrase represented a change in position requiring notice and comment.  Air

Transp. Ass'n, 291 F.3d at 51, 56-57.  Although there was a prior interpretation of the pertinent

regulation that could have been read as inconsistent with the challenged letter, and that was not

"expressly" limited to issues other than those addressed in the letter, the court concluded that the

prior interpretation "nevertheless[did] not provide a 'definitive' interpretation inconsistent with"

the challenged letter.  Id. at 57, 58; see also Darrell Andrews Trucking, 296 F.3d at 1126 (where

regulatory guidance offered some support for positions of both petitioner and respondent agency,

and could "only be described as – at best – ambiguous," it "[could] not be said to mark a

definitive interpretation from which the agency's current construction is a substantial

departure").

Although Plaintiffs assert that EPA's longstanding interpretation was that "releases from finished products are exempt from TRI reporting obligations," Pl. Mem. at 8, Plaintiffs' evidence of this supposed interpretation is sorely lacking. Initially, Plaintiffs appear to base their assertions concerning EPA's supposed positions (both past and present) as much on their own interpretation of EPA's statements as on those statements themselves. See Pl. Mem. at 22 ("Plaintiffs universally agree that the treated wood is an article when it enters storage"); see also Hyde Decl. ¶ 5 ("Koppers has long understood that air releases from finished treated wood products . . . were not reportable . . . as the treated wood products had become 'articles' . . . "); Declaration of H. Martin Rollins (Pl. Ex. 1) ("Rollins Decl.") ¶ 18 (stating that "facilities in the wood treating industry universally agree that treated wood is an article . . . when it enters storage"); id. ¶ 19 ("I have reviewed the October 15, 2007 letter from EPA which states that removal of treated wood from the retort and placement on a drip pad constitutes processing of the treated wood and so defeats the TRI article exemption. I disagree.")[4] Plaintiffs' interpretation of the regulations, or of EPA's statements concerning those regulations, cannot serve as evidence of EPA's position. Cf. Environmental Def. v. EPA, 467 F.3d 1329, 1334 (D.C. Cir. 2006) (petitioners could not show that EPA had reinterpreted regulation by providing only their own interpretation as evidence of agency's interpretation.)

---

[4] Mr. Rollins' disagreement with EPA's October 15 Letter is irrelevant, but it is also based on a misinterpretation. EPA stated that releases that occur at the drip pad and in storage are reportable; it did not, however, state that placing treated wood on a drip pad, without more, constitutes processing of the wood. See October 15 Letter at 1-2. The Letter merely explains that because wood is "processed" at Plaintiffs' facilities (which is not disputed), and because toxic chemicals are released due to that processing (which is also not disputed), treated wood does not qualify as an "article" and any releases from that treated wood – regardless of where at Plaintiffs' facilities they occur – must therefore be accounted for in Plaintiffs' TRI reports. Id.

Nor do the EPA documents proffered by Plaintiffs provide evidence of a definitive agency interpretation of the articles exemption that would exclude releases from all products in storage. The Elkins Letter, see Pl. Mem. at 9-10, states that "normal low-level migration" from plastic film would not be a reportable release; however, the letter ultimately concludes that the film at issue did not qualify as an article because toxic chemicals were released during use of the film at the facility. Elkins Letter at 3. The Elkins Letter demonstrates that EPA draws the distinction between articles and non-articles based in part on whether toxic chemicals are released as the result of the processing of an item at a facility, but offers no support for Plaintiffs' allegation that EPA has ever drawn that distinction based on whether an item is "in storage" or not.

Plaintiffs also point to EPA's instructions for completing TRI reporting forms, which for a time included the statement that "amounts of an EPCRA section 313 chemical that migrate from plastic products in storage do not have to be counted in estimates of releases . . . ." Pl. Mem. at 10 and Ex. 5. Plaintiffs assert that this (now deleted) phrase "merely restates" the articles exemption, see Pl. Mem. at 10, but this claim is entirely unsupported. As discussed above, see supra at 5, the articles exemption by its own terms does not apply "[i]f a release of a toxic chemical occurs as a result of the processing or use of an item at [a] facility. . . ." 40 C.F.R. § 372.38(b). Nothing in the TRI reporting instructions cited by Plaintiffs suggests that EPA had taken a position that stored plastic products, or any other stored products, could be considered "articles" if their processing or use resulted in a release of toxic chemicals. In addition, even if this single phrase could be characterized as a definitive position regarding the reporting of emissions from any products in storage (which EPA does not concede), it has not

- 13 -

appeared in the TRI reporting instructions for several years.  See Ex. 6.

Plaintiffs cite FAQ 89, which states that "storage in itself of a toxic chemical is not considered a manufacturing, processing, or otherwise use activity."  Pl. Mem. at 10 and Ex. 6. Plaintiffs' quote is accurate as far as it goes; however, the FAQ goes on to state that if a threshold for the stored chemical has been exceeded elsewhere at the facility, the facility must include any amounts released during storage of that chemical.  See Pl. Ex. 6 at No. 89.  As explained in FAQ 87, which is located on the same page:

> Storage [of a chemical], in itself, would not meet an activity threshold under EPCRA Section 313. . . . However, <u>if the facility exceeds the manufacturing, processing, or otherwise use threshold for the same toxic chemical elsewhere at the facility, the facility must consider releases from the storage of the toxic chemical</u>.

Pl. Ex. 6 at No. 87 (emphasis added).  The FAQs thus offer no support for Plaintiffs' assertion that EPA has ever adopted a general "storage" exemption.  In addition, there is a detailed and much more extensive section of the FAQ that deals specifically with the articles exemption.  See generally Ex. 4.  Nowhere in this more detailed discussion does EPA state that items in storage automatically qualify as articles, or that releases from items in storage do not need to be reported.

Still less can plaintiffs show any definitive EPA position with regard to the storage of treated wood products in particular.  Plaintiffs point to EPA's 1988 guidance for reporting releases from wood preserving operations, arguing that this guidance does not indicate that emissions from treated wood that occur after the wood has left the treatment cylinder need to be reported.  Pl. Mem. at 9.  Plaintiffs are correct that the 1988 guidance is silent on this point; however, neither does the guidance state that such releases need <u>not</u> be reported.  It thus can

- 14 -

provides no evidence of the definitive agency statements alleged by plaintiffs.

Plaintiffs' evidence of EPA's prior statements concerning the articles exemption is thus far closer to the assemblage of inconclusive materials considered in Association of American Railroads and Air Transport Association than it is to the unequivocal and unvarying statements made in Alaska Professional Hunters or Iyengar.  Even taken together, the EPA statements that Plaintiffs point to do not begin to constitute an "express, direct, and uniform interpretation" holding that products in storage generally – let alone treated wood products in particular – are articles exempt from TRI reporting requirements.  See Ass'n of Am. R.R., 198 F.3d at 949.  EPA cannot be required to undergo notice and comment to "change" a position that it never took in the first place.  See Air Transp. Ass'n, 291 F.3d at 58 (challenged letter "addresse[d] only a theretofore unresolved aspect of" the regulation at issue; as such, it did not "alter a definitive prior interpretation" and did not require notice and comment).

> **2.    The October 15 Letter does not have any significant effect on Plaintiffs' reporting obligations.**

Paralyzed Veterans and its progeny require not only that an agency have previously taken a definitive position, but that the agency's change of position be significant.  See supra at 9-10. In Alaska Hunters, for example, hunting and fishing guides who piloted light aircraft as part of their services had been told for thirty years that they were not governed by regulations pertaining to commercial pilots – and had built a substantial tourist industry on that understanding – but were suddenly informed that they were in fact required to comply with regulations applicable to commercial air operations.  Alaska Hunters, 177 F.3d at 1031-32, 1035-36; see also Iyengar, 233 F. Supp. 2d at 14-15 (agency's statement that legal aliens could not obtain social security numbers for purposes of obtaining driver's license was "a complete reversal" that was

"diametrically opposed" to prior interpretation of regulations).  By contrast, in <u>Association of American Railroads</u>, the D.C. Circuit found it important that none of the plaintiffs could demonstrate the sort of reliance that was present in <u>Alaska Hunters</u>.  <u>Ass'n of Am. R.R.</u>, 198 F.3d at 950.  The court noted that the petitioning association "[did] not claim that its members made large capital expenditures based on their interpretation of [the regulation at issue] or altered their business practices in any significant manner."  <u>Id.</u>

Plaintiffs have similarly failed to identify any significant impact arising from EPA's clarification of its interpretation of the articles exemption in the context of wood preserving facilities.[5]  The <u>only</u> consequence of EPA's action is that Plaintiffs have now been explicitly informed that in the future they are required to include releases from treated wood held in storage at their facilities on their TRI reports – reports that they already file, and that already include information concerning releases of the same chemicals that are released from stored treated wood.  Plaintiffs have not even made, let alone provided evidence to support, any allegations that could place them in company with the pilots of <u>Alaska Hunters</u> – they identify no way in which wood treatment practices or the wood treatment industry generally would have differed (or will now differ) in light of EPA's clarification.  Plaintiffs can proceed exactly as they have done to date, using precisely the same treatment processes and filing similar TRI reports, adjusted only as necessary to include emissions from treated wood held in storage.

---

[5] Plaintiffs state that they have "relied" on EPA's supposed interpretation of the articles exemption, and "conducted their TRI reporting in compliance with" that alleged interpretation. Pl. Mem. at 11.  There are, however, no consequences to any such reliance; as stated in the October 15 letter, Plaintiffs are not expected to revise their past TRI reports.  October 15 Letter at 4.

### 3.    The October 15 Letter is at best an interpretative rule; as such, no notice and comment is required.

Plaintiffs appear to base their notice-and-comment argument solely on their assertion that the October 15 Letter represents a change in EPA's interpretation of the articles exemption. To the extent that plaintiffs are arguing that the Letter independently required notice and comment, however, Plaintiffs' argument is equally flawed. The notice-and-comment provisions of the Administrative Procedure Act do not apply to, inter alia, "interpretative rules." 5 U.S.C. § 553(b)(3)(A). Although the line between interpretative and legislative rules can be difficult to draw, in general interpretative rules are those that "reflect an agency's construction of a statute [or regulation] that has been entrusted to the agency to administer." Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997). One critical distinction is whether the agency's interpretation itself "carries the force and effect of law," or whether it instead "spells out a duty fairly encompassed within the regulation" that the agency is interpreting. Air Transp. Ass'n, 291 F.3d at 405-06 (citing Paralyzed Veterans, 117 F.3d at 588, and concluding that letter that did not impose new rights or duties did not require notice-and-comment rulemaking); see also General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (interpretative rule simply states what agency thinks statute means, and only reminds affected parties of existing duties).

EPA's October 15 Letter does not create any new rights or duties. The duty to report releases of toxic chemicals arises from EPCRA. The articles exemption carves out a limited category of releases that do not need to be reported, and EPA's Letter does nothing more than clarify the reach of that exemption. As such, it is at best an interpretative rule and does not require notice and comment. See id.

- 17 -

**B.    Plaintiffs Have Failed to Demonstrate a Likelihood of Success on Their Claim That EPA's Interpretation of the Articles Exemption is Arbitrary or Capricious.**

Plaintiffs also argue that EPA's interpretation of the articles exemption in the October 15 Letter is arbitrary or capricious.  Pl. Mem. at 19-22.  To succeed on such a claim, Plaintiffs would be required to overcome the "substantial deference" due EPA's interpretation of its own regulations.  See Air Transp. Ass'n., 291 F.3d at 49.  That interpretation is given "controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994) (citations omitted).  Plaintiffs have failed to demonstrate that they are likely to succeed in overcoming this broadly deferential standard.

Initially, Plaintiffs argue that EPA was required to provide a "reasoned explanation" to justify its supposed departure from a prior interpretation.  Pl. Mem. at 19; see generally id. at 19-22.  For the reasons discussed above, Plaintiffs have failed to demonstrate that EPA has departed from a prior interpretation of its own regulations; thus, Plaintiffs' claim that EPA was required to provide an explanation for doing so also necessarily fails.

Plaintiffs' challenge is, moreover, based on a misstatement of EPA's interpretation of the articles exemption.  EPA's position is not, as Plaintiffs contend, that "the mere physical movement of a finished product into storage or shipping" can "defeat" the (in Plaintiffs' view) otherwise-applicable articles exemption.  Pl. Mem. at 20; see also id. at 21.  Both the definition of "article" and the articles exemption itself state that an item does not qualify as an "article" "if a release of a toxic chemical occurs as a result of the processing or use of [that] item at the facility."  40 C.F.R. § 372.38(b); see also 40 C.F.R. § 372.3.  EPA's October 15 letter simply clarifies that if toxic chemicals are released as a result of the processing of an item at any stage,

the item is no longer an "article" and <u>all</u> releases of those chemicals at the facility must be reported. Because toxic chemicals are released during the processing of wood (a fact that plaintiffs do not dispute), treated wood is not an "article," and it does not suddenly become one simply because it is moved into storage. Releases from treated wood are therefore not exempt and must be reported regardless of where at the facility they occur.

The Court need not determine at this time whether EPA's interpretation is reasonable; it need only determine whether Plaintiffs have shown that they are likely to succeed on the merits of their claim that it is not. Plaintiffs offer little more than their own views of how the articles exemption should be interpreted to counter EPA's interpretation of its own regulation. <u>See</u> Pl. Mem. at 20 (arguing that EPA's interpretation is illogical); <u>Id.</u> at 22 (explaining why in Plaintiffs' view certain goods"should regain" status as exempt articles when placed in storage). In light of the deference due EPA's interpretation of its own regulations, <u>see</u> <u>supra</u>, this falls far short of meeting Plaintiffs' burden.

In sum, Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their claim. Having failed in this "particularly important" respect, Plaintiffs would be required to make "a very strong showing"on the remaining preliminary injunction factors. <u>City of Tempe v. Federal Aviation Admin.</u>, 239 F. Supp. 2d 55, 59 (D.D.C. 2003) (citation omitted). As demonstrated in the following sections, Plaintiffs cannot do so, and their motion for preliminary injunction should therefore be denied.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Plaintiffs' near six-month delay in seeking relief following the October 15 Letter undermines any claim that emergency relief is now required. Nor have Plaintiffs shown that the

harms they allege, even if shown to occur and asserted in a timely manner, could justify preliminary relief. Plaintiffs have thus failed to demonstrate that an injunction is required to prevent irreparable harm.

### A.    Plaintiffs' Delay in Seeking Judicial Relief Undermines Their Claim of Irreparable Harm

Where a party delays in seeking preliminary relief, the "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2d Cir. 1985) (citation omitted). As the Second Circuit explained,

> Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.

Id. at 276; see also Sandoz, 439 F. Supp. 2d at 31 (agreeing that claims of harm "[fell] short" in part because of delay in seeking relief); City of Tempe, 239 F. Supp. 2d at 65 n. 13 (fact that plaintiffs were not diligent in seeking preliminary injunction undermined their case). The D.C. Circuit has characterized as "inexcusable" a six-week delay in seeking an injunction from the time that plaintiffs knew their rights had allegedly been infringed. Fund for Animals v. Frizzell, 530 F.2d 982, 987-88 (D.C. Cir. 1976). Here, Plaintiffs inexplicably delayed nearly six months from the October 15 Letter before even filing their complaint – time during which this matter could have been well on the way to a decision, if not entirely resolved. See Quince Orchard Valley Citizens Ass'n v. Hodel, 872 F.2d 75, 79-80 (4th Cir. 1989) (dispute could have been resolved in time that elapsed between challenged agency action and motion for preliminary injunction; district court was therefore justified in concluding that any harm to plaintiff "was a

product of its own delay" and in denying motion).

**B.    Plaintiffs Have Not Shown That Compliance With TRI Reporting Requirements Constitutes Irreparable Harm**.

Plaintiffs are already filing TRI reports, and indeed are already reporting releases of the chemicals that are emitted from treated wood in storage. See supra at 2. Thus, the only thing that Plaintiffs will need to do differently for the 2007 reporting year than for previous years is to increase their release reporting to reflect a "reasonable estimate[]" of the emissions from treated wood in storage. See 42 U.S.C. § 11023(g)(2). Plaintiffs' claims of harm center on the alleged "impossibility of gathering, assembling and accurately reporting" data concerning these emissions by the July 1, 2008 TRI reporting deadline. Pl. Mem. at 22; see also, e.g., Hyde Decl. ¶ 10; Rollins Decl. ¶ 20.

The wood treating industry is "highly diverse," using a variety of woods, processing techniques, and preservatives.   Rollins Decl. ¶ 9; see generally id. ¶¶ 8-17).  Reporting of releases currently varies from facility to facility depending on "variations in company-specific product and manufacturing lines" as well as variations in processing methods at individual facilities. See Rollins Decl. ¶ 18. Plaintiffs appear to believe that they will now need to change this facility-specific approach, and that they are required to develop (at an allegedly significant cost) a single industry-wide methodology for assessing emissions from treated wood in storage. See Rollins Decl. ¶ 22 (discussing barriers "the industry" will allegedly encounter in developing emissions estimation methodology); Rollins Decl. ¶¶ 39-40 (discussing money "the industry" would allegedly need to spend to develop emissions estimation methodologies for creosote and pentachlorophenol).

To the extent that they do believe a standardized methodology is required, Plaintiffs are

in error.  EPCRA requires only a reasonable estimate of releases, and nowhere dictates that all

facilities in a given industry must use the same methodology.  Individual facilities can account

for the complicating factors that Mr. Rollins discusses – variations in wood species,

preservatives used, type of finished products, stacking methodologies, and even seasonal

variations – in their individual reporting methods.  See Rollins Decl. ¶ 23; see generally id.

¶¶ 22-40.  Plaintiffs acknowledge that facilities can at least identify a range within which

emissions from stored wood fall.  Pl. Mem. at 23; see also Rollins Decl. ¶ 27.  A reasonable

estimate from within this range is all that each facility need provide to comply with reporting

requirements.  See 42 U.S.C. § 11023(g)(2); see also 2007 Instr. at 48-49. Plaintiffs are free to

develop more accurate methodologies if they so choose, but the cost of that choice cannot be

counted as "harm" justifying injunctive relief.[9]

Even if plaintiffs had demonstrated that they are required to incur the costs of developing

highly accurate reporting methodologies, which they have failed to do, they would not have

shown that this would constitute irreparable harm sufficient to justify a preliminary injunction.

Demonstrating that a cost will be incurred to comply with a regulation is not the same thing as

demonstrating an unrecoverable financial loss.  See Armour & Co. v. Ball, 337 F. Supp. 938 (D.

Mich. 1971), rev'd on other grounds 468 F.2d 76 (6th Cir. 1972) (cost of complying with

regulation could not be regarded as irreparable injury; court noted among other factors that cost

---

[9]  Plaintiffs offer nothing to support their conclusory assertion that facilities that overestimate
emissions may be subject to "public stigma" or "more stringent and unnecessary regulatory
requirements."  Pl. Mem. at 23-24.  Such unsupported statements are entirely insufficient to meet
Plaintiffs' burden.  See Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)
(movant seeking stay must substantiate claim of irreparable injury by providing "proof that the
harm has occurred in the past and is likely to occur again, or proof indicating that the harm is
certain to occur in the near future") (emphasis addded).

of compliance did not equate to financial loss, since increased cost would presumably be passed on to consumers); see also A.O. Smith Corp. v. FTC, 530 F.2d 515, 527-28 (3rd Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction").

## III.    PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE PUBLIC INTEREST WOULD BE SERVED BY A PRELIMINARY INJUNCTION

One of the central purposes of EPCRA is to ensure that communities are informed regarding toxic substances released into the local environment.  See 42 U.S.C. § 11023(h); see also Dayton Power & Light Co. v. Browner, 44 F. Supp. 2d 356, 359-60 (D.D.C. 1999) (recognizing "informational purpose" of EPCRA and importance of informing public of toxic emissions). Plaintiffs do not dispute that toxic substances are released from treated wood in storage; their only claim is that they should not be required to account for these releases in their annual TRI reports.  A preliminary injunction would harm the public interest by further delaying the reporting of information concerning undisputed releases of toxic chemicals.  That this information has not previously been reported due to plaintiffs' unilateral interpretation of the articles exemption, see Pl. Mem.at 24, does not mean that it should not be reported now.

Plaintiffs' assertion that an injunction is required to preserve a general interest in compliance with the law by public officials and to protect unidentified "other persons" from having to report toxic emissions from goods in storage, Pl. Mem. at 24, assumes a conclusion that Plaintiffs have – as demonstrated above – utterly failed to prove: that the October 15 Letter represents a departure from EPA's prior policy, and one undertaken in contravention of law. Plaintiffs have thus failed to establish the existence of any interest that could outweigh the

public's interest in full reporting of toxic releases.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be

denied.


April 14, 2008                                    Respectfully submitted,

                                                 Ronald J. Tenpas
                                                 Assistant Attorney General
                                                 United States Department of Justice
                                                 Environment and Natural Resources Division

                                                 */s/ Angeline Purdy*
                                     By:         _____
                                                 Angeline Purdy
                                                 Environmental Defense Section
                                                 U.S. Department of Justice
                                                 P.O. Box 23986
                                                 Washington, D.C. 20026-3986
                                                 Voice: (202) 514-0996
                                                 Fax: (202) 514-8865
                                                 e-mail: angeline.purdy@usdoj.gov

                                                 Overnight delivery:
                                                 Patrick Henry Building, Suite 8000
                                                 601 D Street, N.W.
                                                 Washington, D.C.  20004


Of Counsel:

Erin S. Koch
Office of General Counsel
U. S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460-2001

Creosote Council Et al. v. EPA
No. 08-00512

Ex. 1 to EPA's Memorandum in Opposition to Motion for Preliminary Injunction

(IMPORTANT: Type or print; read instructions before completing form)

Form Approved OMB Number: 2070-0093
Approval Expires: 03/31/2011                    **Page 1 of 5**

# FORM R

**EPA**
**United States**
**Environmental Protection Agency**

Section 313 of the Emergency Planning and Community Right-to-Know Act of 1986, also Known as Title III of the Superfund Amendments and Reauthorization Act

| TRI Facility ID Number |
|---|
| Toxic Chemical, Category or Generic Name |

WHERE TO SEND COMPLETED FORMS: 1. TRI Data Processing Center
                                                                    P. O. Box 1513
                                                                    Lanham, MD 20703-1513

2. APPROPRIATE STATE OFFICE
   (See instructions in Appendix E)

| This section only applies if you are revising or withdrawing a previously submitted form, otherwise leave blank. | **Revision (enter up to two code(s))** | | **Withdrawal (enter up to two code(s))** | |
|---|---|---|---|---|

**IMPORTANT:  See instructions to determine when "Not Applicable (NA)" boxes should be checked.**

## PART 1.  FACILITY IDENTIFICATION INFORMATION

### SECTION 1.  REPORTING YEAR _____

### SECTION 2.  TRADE SECRET INFORMATION

| 2.1 | Are you claiming the toxic chemical identified on page 2 trade secret? | | | 2.2 | Is this copy | Sanitized | Unsanitized |
|---|---|---|---|---|---|---|---|
| | ☐ Yes (Answer question 2.2; Attach substantiation forms) | ☐ No (Do not answer 2.2; Go to Section 3) | | | (Answer only if "YES" in 2.1) | | |

### SECTION 3.  CERTIFICATION     (Important:  Read and sign after completing all form sections.)

I hereby certify that I have reviewed the attached documents and that, to the best of my knowledge and belief, the submitted information is true and complete and that the amounts and values in this report are accurate based on reasonable estimates using data available to the preparers of this report.

| Name and official title of owner/operator or senior management official: | Signature: | Date Signed: |
|---|---|---|

### SECTION 4. FACILITY IDENTIFICATION

| 4.1 | | TRI Facility ID Number |
|---|---|---|

| Facility or Establishment Name | Facility or Establishment Name or Mailing Address  (If different from street address) |
|---|---|
| Street | Mailing Address |
| City/County/State/Zip Code | City/State/Zip Code | Country (Non-US) |

| 4.2 | This report contains information for: (Important: Check a or b; check c or d if applicable) | a. ☐ An entire facility | b. ☐ Part of a facility | c. ☐ A Federal facility | d. ☐ GOCO |
|---|---|---|---|---|---|

| 4.3 | Technical Contact Name | Telephone Number (include area code) |
|---|---|---|
| | Email Address | |

| 4.4 | Public Contact Name | Telephone Number (include area code) |
|---|---|---|
| | Email Address | |

| 4.5 | NAICS Code (s) (6 digits) | Primary | | | | | |
|---|---|---|---|---|---|---|---|
| | | a. | b. | c. | d. | e. | f. |

| 4.6 | Dun & Bradstreet Number (s) (9 digits) | a. |
|---|---|---|
| | | b. |

### SECTION 5. PARENT COMPANY INFORMATION

| 5.1 | Name of Parent Company | NA ☐ | |
|---|---|---|---|

| 5.2 | Parent Company's Dun & Bradstreet Number | NA ☐ | |
|---|---|---|---|

EPA Form 9350 -1 (Rev. 01/2008) - Previous editions are obsolete.

Form Approved OMB Number:   2070-0093
Approval Expires: 03/31/2011

(IMPORTANT:  Type or print; read instructions before completing form)     **Page 2 of 5**

# FORM R

### PART II.  TOXIC CHEMICAL RELEASE INVENTORY REPORTING FORM

| | |
|---|---|
| | TRI Facility ID Number |
| | |
| | Toxic Chemical, Category or Generic Name |

## SECTION 1. TOXIC CHEMICAL IDENTITY          (Important:  DO NOT complete this section if you completed Section 2 below.)

**1.1** | CAS Number (Important:  Enter only one number exactly as it appears on the Section 313 list.  Enter category code if reporting a chemical category.)

**1.2** | Toxic Chemical or Chemical Category Name (Important:  Enter only one name exactly as it appears on the Section 313 list.)

**1.3** | Generic Chemical Name (Important:  Complete only if Part 1, Section 2.1 is checked "yes".  Generic Name must be structurally descriptive.)

**1.4** | **Distribution of Each Member of the Dioxin and Dioxin-like Compounds Category.**
(If there are any numbers in boxes 1-17, then every field must be filled in with either 0 or some number between 0.01 and 100.  Distribution should be reported in percentages and the total should equal 100%.  If you do not have speciation data available, indicate NA.)

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NA | | | | | | | | | | | | | | | | | | |

## SECTION 2. MIXTURE COMPONENT IDENTITY          (Important:  DO NOT complete this section if you completed Section 1 above.)

**2.1** | Generic Chemical Name Provided by Supplier (Important:  Maximum of 70 characters, including numbers, letters, spaces and punctuation.)

## SECTION 3.  ACTIVITIES AND USES OF THE TOXIC CHEMICAL AT THE FACILITY
### (Important:  Check all that apply.)

| **3.1** Manufacture the toxic chemical: | **3.2** Process the toxic chemical: | **3.3** Otherwise use the toxic chemical: |
|---|---|---|
| a. ☐ Produce    b. ☐ Import | a. ☐ As a reactant | a. ☐ As a chemical processing aid |
| If produce or import | b. ☐ As a formulation component | b. ☐ As a manufacturing aid |
| c. ☐ For on-site use/processing | c. ☐ As an article component | c. ☐ Ancillary or other use |
| d. ☐ For sale/distribution | d. ☐ Repackaging | |
| e. ☐ As a byproduct | e. ☐ As an impurity | |
| f. ☐ As an impurity | | |

## SECTION 4. MAXIMUM AMOUNT OF THE TOXIC CHEMICAL ON SITE AT ANY TIME DURING THE CALENDAR YEAR

**4.1** |          (Enter two digit code from instruction package.)

## SECTION 5.    QUANTITY OF THE TOXIC CHEMICAL ENTERING EACH ENVIRONMENTAL MEDIUM ONSITE

| | | A. Total Release        (pounds/year*)  (Enter a range code** or estimate) | B. Basis of Estimate  (enter code) | C. % From Stormwater |
|---|---|---|---|---|
| **5.1** | Fugitive or non-point air emissions | NA ☐ | | |
| **5.2** | Stack or point air emissions | NA ☐ | | |
| **5.3** | Discharges to receiving streams or water bodies (enter one name per box) | | | |
| | Stream or Water Body Name | | | |
| **5.3.1** | | | | |
| **5.3.2** | | | | |
| **5.3.3** | | | | |

If additional pages of Part II, Section 5.3 are attached, indicate the total number of pages in this box and indicate the Part II, Section 5.3 page number in this box.          (example: 1,2,3, etc.)

*For Dioxin or Dioxin-like compounds, report in grams/year.
** Range Codes: A= 1-10 pounds; B= 11-499 pounds; C= 500-999 pounds.

Form Approved OMB Number:  2070-0093
Approval Expires: 03/31/2011    **Page 3 of 5**

(IMPORTANT:  Type or print; read instructions before completing form)

# FORM R

### PART II.  CHEMICAL - SPECIFIC INFORMATION (CONTINUED)

| TRI Facility ID Number |
|---|

| Toxic Chemical, Category or Generic Name |
|---|

## SECTION 5. QUANTITY OF THE TOXIC CHEMICAL ENTERING EACH ENVIRONMENTAL MEDIUM ON SITE (continued)

| | | NA | A. Total Release (pounds/year*) (enter range code ** or estimate ) | B. Basis of Estimate (enter code) |
|---|---|---|---|---|
| 5.4.1 | Underground Injection onsite to Class I Wells | | | |
| 5.4.2 | Underground Injection onsite to Class II-V Wells | | | |
| 5.5 | Disposal to land onsite | | | |
| 5.5.1A | RCRA Subtitle C landfills | | | |
| 5.5.1B | Other landfills | | | |
| 5.5.2 | Land treatment/application farming | | | |
| 5.5.3A | RCRA Subtitle C surface impoundments | | | |
| 5.5.3B | Other surface impoundments | | | |
| 5.5.4 | Other disposal | | | |

## SECTION 6.  TRANSFERS OF THE TOXIC CHEMICAL IN WASTES TO OFF-SITE LOCATIONS

### 6.1 DISCHARGES TO PUBLICLY OWNED TREATMENT WORKS (POTWs)

**6.1.A    Total Quantity Transferred to POTWs and Basis of Estimate**

| 6.1.A.1 Total Transfers (pounds/year*) (enter range code ** or estimate) | 6.1.A.2    Basis of Estimate (enter code) |
|---|---|
| | |

| 6.1.B | POTW Name | |
|---|---|---|
| POTW Address | | |

| City | | State | | County | | Zip | |
|---|---|---|---|---|---|---|---|

| 6.1.B | POTW Name | |
|---|---|---|
| POTW Address | | |

| City | | State | | County | | Zip | |
|---|---|---|---|---|---|---|---|

If additional pages of Part II, Section 6.1 are attached, indicate the total number of pages in this box [        ] and indicate the Part II, Section 6.1 page number in this box [        ]   (example:  1,2,3, etc.)

### SECTION 6.2 TRANSFERS TO OTHER OFF-SITE LOCATIONS

| 6.2.___ | Off-Site EPA Identification Number (RCRA ID No.) |
|---|---|

| Off-Site Location Name | |
|---|---|

| Off-Site Address | |
|---|---|

| City | | State | | County | | Zip | | Country (Non-US) | |
|---|---|---|---|---|---|---|---|---|---|

Is location under control of reporting facility or parent company?        [   ] Yes     [   ] No

EPA Form 9350 -1 (Rev. 01/2008) - Previous editions are obsolete.        * For Dioxin or Dioxin-like compounds, report in grams/year
** Range Codes:  A=1-10 pounds; B=1-499 pounds; C=500 - 999 pounds.

(IMPORTANT: Type or print; read instructions before completing form)

Form Approved OMB Number: 2070-0093
Approval Expires: 03/31/2011

**Page 4 of 5**

# FORM R
## PART II. CHEMICAL-SPECIFIC INFORMATION (CONTINUED)

TRI Facility ID Number

Toxic Chemical, Category or Generic Name

### SECTION 6.2 TRANSFERS TO OTHER OFF-SITE LOCATIONS (CONTINUED)

| A. Total Transfers (pounds/year*)<br>(enter range code**or estimate) | B. Basis of Estimate<br>(enter code) | C. Type of Waste Treatment/Disposal/<br>Recycling/Energy Recovery (enter code) |
|---|---|---|
| 1. | 1. | 1. M |
| 2. | 2. | 2. M |
| 3. | 3. | 3. M |
| 4. | 4. | 4. M |

6.2 _____    Off-Site EPA Identification Number (RCRA ID No.)

Off-Site Location Name

Off-Site Address

| City | | State | | County | | Zip | | Country<br>(Non-US) |
|---|---|---|---|---|---|---|---|---|

Is location under control of reporting facility or parent company?    Yes ☐    No ☐

| A. Total Transfers (pounds/year*)<br>(enter range code**or estimate) | B. Basis of Estimate<br>(enter code) | C. Type of Waste Treatment/Disposal/<br>Recycling/Energy Recovery (enter code) |
|---|---|---|
| 1. | 1. | 1. M |
| 2. | 2. | 2. M |
| 3. | 3. | 3. M |
| 4. | 4. | 4. M |

### SECTION 7A. ON-SITE WASTE TREATMENT METHODS AND EFFICIENCY

☐ Not Applicable (NA) -    Check here if no on-site waste treatment is applied to any
waste stream containing the toxic chemical or chemical category.

| a. General<br>Waste Stream<br>[enter code] | b. Waste Treatment Method(s) Sequence<br>[enter 3- or 4- character code(s)] | | | | | | d. Waste Treatment Efficiency<br>[enter 2 character code] |
|---|---|---|---|---|---|---|---|
| 7A.1a | 7A.1b | 1 | | 2 | | | 7A.1d |
| | 3 | 4 | | 5 | | | |
| | 6 | 7 | | 8 | | | |
| 7A.2a | 7A.2b | 1 | | 2 | | | 7A.2d |
| | 3 | 4 | | 5 | | | |
| | 6 | 7 | | 8 | | | |
| 7A.3a | 7A.3b | 1 | | 2 | | | 7A.3d |
| | 3 | 4 | | 5 | | | |
| | 6 | 7 | | 8 | | | |
| 7A.4a | 7A.4b | 1 | | 2 | | | 7A.4d |
| | 3 | 4 | | 5 | | | |
| | 6 | 7 | | 8 | | | |
| 7A.5a | 7A.5b | 1 | | 2 | | | 7A.5d |
| | 3 | 4 | | 5 | | | |
| | 6 | 7 | | 8 | | | |

If additional pages of Part II, Section 6.2/7A are attached, indicate the total number of pages in this box ☐
and indicate the Part II, Section 6.2/7 page number in this box: ☐    (example: 1,2,3,etc.)

EPA Form 9350 -1 (Rev. 01/2008) - Previous editions are obsolete.

*For Dioxin or Dioxin-like compounds, report in grams/year
**Range Codes: A=1 - 10 pounds; B=11 - 499 pounds C= 500-999 pounds.

(IMPORTANT: Type or print; read instructions before completing form)

Form Approved OMB Number: 2070-0093
Approval Expires: 03/31/2011

**Page 5 of 5**

# FORM R

## PART II. CHEMICAL-SPECIFIC INFORMATION (CONTINUED)

TRI Facility ID Number

Toxic Chemical, Category or Generic Name

### SECTION 7B. ON-SITE ENERGY RECOVERY PROCESSES

☐  Not Applicable (NA) - Check here if no on-site energy recovery is applied to any waste stream containing the toxic chemical or chemical category.

Energy Recovery Methods [enter 3-character code(s)]

1 [        ]    2 [        ]    3 [        ]

### SECTION 7C. ON-SITE RECYCLING PROCESSES

☐  Not Applicable (NA) - Check here if no on-site recycling is applied to any waste stream containing the toxic chemical or chemical category.

Recycling Methods [enter 3-character code(s)]

1 [        ]    2 [        ]    3 [        ]

### SECTION 8.  SOURCE REDUCTION AND RECYLING ACTIVITIES

| | | Column A Prior Year (pounds/year*) | Column B Current Reporting Year (pounds/year*) | Column C Following Year (pounds/year*) | Column D Second Following Year (pounds/year*) |
|---|---|---|---|---|---|
| 8.1 | | | | | |
| 8.1a | Total on-site disposal to Class I Underground Injection Wells, RCRA Subtitle C landfills, and other landfills | | | | |
| 8.1b | Total other on-site disposal or other releases | | | | |
| 8.1c | Total off-site disposal to Class I Underground Injection Wells, RCRA Subtitle C landfills, and other landfills | | | | |
| 8.1d | Total other off-site disposal or other releases | | | | |
| 8.2 | Quantity used for energy recovery onsite | | | | |
| 8.3 | Quantity used for energy recovery offsite | | | | |
| 8.4 | Quantity recycled onsite | | | | |
| 8.5 | Quantity recycled offsite | | | | |
| 8.6 | Quantity treated onsite | | | | |
| 8.7 | Quantity treated offsite | | | | |
| 8.8 | Quantity released to the environment as a result of remedial actions, catastrophic events, or one-time events not associated with production processes (pounds/year)* | | | | |
| 8.9 | Production ratio or activity index | | | | |
| 8.10 | Did your facility engage in any source reduction activities for this chemical during the reporting year?  If not, enter "NA" in Section 8.10.1 and answer Section 8.11. | | | | |

| | Source Reduction Activities [enter code(s)] | Methods to Identify Activity (enter codes) | | |
|---|---|---|---|---|
| 8.10.1 | | a. | b. | c. |
| 8.10.2 | | a. | b. | c. |
| 8.10.3 | | a. | b. | c. |
| 8.10.4 | | a. | b. | c. |
| 8.11 | If you wish to submit additional optional information on source reduction, recycling, or pollution control activities, check "Yes." | | Yes ☐ | |

EPA Form 9350 -1 (Rev. 01/2008) - Previous editions are obsolete.          *For Dioxin or Dioxin-like compounds, report in grams/year.

<u>Creosote Council Et al. v. EPA</u>
No. 08-00512

Ex. 2 to EPA's Memorandum in Opposition to Motion for Preliminary Injunction



EPA 260-K-07-001
March 2008

# Toxic Chemical Release Inventory Reporting Forms and Instructions

*Revised 2007 Version*

## Section 313
### of the Emergency Planning and Community Right-to-Know Act
(Title III of the Superfund Amendments and Reauthorization Act of 1986)

*How to Determine if Your Facility Must Submit a Form R or Is Eligible to Use Form A*

not be considered for lead not in stainless steel, brass, or bronze alloys;

4) If a facility exceeds the 100-pound threshold for lead other than in stainless steel, brass, or bronze alloys, the facility may not apply Form A eligibility as a non-PBTs, range reporting in Sections 5 and 6 of the Form R or the use of whole numbers and 2 significant digits to any of the lead they report through they may be eligible for Form A using the PBT eligibility criteria. If a facility that exceeds the 25,000/10,000 pound threshold for lead in stainless steel, brass, or bronze alloy without tripping the 100-pound threshold for non-alloyed lead, the facility may consider the Form A requirements for non-PBTs, range reporting in Sections 5 and 6 of the Form R, and the use of whole numbers and 2 significant digits.

## B.3.c.        Activity Exemptions

**Otherwise Use Exemptions.** Certain otherwise uses of listed EPCRA section 313 chemicals are specifically exempted:

- Otherwise use as a structural component of the facility;

- Otherwise use in routine janitorial or facility grounds maintenance;

- Personal uses by employees or other persons;

- Otherwise use of products containing EPCRA section 313 chemicals for the purpose of maintaining motor vehicles operated by the facility; and

- Otherwise use of EPCRA section 313 chemicals contained in intake water (used for processing or non-contact cooling) or in intake air (used either as compressed air or for combustion).

The exemption of an EPCRA section 313 chemical otherwise used 1) as a structural component of the facility; or 2) in routine janitorial or facility grounds maintenance; or 3) for personal use by an employee cannot be taken for activities involving process-related equipment.

**Articles Exemption.** EPCRA section 313 chemicals contained in articles that are processed or otherwise used at a covered facility are exempt from threshold determinations and release and other waste management calculations. The exemption applies when the facility receives the article from another facility or when the facility produces the article itself. The exemption applies only to the quantity of EPCRA section 313 chemical present in the article. If the EPCRA section 313 chemical is manufactured (including imported), processed, or otherwise used at the covered facility other than as part of the article, in excess of an applicable threshold quantity, the facility is required to

report (40 CFR Section 372.38(b)). For an EPCRA section 313 chemical in an item to be exempt as part of the article, the item must meet all the following criteria in the EPCRA section 313 article definition; that is, it must be a manufactured item (1) which is formed to a specific shape or design during manufacture, (2) which has end use functions dependent in whole or in part upon its shape or design during end use, and (3) which does not release a toxic chemical under normal conditions of processing or otherwise use of the item at the facility.

If the processing or otherwise use of all like items results in a total release of 0.5 pound or less of an EPCRA section 313 chemical in a reporting year to any environmental medium, EPA will allow this release to be rounded to zero, and the manufactured items retain their article status. The 0.5 pound threshold does not apply to each individual article, but applies to the sum of all releases from processing or otherwise use of all like articles. If all the releases of like articles over a reporting year are completely captured and recycled/reused on-site or off-site, those items retain their article status. Any amount that is released and is not recycled/reused will count toward the 0.5 pound per year cut-off value.

The articles exemption applies to the normal processing or otherwise use of articles. This exemption does not apply to the manufacture of the article. EPCRA section 313 chemicals incorporated into articles produced at a facility must be factored into threshold determinations and release and other waste management calculations.

If, in the course of processing or otherwise use, an item retains its initial thickness or diameter, in whole or in part, it meets the first part (i.e., it must be a manufactured item which is formed to a specific shape or design during manufacture) of the article definition. If the item's basic dimensional characteristics are totally altered during processing or otherwise use, the item does not meet the first part of the definition. An example of items that do not meet the definition would be items which are cold extruded, such as lead ingots, which are formed into wire or rods. On the other hand, cutting a manufactured item into pieces which are recognizable as the article would not change the original dimensions as long as the diameter or the thickness of the item remained the same; the articles exemption would continue to apply. Metal wire may be bent and sheet metal may be cut, punched, stamped, or pressed without losing their article status as long as the diameter of the wire or tubing or the thickness of the sheet is not totally changed.

What constitutes a release of an EPCRA section 313 chemical is important since processing or otherwise use of articles that result in a release to the environment (or more than 0.5 pounds) negate the article status and precludes eligibility for the exemption. Cutting, grinding, melting, or other processing of manufactured items could result in a release of an EPCRA section 313 chemical

*How to Determine if Your Facility Must Submit a Form R or Is Eligible to Use Form A*

during normal conditions of processing or otherwise use

and therefore negate the exemption as articles.

---

**Example 4: Articles Exemption**

❑    Nickel that is incorporated into a brass doorknob is processed to manufacture the brass doorknob, and therefore must be counted toward threshold determinations and release and other waste management calculations. However, the use of the brass doorknobs elsewhere in the facility does not have to be counted. Disposal of the brass doorknob after its use does not constitute a "release;" thus, the brass doorknob remains an article.

❑    If an item used in the facility is fragmented, the item is still an article if those fragments being discarded remain identifiable as the article (e.g., recognizable pieces of a cylinder, pieces of wire). For instance, an eight-foot piece of wire is cut into two four-foot pieces of wire, without releasing any EPCRA section 313 chemicals. Each four-foot piece is identifiable as a piece of wire; therefore, the article status for these pieces of wire remains intact.

❑    EPCRA section 313 chemicals received in the form of pellets are not articles because the pellet form is simply a convenient form for further processing of the material.

---

***De Minimis* Exemption.** The *de minimis* exemption allows facilities to disregard certain minimal concentrations of non-PBT chemicals in mixtures or other trade name products when making threshold determinations and release and other waste management calculations. The *de minimis* exemption does not apply to the manufacture of an EPCRA section 313 chemical except if that EPCRA section 313 chemical is manufactured as an impurity and remains in the product distributed in commerce, or if the EPCRA section 313 chemical is imported below the appropriate *de minimis* level. The *de minimis* exemption does not apply to a byproduct manufactured coincidentally as a result of manufacturing, processing, otherwise use, or any waste management activities. The *de minimis* exemption does not apply to any PBT chemical (except lead when it is contained in stainless steel, brass or bronze alloy) or PBT chemical category. A list of PBT chemicals may be found in Section B.4 of these instructions.

When determining whether the *de minimis* exemption applies to an EPCRA section 313 chemical, the owner/operator must consider the concentration of the non-PBT EPCRA section 313 chemical in mixtures and other trade name products. If the non-PBT EPCRA section 313 chemical in a mixture or other trade name product is manufactured as an impurity, imported, processed, or otherwise used and is below the appropriate *de minimis* concentration level, then the quantity of the non-PBT EPCRA section 313 chemical in that mixture or other trade name product does not have to be applied to threshold determinations nor included in release or other waste management determinations. If a non-PBT EPCRA section 313 chemical in a mixture or other trade name product is below the appropriate *de minimis* level, all releases and other waste management activities associated with the EPCRA section 313 chemical in *that* mixture or other trade name product are exempt from EPCRA section 313 reporting. It is possible to meet an activity (e.g., processing) threshold for an EPCRA section 313 chemical on a facility-wide basis,

but not be required to calculate releases or other waste management quantities associated with a particular process because that process involves only mixtures or other trade name products containing the non-PBT EPCRA section 313 chemical below the *de minimis* level.

EPA interprets the *de minimis* exemption such that once a non-PBT EPCRA section 313 chemical concentration is at or above the appropriate *de minimis* level in the mixture or other trade name product threshold determinations and release and other waste management calculations must be made, even if that chemical later falls below the *de minimis* level in the same mixture or other trade name product. Thus, EPA considers reportable all releases and other quantities managed as waste that occur after the *de minimis* level has been met or exceeded. If an EPCRA section 313 chemical in a mixture or other trade name product at or above *de minimis* is brought on-site, the *de minimis* exemption never applies.

*De minimis* levels for non-PBT EPCRA section 313 chemicals and chemical categories are set at concentration levels of either 1% or 0.1%; PBT chemicals and chemical categories do not have *de minimis* levels with regard to this exemption. The 0.1% *de minimis* levels are dictated by determinations made by the National Toxicology Program (NTP) in its Annual Report on Carcinogens, the International Agency for Research and Cancer (IARC) in its Monographs, or 29 CFR part 1910, subpart Z. Therefore, once a non-PBT chemical's status under NTP, IARC, or 29 CFR part 1910, subpart Z indicates that the chemical is a carcinogen or potential carcinogen, the reporting facility may disregard levels of the chemical below the 0.1% *de minimis* concentration provided that the other criteria for the *de minimis* exemption are met. *De minimis* levels for chemical categories apply to the total concentration of all chemicals in the category within a mixture, not the

## Section 4.  Maximum Amount of the EPCRA Section 313 Chemical On-site at Any Time during the Calendar Year

For data element 4.1 of Part II, insert the code (see codes below) that indicates the maximum quantity of the EPCRA section 313 chemical (e.g., in storage tanks, process vessels, on-site shipping containers, or in wastes generated) at your facility at any time during the calendar year. If the EPCRA section 313 chemical was present at several locations within your facility, use the maximum total amount present at the entire facility at any one time. While range reporting is not allowed for PBT chemicals elsewhere on the Form R, range reporting for PBT chemicals is allowed for the Maximum Amount On Site.

> **Example 11: Manufacturing and Processing Activities of EPCRA Section 313 Chemicals**
>
> In the two examples below, it is assumed that the threshold quantities for manufacture, process, or otherwise use (25,000 pounds, 25,000 pounds, and 10,000 pounds, respectively for non-PBT chemicals; 100 pounds for certain PBT chemicals; 10 pounds for highly persistent, highly bioaccumulative toxic chemicals; and 0.1 grams for the PBT chemical category comprised of dioxin and dioxin-like compounds) have been exceeded and the reporting of EPCRA section 313 chemicals is therefore required.
>
> 1. Your facility manufactures diazomethane. Fifty percent is sold as a product, thus it is processed. The remaining fifty percent is reacted with alpha-naphthylamine, forming N-methyl-alpha-naphthylamine and also producing nitrogen gas.
>
> Your company manufactures diazomethane, an EPCRA section 313 chemical, both for sale/ distribution as a commercial product and for on-site use/processing as a feedstock in the N-methyl-alpha-naphthylamine production process. Because the diazomethane is a reactant, it is also processed. See Figure 3 for how this information would be reported in Part II, Section 3 of Form R.
>
> Your facility also processes alpha-naphthylamine, as a reactant to produce N-methyl-alpha-naphthylamine, a chemical not on the EPCRA section 313 list.
>
> 2. Your facility is a commercial distributor of Missouri bituminous coal, which contains mercury at 1.5 ppm (w:w). You should check the box on the Form R at Part II, Section 3.2.e for processing mercury as an impurity.

**Weight Range in Pounds**

| Range Code | From... | To... |
|---|---|---|
| 01 | 0 | 99 |
| 02 | 100 | 999 |
| 03 | 1,000 | 9,999 |
| 04 | 10,000 | 99,999 |
| 05 | 100,000 | 999,999 |
| 06 | 1,000,000 | 9,999,999 |
| 07 | 10,000,000 | 49,999,999 |
| 08 | 50,000,000 | 99,999,999 |
| 09 | 100,000,000 | 499,999,999 |
| 10 | 500,000,000 | 999,999,999 |
| 11 | 1 billion | more than 1 billion |

If the EPCRA section 313 chemical was part of a mixture or other trade name product at your facility, determine the maximum quantity of the EPCRA section 313 chemical present at the facility by calculating the weight percent of the EPCRA section 313 chemical only.

Do not include the weight of the entire mixture or other trade name product. These data may be found in the Tier II form your facility may have prepared under Section 312 of EPCRA. See Part 40, Section 372.30(b) of the *Code of Federal Regulations* for further information on how to calculate the weight of the EPCRA section 313 chemical in the mixture or other trade name product. For EPCRA section 313 chemical categories (e.g., nickel compounds), include all chemical compounds in the category when calculating the maximum amount, using the entire weight of each compound. When reporting for dioxin and dioxin-like compounds you should convert the maximum amount from grams to pounds before choosing the appropriate range code in Section 4 of Part II.

## Section 5.  Quantity of the EPCRA Section 313 Chemical Entering Each Environmental Medium On-site

In Section 5, you must account for the total aggregate on-site releases of the EPCRA section 313 chemical to the environment from your facility for the calendar year.

On-site releases to the environment include emissions to the air, discharges to surface waters, and releases to land and underground injection wells.

For all toxic chemicals (except the dioxin and dioxin-like compound category), do not enter the values in Section 5 in gallons, tons, liters, or any measure other than pounds. You must also enter the values as whole numbers (do not use scientific notation). Numbers following a decimal point are not acceptable for toxic chemicals other than those designated as PBT chemicals. For PBT chemicals, facilities should report release and other waste

*Instructions for Completing Part II of EPA Form R*

management quantities greater than 0.1 pound (except the dioxin and dioxin-like compounds category), provided the accuracy and the underlying data on which the estimate is based supports this level of precision.

For the dioxin and dioxin-like compounds category, facilities should report at a level of precision supported by the accuracy of the underlying data and the estimation techniques on which the estimate is based. For the dioxin and dioxin-like compounds chemical category, which has a reporting threshold of 0.1 gram, facilities need only report all release and other waste management quantities greater than 100 micrograms (i.e., 0.0001 grams). (See example 12.) Notwithstanding the numeric precision used when determining reporting eligibility thresholds, facilities should report on Form R to the level of accuracy that their data supports, up to seven digits to the right of the decimal. EPA's reporting software and data management systems support data precision up to seven digits to the right of the decimal.

---

**Example 12: Reporting Dioxins and Dioxin-Like Compounds**

If the total quantity for Section 5.2 of the Form R (i.e., stack or point air emissions) is 0.00005 grams or less, then zero can be entered. If the total quantity is between 0.00005 and 0.0001 grams, then 0.0001 grams can be entered or the actual number can be entered (e.g., 0.000075).

---

**NA vs. a Numeric Value (e.g., Zero).** Generally, NA is applicable if the waste stream that contains or contained the EPCRA section 313 chemical is not directed to the relevant environmental medium, or if leaks, spills and fugitive emissions cannot occur. If the waste stream that contains or contained the EPCRA section 313 chemical is directed to the environmental medium, or if leaks, spills or fugitive emissions can occur, NA should not be used, even if treatment or emission controls result in a release of zero. If the annual aggregate release of that chemical was equal to or less than 0.5 pound, the value reported is zero (unless the chemical is a listed PBT chemical).

For Section 5.1, NA generally is not applicable for volatile organic compounds (VOCs). For Section 5.5.4, NA generally would not be applicable, recognizing the possibility of accidental spills or leaks of the EPCRA section 313 chemical.

An example that illustrates the use of NA vs. a numeric value (e.g., zero) would be nitric acid involved in a facility's processing activities. If the facility neutralizes the wastes containing nitric acid to a pH of 6 or above, then the facility reports a release of zero for the EPCRA section 313 chemical, not NA. Another example is when the facility has no underground injection well, in which

case NA should be entered in Part I, Section 4.10 and checked in Part II, Section 5.4.1 and 5.4.2 of Form R. Also, if the facility does not landfill the acidic waste, NA should be checked in Part II, Section 5.5.1.B of Form R.

All releases of the EPCRA section 313 chemical to the air must be classified as either stack or fugitive emissions, and included in the total quantity reported for these releases in Sections 5.1 and 5.2. Instructions for columns A, B, and C follow the discussions of Sections 5.1 through 5.5.

## 5.1    Fugitive or Non-Point Air Emissions

Report the total of all releases of the EPCRA section 313 chemical to the air that are not released through stacks, vents, ducts, pipes, or any other confined air stream. You must include (1) fugitive equipment leaks from valves, pump seals, flanges, compressors, sampling connections, open-ended lines, etc.; (2) evaporative losses from surface impoundments and spills; (3) releases from building ventilation systems; and (4) any other fugitive or non-point air emissions. Engineering estimates and mass balance calculations (using purchase records, inventories, engineering knowledge or process specifications of the quantity of the EPCRA section 313 chemical entering product, hazardous waste manifests, or monitoring records) may be useful in estimating fugitive emissions. You should check the NA box in Section 5.1 if you do not engage in activities that result in fugitive or non-point air emissions of this listed toxic chemical. For VOCs, NA generally would not be applicable.

## 5.2    Stack or Point Air Emissions

Report the total of all releases of the EPCRA section 313 chemical to the air that occur through stacks, confined vents, ducts, pipes, or other confined air streams. You must include storage tank emissions. Air releases from air pollution control equipment would generally fall in this category. Monitoring data, engineering estimates, and mass balance calculations may help you to complete this section. You should check the NA box in Section 5.2 if there are no stack air activities involving the waste stream that contains or contained the EPCRA section 313 chemical.

## 5.3    Discharges to Receiving Streams or Water Bodies

In Section 5.3 you are to enter all the names of the streams or water bodies to which your facility directly discharges the EPCRA section 313 chemical on which you are reporting. A total of three spaces is provided on page 2 of Form R. Enter the name of each receiving stream or surface water body to which the EPCRA section 313 chemical being reported is directly discharged. Report the name of the receiving stream or water body as it appears on the permit for the facility. If the stream is not included in the NPDES permit or its

*Instructions for Completing Part II of EPA Form R*

holding, settling, storage, and elevation pits; ponds, and lagoons. If the pit, pond, or lagoon is intended for storage or holding without discharge, it would be considered to be a surface impoundment used as a final disposal method. A facility must determine, to the best of its ability, the percentage of a volatile chemical, e.g., benzene, that is in waste sent to a surface impoundment that evaporates during the reporting year. The facility must report this as a fugitive air emission in section 5.1. The balance should be reported in either section 5.5.3A or 5.5.3B.

Quantities of the EPCRA section 313 chemical released to surface impoundments that are used merely as part of a wastewater treatment process generally should not be reported in this section. However, if an impoundment accumulates sludges containing the EPCRA section 313 chemical, you must include an estimate in this section unless the sludges are removed and otherwise disposed (in which case they must be reported under the appropriate section of the form). For the purposes of this reporting, storage tanks are not considered to be a type of disposal and are not to be reported in this section of Form R.

### 5.5.3A    RCRA Subtitle C Surface Impoundments

Enter the total amount of the EPCRA section 313 chemical that was placed in RCRA Subtitle C surface impoundments.

### 5.5.3B    Other Surface Impoundments

Enter the total amount of the EPCRA section 313 chemical that was placed in surface impoundments other than RCRA Subtitle C surface impoundments.

### 5.5.4    Other Disposal

Includes any amount of an EPCRA section 313 chemical released to land that does not fit the categories of landfills, land treatment, or surface impoundment. This other disposal would include any spills or leaks of EPCRA section 313 chemicals to land. For example, 2,000 pounds of benzene leaks from an underground pipeline into the land at a facility. Because the pipe was only a few feet from the surface at the erupt point, 30% of the benzene evaporates into the air. The 600 pounds released to the air would be reported as a fugitive air release (Part II, Section 5.1) and the remaining 1,400 pounds would be reported as a release to land, other disposal (Part II, Section 5.5.4).

### Section 5 Column A: Total Release

Only on-site releases of the EPCRA section 313 chemical to the environment for the calendar year are to be reported in this section of Form R. The total on-site releases from your facility do not include transfers or shipments of the EPCRA section 313 chemical from your facility for sale or distribution in commerce, or of wastes to other facilities for disposal, treatment, energy recovery, or recycling (see Part II, Section 6 of these Instructions). Both routine releases, such as fugitive air emissions, and accidental or non-routine releases, such as chemical spills, must be included in your estimate of the quantity released.

**Releases of Less Than 1,000 Pounds.** For total annual releases or off-site transfers of an EPCRA section 313 chemical from the facility of less than 1,000 pounds, the amount may be reported either as an estimate or by using the range codes that have been developed (range reporting in section 5 does not apply to PBT chemicals). The reporting range codes to be used are:

| Code | Range (pounds) |
|------|----------------|
| A | 1-10 |
| B | 11-499 |
| C | 500-999 |

Do not enter a range code and an estimate in the same box in column A. Total annual on-site releases of an EPCRA section 313 chemical from the facility of less than 1 pound may be reported in one of several ways. You should round the value to the nearest pound. If the estimate is greater than 0.5 pound, you should either enter the range code "A "for "1-10" or enter "1" in column A. If the release is equal to or less than 0.5 pound, you may round to zero and enter "0" in column A.

Note that total annual releases of 0.5 pound or less from the processing or otherwise use of an article maintain the article status of that item. Thus, if the only releases you have are from processing an article, and such releases are equal to or less than 0.5 pound per year, you are not required to submit a report for that EPCRA section 313 chemical. The 0.5-pound release determination does not apply to just a single article. It applies to the cumulative releases from the processing or otherwise use of the same type of article (e.g., sheet metal or plastic film) that occurs over the course of the reporting year.

**Releases of 1,000 Pounds or More.** For releases to any medium that amount to 1,000 pounds or more for the year, you must provide an estimate in pounds per year in column A. Any estimate provided in column A need not be reported to more than two significant figures. This estimate should be in whole numbers. Do not use decimal points.

**Calculating On-Site Releases.** To provide the release information in column A, EPCRA section 313(g)(2) requires a facility to use readily available data (including monitoring data) collected pursuant to other provisions of law, or, where such data are not readily available, "reasonable estimates" of the amounts involved. If available data (including monitoring data) are known to be nonrepresentative, facilities must make reasonable estimates using the best readily available information.

## *Instructions for Completing Part II of EPA Form R*

Reasonable estimates of the amounts released should be made using published emission factors, material balance calculations, or engineering calculations. You may not use emission factors or calculations to estimate releases if more accurate data are available.

No additional monitoring or measurement of the quantities or concentrations of any EPCRA section 313 chemical released into the environment, or of the frequency of such releases, beyond that required under other provisions of law or regulation or as part of routine plant operations, is required for the purpose of completing Form R.

You must estimate the quantity (in pounds) of the EPCRA section 313 chemical or chemical category that is released annually to each environmental medium on-site. Include only the quantity of the EPCRA section 313 chemical in this estimate. If the EPCRA section 313 chemical present at your facility was part of a mixture or other trade name product, calculate only the releases of the EPCRA section 313 chemical, not the other components of the mixture or other trade name product. If you are only able to estimate the releases of the mixture or other trade name product as a whole, you should assume that the release of the EPCRA section 313 chemical is proportional to its concentration in the mixture or other trade name product. See Part 40, Section 372.30(b) of the Code of Federal Regulations for further information on how to calculate the concentration and weight of the EPCRA section 313 chemical in the mixture or other trade name product.

If you are reporting an EPCRA section 313 chemical category listed in Table II of these instructions rather than a specific EPCRA section 313 chemical, you must combine the release data for all chemicals in the EPCRA section 313 chemical category (e.g., all listed members of certain glycol ethers or all listed members of chlorophenols) and report the aggregate amount for that EPCRA section 313 chemical in that category separately. For example, if your facility releases 3,000 pounds per year of 2-chlorophenol, 4,000 pounds per year of 3-chlorophenol, and 4,000 pounds per year of 4-chlorophenol to air as fugitive emissions, you must report that your facility releases 11,000 pounds per year of chlorophenols to air as fugitive emissions in Part II, Section 5.1.

For aqueous ammonia solutions, releases must be reported based on 10% of total aqueous ammonia. Ammonia evaporating from aqueous ammonia solutions is considered to be anhydrous ammonia; therefore, 100% of the anhydrous ammonia should be reported if it is released to the environment. For dissociable nitrate compounds, release estimates should be based on the weight of the nitrate only.

For metal category compounds (e.g., chromium compounds), report releases of only the parent metal.

For example, a user of various inorganic chromium salts would report the total chromium released regardless of the chemical compound and exclude any contribution to mass made by the other portion of the compound.

**Section 5 Column B: Basis of Estimate**

For each release and otherwise managed waste estimate (Sections 5 & 6), you are required to indicate the principal method used to determine the amount of release and otherwise managed waste reported. You should enter a letter code identifying the method that applies to the largest portion of the total estimated release and otherwise managed waste quantity.

The codes are as follows:

| | |
|---|---|
| M1 | Estimate is based on continuous monitoring data or measurements for the EPCRA section 313 chemical |
| M2 | Estimate is based on periodic or random monitoring data or measurements for the EPCRA section 313 chemical |
| C | Estimate is based on mass balance calculations, such as calculation of the amount of the EPCRA section 313 chemical in streams entering and leaving process equipment. |
| E1 | Estimate is based on published emission factors, such as those relating release quantity to through-put or equipment type (e.g., air emission factors). |
| E2 | Estimate is based on site specific emission factors, such as those relating release quantity to through-put or equipment type (e.g., air emission factors). |
| O | Estimate is based on other approaches such as engineering calculations (e.g., estimating volatilization using published mathematical formulas) or best engineering judgment. This would include applying an estimated removal efficiency to a waste stream, even if the composition of the stream before treatment was fully identified through monitoring data. |

For example, if 40 percent of stack emissions of the reported EPCRA §313 chemical were derived using source testing data, 30 percent by mass balance, and 30 percent by published chemical-specific emission factors, you should enter the code letter "M2" for periodic or random emission monitoring.

If the monitoring data, mass balance, or emission factor used to estimate the release is not specific to the EPCRA §313 chemical being reported, the form should identify the estimate as based on other methods of estimation (O).

If a mass balance calculation yields the flow rate of a waste, but the quantity of reported EPCRA §313

*Instructions for Completing Part II of EPA Form R*

chemical in the waste is based on solubility data, you should report "O" because engineering calculations were used as the basis of estimate of the quantity of the EPCRA §313 chemical in the waste.

If the concentration of the EPCRA §313 chemical in the waste was measured by continuous emissions monitoring equipment and the flow rate of the waste was determined by mass balance, then the primary basis of the estimate should be "continuous emission monitoring" (M1). Even though a mass balance calculation also contributed to the estimate, "continuous emission monitoring" should be indicated because monitoring data were used to estimate the concentration of the chemical in waste.

Mass balance (C) should only be indicated if it is **directly** used to calculate the mass (weight) of EPCRA §313 chemical released. Monitoring data should be indicated as the basis of estimate **only** if the EPCRA §313 chemical concentration is measured in the waste. Monitoring data should **not** be indicated, for example, if the monitoring data relate to a concentration of the EPCRA §313 chemical in other process streams within the facility.

It is important to realize that the accuracy and proficiency of release estimation will improve over time. However, submitters are not required to use new emission factors or estimation techniques to revise previous Form R submissions.

### Section 5 Column C: Percent from Stormwater

This column relates only to Section 5.3 - discharges to receiving streams or water bodies. If your facility has monitoring data on the amount of the EPCRA section 313 chemical in stormwater runoff (including unchanneled runoff), you must include that quantity of the EPCRA section 313 chemical in your water release in column A and indicate the percentage of the total quantity (by weight) of the EPCRA section 313 chemical contributed by stormwater in column C (Section 5.3C).

If your facility has monitoring data on the EPCRA section 313 chemical and an estimate of flow rate, you must use these data to determine the percent stormwater.

If you have monitored stormwater but did not detect the EPCRA section 313 chemical, enter zero in column C. If your facility has no stormwater monitoring data for the chemical, you should enter NA in this space on the form.

If your facility does not have periodic measurements of stormwater releases of the EPCRA section 313 chemical, but has submitted chemical-specific monitoring data in permit applications, then these data must be used to calculate the percent contribution from

stormwater. One way to calculate the flow rates from stormwater runoff is the Rational Method. In this method, flow rates, Q, can be estimated by multiplying the land area of the facility, A, by the runoff coefficient, C, and then multiplying that figure by the annual rainfall intensity, I (i.e., $Q = A*C*I$). The rainfall intensity, I, is specific to the geographical area of the country where the facility is located, and may be obtained from most standard engineering manuals for hydrology. The flow rate, Q, will have volumetric dimensions per unit time, and will have to be converted to units of pounds per year. The runoff coefficient represents the fraction of rainfall that does not seep into the ground but runs off as stormwater. The runoff coefficient is directly related to how the land in the drainage area is used. (See table below)

| Description of Land Area | Runoff Coefficient |
|---|---|
| **Business** | |
| Downtown areas | 0.70-0.95 |
| Neighborhood areas | 0.50-0.70 |
| Industrial | |
| Light areas | 0.50-0.80 |
| Heavy areas | 0.60-0.90 |
| Industrial | |
| Railroad yard areas | 0.20-0.40 |
| Unimproved areas | 0.10-0.30 |
| Streets | |
| Asphaltic | 0.70-0.95 |
| Concrete | 0.80-0.95 |
| Brick | 0.70-0.85 |
| Drives and walks | 0.70-0.85 |
| Roofs | 0.75-0.95 |
| Lawns: Sandy Soil | |
| Flat, 2% | 0.05-0.10 |
| Average, 2 - 7% | 0.10-0.15 |
| Steep, 7% | 0.15-0.20 |
| Lawns: Heavy Soil | |
| Flat, 2% | 0.13-0.17 |
| Average, 2 - 7% | 0.18-0.22 |
| Steep, 7% | 0.25-0.35 |

You should choose the most appropriate runoff coefficient for your site or calculate a weighted-average coefficient, which takes into account different types of land use at your facility:

Weighted-average runoff coefficient =

(Area 1 % of total)(C1) + (Area 2 % of total)(C2) + (Area 3 % of total)(C3) + ... + (Area i % of total)(Ci)
where
Ci   =   runoff coefficient for a specific land use of Area i.

Creosote Council Et al. v. EPA
No. 08-00512

Ex. 3 to EPA's Memorandum in Opposition to Motion for Preliminary Injunction



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

MAR – 8 2000

OFFICE OF
ENVIRONMENTAL INFORMATION

## MEMORANDUM

**SUBJECT:**    EPCRA Section 313 Reporting and Lead Storage at Federal Facilities

**FROM:**    Maria J. Doa, Director
Toxics Release Inventory Program Division

**TO:**    F. Kevin Reilly
Defense National Stockpile Center

This memorandum responds to an EPCRA Section 313 interpretive guidance question regarding activities at a federal facility. The issue involves federal facilities known as Defense National Stockpile Centers (DNSC). These facilities, which are responsible for storing lead bars and ingots, are now selling the lead. The question is whether the sale of the lead bars and ingots constitutes a *processing* activity, requiring the DNSC facility to consider the amount sold toward the *processing* threshold.

According to your conversation with John Harman, the DNSC facilities have stored the lead bars and ingots in warehouses and storage locations for thirty to forty years. The DNSC facilities have not performed any activity involving the lead other than to store it. Because Congress has determined that this large-scale storage is no longer necessary, the DNSC facilities are now selling the lead. When a buyer purchases the lead bars and ingots, the DNSC facility "bundles the bars/ingots into metric ton lifts and loads them onto the buyers' conveyances." "When a storage location is vacated, DNSC conducts environmental reviews and cleans the site if necessary."

In the case presented by DNSC, these federal facilities have performed a *processing* activity. *Processing* is defined as the "preparation of a toxic chemical, after its *manufacture*, for distribution in commerce..." When the DNSC facilities bundle the bars/ingots into metric ton lifts in order to provide them to the buyer, it is preparing the bars/ingots for the purposes of distribution into commerce, and thus is processing the bars/ingots.

EPA has provided guidance on the preparation of a toxic chemical prior to distribution into commerce in its EPCRA section 313 Questions and Answers, Revised 1998 Version document. Question 164 addresses a facility that receives petroleum via a pipeline from off-site, stores the petroleum on-site, then sends the petroleum via pipeline to another facility. The facility in question has repackaged the toxic chemical after storage for distributing it into commerce, and thus is processing the toxic chemical.

Another example is question 207, in which a facility receives shipments of an EPCRA section 313 listed toxic chemical in a railcar. The facility transfers the toxic chemical into large tank trucks for distribution into commerce. As stated in the answer to this question, "The act of removing a listed toxic chemical from one container and placing it in another is considered repackaging, regardless of the size of the containers involved".

The DNSC facilities have received the toxic chemical (e.g., lead), stored it, then transferred the toxic chemical onto trucks for distribution into commerce. The DNSC facilities have processed the lead ingots. Each DNSC facility should count this amount of the toxic chemical sent off-site to other facilities toward its 25,000 pound processing threshold.

The exception is if the DNSC facilities can claim an exemption under EPCRA section 313. These facilities may be eligible for the articles exemption. The articles exemption allows facilities to exempt toxic chemicals that are part of an article. There are three basic criteria for meeting the articles exemption:

1) if the articles are formed to a specific shape or design during manufacture
2) if the articles have end use functions dependent in whole or in part upon its shape or design; and
3) if the articles do not release a toxic chemical under the normal circumstances of processing or otherwise use at the facility.

According to your conversations with John Harman, the DNSC facilities received the lead bars/ingots after their manufacture in their present shape or design. The DNSC facilities have stored the lead bars/ingots and have not altered their shape or design. The final criterion the DNSC facilities should consider is if there were releases of toxic chemicals (i.e., lead) from these articles.

On this final point, EPA allows facilities to round any amounts equal to or less than 0.5 pound per year to zero for each year. If, however, a DNSC facility has releases from the lead bars/ingots totaling more than 0.5 pound per year for all like articles, then the articles exemption does not apply. A DNSC facility, therefore, must consider the total amount of releases per year from all the lead bars/ingots. If this total amount exceeds 0.5 pound per year, then the DNSC facility can not claim the articles exemption for the lead bars/ingots unless any amount above 0.5 pound for all like articles during the entire reporting year is completely captured and sent for recycling/reuse on-site or off-site. In such cases, the items may remain exempt as articles.

If you have any questions on this matter, please feel free to contact John Harman of my staff. He can be reached by telephone at 202 260 6395, by email at "harman.john@epa.gov", or by fax at 202 401 8142. Thank you.

cc: IG Workgroup

<u>Creosote Council Et al. v. EPA</u>
No. 08-00512

Ex. 4 to EPA's Memorandum in Opposition to Motion for Preliminary Injunction



**United States**
**Environmental Protection Agency**

Office of Pollution
Prevention and Toxics
Washington, DC 20460

December 1998
EPA 745-B-98-004

# EPCRA Section 313
## Questions and Answers

Revised 1998 Version



## Section 313 of the
## Emergency Planning and
## Community Right-to-Know Act

**Toxic Chemical Release Inventory**

*waste management* determinations if only the first <u>de minimis</u> calculation is exceeded. If the second <u>de minimis</u> calculation is exceeded then all of the category members in the *mixture* must be included in threshold determinations and *release* and other *waste management* calculations.

**EXEMPTIONS**

*Overburden, Waste Rock, Process, De Minimis*

**341. How should *covered facilities* consider consolidated rock that overlies an ore body and unconsolidated/consolidated materials that do not overlie an ore body but do not meet the classification as waste rock? Are these materials considered waste rock (<u>i.e.,</u> <u>de minimis</u> exemption does not apply) for threshold determinations and *release* and other *waste management* calculations or, are they considered *processed* materials eligible for the <u>de minimis</u> exemption?**

For covered metal mining facilities, unconsolidated material that overlies a deposit of useful materials or ores is eligible for the "*overburden* exemption" and does not have to be considered toward threshold determinations, or *release* and other *waste management* calculations. This exemption does not apply to consolidated material or unconsolidated/consolidated materials that do not overlie a deposit of useful material and which may be displaced or otherwise managed during extraction. Similar to waste rock that is separated from the useful more mineralized material at the point of extraction, amounts of these materials are not considered toward any threshold activities. However, these materials are not exempt from *release* and other *waste management* reporting and must be included if thresholds are exceeded elsewhere at the *facility* for the same listed *toxic chemicals*.

*F. Articles*

*Article Exemption, Threshold Determination*

**342. Are *articles* exempt from threshold determinations in normal *processing, otherwise use,* or *disposal*?**

An *article* would be exempt from threshold determinations if the *article* meets the criteria for exemption. The *article* must be a *manufactured* item: (1) which is formed to a specific shape or design during *manufacture*; (2) which has end use functions dependent in whole or in part upon its shape or design; and (3) which does not *release* a *toxic chemical* under normal conditions of *processing* or *otherwise use* of the item at the *facility* or *establishments*. If an item retains its initial thickness or diameter in whole or in part, as a result of normal *processing* or *otherwise use*, then it meets the first part of the definition. *Disposal* of materials that are recognizable as the *processed article* is not considered a *release* or management of a waste containing a listed *toxic chemical* from an *article*, and thus, does not negate the *article* status.

**EXEMPTIONS**

*Article Exemption, Threshold Determination*

**343. Are metal *articles* exempt from threshold determinations under normal *processing* or *otherwise use*?**

The fact that an item is metal is irrelevant because metals do not have special status under the *article* exemption. If the metal *article* meets all the criteria for the *article* exemption during normal *processing* and *otherwise use,* then it would be exempt from threshold determinations and *release* and other *waste management* calculations.

*Threshold Determination, Article Exemption, Recycle*

**344. A *covered facility manufactures* "non-*article*" metal items. If all wastes from the manufacturing process are recycled, are the items still subject to threshold determinations?**

If a "non-*article*" metal item is *processed* but all wastes are recycled, the item is still subject to threshold determinations and *release* and other *waste management* calculations. The *toxic chemicals* therein must be applied to the appropriate thresholds.

*Article Exemption, Article Releases, Half Pound Policy*

**345. Please clarify the Agency's half pound policy for the *article* exemption.**

The Agency has adopted a "round to the nearest pound policy." If the amount of a listed *toxic chemical* in *releases* from *processing* or *otherwise using* all like items is equal to or less than a half pound, this amount can be rounded to zero. Thus, the exemption would be maintained. The half pound limit does not apply to each individual *article*, but applies to the sum of all amounts released during *processing* or *otherwise use* of all like items over the entire reporting year. If the listed *toxic chemical* that is released exceeds a half pound and is completely recycled/reused, on-site or off-site, then the item may still maintain it status as an *article*.

*Article Exemption, Manufacturing Article*

**346. Does the *article* exemption in the Section 313 rule apply to preparation (i.e., manufacture) of the *article*? What about *processing* or *otherwise using* that *article*?**

The *article* exemption applies to the normal *processing* or *otherwise use* of an *article*. It does not apply to the manufacture of an *article*. For example, the manufacture of *articles* such as tableware is not exempt. *Toxic chemicals* processed into *articles* produced at a *facility* must be factored into threshold determinations and *release* and other *waste management* calculations.

*Article Exemption, Manufacturing Article*

**347. A *covered facility* uses sheet metal to manufacture metal desks. When manufacturing the desks, the operator welds and solders some of the sheet metal together. Must the *facility* include the *toxic chemicals* in the welding rods, solders, and the metals being joined for its threshold determination? Does the metal desk meet the *article* exemption?**

If 0.5 pounds or less of the *toxic chemical* is released from all like *articles* in the reporting year and the overall thickness or diameter of the sheet metal is not changed when *processed* into the desk, the sheet metal would retain its *article* status.  The desk itself would not meet the criteria for the *article* exemption because the exemption does not apply to the *manufacture* of *articles*.  Also, because air emissions are generated from the welding and soldering rods when they are used, the owner/operator must assess the entire amount of the *toxic chemical* in the rods for *processing* threshold purposes.

*Article Exemption, Components of Product*

**348.  A *covered facility* has a condenser that consists of many individual copper tubes.  These copper tubes must be replaced periodically and are often replaced individually.  Can each of the copper tubes be considered an *article* under Section 313?**

Each tube may be considered an *article*.  However, for amounts of listed *toxic chemicals* to be exempt from threshold determinations and *release* and other *waste management* calculations under the *article* exemption, releases of all listed *toxic chemicals* for all "like" *article*s must not exceed 0.5 pounds (see Toxic Release Inventory Forms and Instructions current version).  In this example, releases from all the replaced copper tubes must not exceed 0.5 pounds for the reporting year for the amounts not to be considered.  If the tubes are ineligible for the exemption, then amounts of listed *toxic chemicals* contained in the tubes replaced (put in service) during the reporting year must be counted towards thresholds.

*Article Exemption, Article Releases, Welding Rods*

**349.  Our *facility* uses welding rods for equipment maintenance.  Can these be considered *articles*?**

One of the three qualifying criteria for the *article* exemption (40 CFR Section 372.3), states that an *article* "does not release a *toxic chemical* under normal conditions of *processing* or *otherwise use* of that item at the *facility* or *establishment*."  When the welding rod is used, a listed *toxic chemical* is released.  Therefore, the welding rod can not be considered an *article*.

*Article Exemption, Fume or Dust Qualifier*

**350.  A *facility* generates metal dust when it processes sheet metal.  Each dust particle is actually an alloy containing more than one type of metal (e.g., chromium and aluminum).  If the *toxic chemical* in the metal is listed with a qualifier which includes dust (e.g., aluminum), does EPA consider the dust particle the listed *toxic chemical*?**

In this example, EPA considers metal dust particles, which contain aluminum in the dust form, a listed *toxic chemical*.  Therefore, that weight percentage of the metal dust which is aluminum would be subject to threshold determinations and *release* and other *waste management* reporting as aluminum dust.

EXEMPTIONS

111

**EXEMPTIONS**

*Article Exemption*

**351. A *covered facility* uses a die block to manufacture items. When the block becomes worn and needs adjustments such as shaving and melting to restore its shape, how does the *facility* report on *releases* resulting from that activity?**

If, upon shaving and melting the die block, the diameter or thickness are not retained in whole or in part or *toxic chemicals* are released in an amount which exceeds 0.5 pounds for all like items in a reporting year, then the block would no longer qualify for the *article* exemption and the *facility* would have to perform threshold determinations and report *releases* and other *waste management* of the listed *toxic chemical*. When threshold determinations are made, the *facility* must consider the weight of the *toxic chemical* contained in the entire block for threshold determinations. However, only quantities in like *articles* that do not meet the *article* definition and were placed into use within the reporting year would be considered towards thresholds. Those items in use from previous years would not be considered in the threshold determinations for the current reporting year.

*Article Exemption, Change in Diameter/ Thickness*

**352. A mine's electrorefining operation uses an anode containing a *toxic chemical*. The anode is meant to degrade, and the thickness changes over the entire anode. Is this anode eligible for the *article* exemption?**

No. Since the item did not retain its original thickness in whole or in part, the anode is not considered an *article*.

*Article Exemption, Fume or Dust Qualifier*

**353. A company *processes* a galvanized sheet metal containing elemental zinc, not a zinc compound. When the sheet metal is *processed* it generates zinc dust, all of which is captured and sent off-site for recycling. The sheet metal is formed to a specific shape and its end use functions depend in whole on its shape during end use. Can the company claim an exemption because the sheet metal remains an *article*, or must it do a threshold determination for zinc because it has coincidentally *manufactured* zinc in the dust form?**

Elemental zinc is listed with a qualifier, fume or dust, and is only reportable in the form of fume or dust. Thus, the zinc in the sheet metal would not count toward the threshold determinations since it is not in the fume or dust form. The zinc that is generated (in the form of fume or dust) as a result of the sheet metal *processing* is reportable and would be counted toward the 25,000 pound threshold determination for *manufacturing,* regardless of the sheet metal's *article* status.

*Article Exemption, Process, Batteries*

**354. If an automobile manufacturer receives finished car batteries and places these batteries into the cars they sell, must the automobile manufacturer report the lead which is incorporated in the battery?**

**EXEMPTIONS**

If the car battery is completely sealed while present at the *facility*, it would be considered an *article*, and thus would be exempt from EPCRA Section 313 reporting. If lead is released from the batteries under normal *processing* at the *facility*, as might occur during maintenance of the battery, the release would negate the *article* exemption. If the exemption is negated, the amount of lead and any other *toxic chemical* in these non-*article* batteries would be applied toward the 25,000 pound *processing* threshold to determine if the *facility* must report.

*Article Exemption, Reportable Release*

**355. I am a power tool manufacturer and we use copper, a listed *toxic chemical*. We receive copper plates and shave the rough edges off them. All of the shavings are vacuumed and sold to a scrap metal *facility* which makes ingots and sells them. Is the copper plate an *article*? How do I consider the shavings?**

Because all of the copper released from the plate is collected and reused, no reportable release has occurred and the *article* exemption is maintained. If the copper is *disposed* of, on the other hand, the plates lose the *article* status.

*Article Exemption, Glass*

**356. If glass is purchased (with about a 20 percent lead content) and its form is physically changed to make light bulbs, is that considered *processing* or does the *article* exemption apply?**

The *article* exemption does not apply because: (1) the end use of the glass is not dependent on the specific shape or design of the glass entering the process—the glass is melted and reshaped, and/or (2) emissions result from heating of the glass during processing.

*Article Exemption, Article Releases*

**357. A *covered facility* cuts metal sheets containing nickel, releasing fumes. It then further grinds the metal to its final shape, producing grindings. For the sheets to retain their *article* status, the fumes and grindings must be equal to or less than 0.5 pound/year to any media. Does this value apply to aggregate grindings and fumes from like *articles* being *processed* or *otherwise used* in the same way (i.e., cutting or grinding) or to grindings and fumes generated from all manners of *processing* or *otherwise use* of like *articles*?**

The 0.5 pound/year release value applies to aggregate grindings and fumes from like *articles* being *processed* or *otherwise used* in all manners at the *facility*. This value applies to the total aggregate grindings and fumes of the listed *toxic chemical* from both steps of the process (i.e., cutting and grinding). The various shapes resulting from the cutting are "the same type of item" as the initial sheet. Thus, the amount of fumes resulting from cutting should be added to the amount of resulting grindings.

**EXEMPTIONS**

*Article*
*Exemption,*
*Article*
*Releases,*
*Supplier*
*Notification*

**358. A *covered facility* uses plastic containing di-(2-ethylhexyl) phthalate (DEHP) to wrap its products. The plastic is cut by a hot wire, a process during which minute quantities of DEHP are *released*. Is the plastic exempt from reporting and from supplier notification because it can be considered an *article*?**

The plastic wrap containing DEHP is not exempt as an *article* because quantities of DEHP are released during the cutting process. If a *facility* releases 0.5 pounds or less of DEHP during the reporting year from all like items, this amount can be rounded to zero and therefore would be exempt. If the *facility* can reasonably document that none of its customers are likely to release more than 0.5 pounds, no supplier notification is required.

*Article*
*Exemption,*
*Sheet Metal,*
*Threshold*
*Determination,*
*Processing*
*Determination*

**359. A *covered facility processes* sheet metal that contains a listed *toxic chemical*. When *processed,* some pieces of the sheet metal are cut generating shavings which contain the listed *toxic chemicals* and which are not 100 percent recycled. Specifically, more than 0.5 lbs is released from all like items during the reporting year, and therefore, the sheet metal does not meet the *article* exemption criteria. Must the *facility* consider the amount of the listed *toxic chemical* in the entire piece of sheet metal for threshold determinations or may the *facility* consider just the amount of listed *toxic chemical* in the area of the sheet metal that is cut?**

All of the listed *toxic chemical* in the entire piece of cut sheet metal must be counted toward the shavings or the *processing* threshold, not just the weight of the listed *toxic chemical* in the section of the item on which work is done. The weight of the listed *toxic chemical* in the entire piece of sheet metal is used; the exemption cannot apply to a portion of the *article*.

*Article*
*Exemption,*
*Wire,*
*Compounds*

**360. I use copper wire in one of my products. I cut it and bend it and then heat seal it into a glass bulb. How do I consider the copper wire for Section 313 reporting?**

First, the wire would remain an *article* if during the manufacture of the glass bulbs no *toxic chemicals* are released, and if the wire meets the other two criteria of the *article* exemption (i.e., it is formed to a specific shape or design during manufacture and it has end use functions dependent in whole or in part upon its shape or design). If the wire is not an *article*, then for an element such as copper, both copper metal and copper compounds are subject to EPCRA Section 313 reporting. Determine the form of the copper in the wire first. If it is pure copper wire, the entire weight of the entire wire must be used. If it is an alloy, the weight percent of the *toxic chemical* times the entire wire weight must be used. If there are multiple copper compounds, the entire weight of each copper compound must be used for the *processing* threshold determination.

EXEMPTIONS

*Article Exemption, Wire*

**361. We cut copper wire into segments which are then wound around a motor part. The ends are not stacked and our engineer determined that no copper is released. Is the wire still an *article*?**

Cutting the wire into segments and winding it around a motor part do not negate the exemption since the diameter and thickness of the wire is not changed. The copper wire remains an *article* as long as no *toxic chemicals* (or less than 0.5 lbs for all like items over the entire reporting year) are released during use. Since your engineer determined no copper is released, the *article* exemption does apply and the copper wire does not have to be considered for threshold determinations and *releases* and other *waste management* calculations.

*Article Exemption, Wire*

**362. Copper wire at a *facility* is cleansed by dipping it into a sulfuric acid solution. This acidic solution etches away a portion of the surface of the wire. The etched copper reacts with the acid to form copper sulfate. The wastestream containing the copper sulfate is sent directly to a POTW and no other releases of copper occur on-site to any other environmental media. Is the article exemption (40 CFR Section 372.38(b)) negated for the copper wire?**

The transfer of the copper sulfate to the POTW constitutes a release from the article. The release from the copper wire in the form of a copper compound would negate the *article* exemption for the copper wire. If the *facility* exceeds an activity threshold for the copper wire, a report must be filed for copper. In addition, if the 25,000 pound *manufacturing* threshold is exceeded for the copper sulfate, a report must also be filed for copper compounds. If a threshold for copper and copper compounds is individually met, the *facility* may file one report for both.

*Article Exemption, Sheet Metal*

**363. I run a metal fabrication facility, SIC code 34. If I cut the metal sheets and send the shavings off-site for reuse, can I consider the metal sheets *articles*?**

Yes. If the only thing separated from the metal sheets during cutting are shavings, and if all the shavings are sent off-site for reuse, and the thickness of the metal sheet is not completely altered during *processing,* then the metal sheets are still considered *articles* and are exempt. If cutting results in shavings or other waste materials from the sheets, and if these shavings are completely captured and sent either on-site or off-site to be either recycled or reused, then the item (in this case, metal sheets) can retain the *article* exemption, given that the other criteria for exemption are met.

SECTION 2 _____ 1998 EPCRA Section 313 Questions and Answers

**EXEMPTIONS**

*Article
Exemption,
Sheet Metal,
Article
Releases*

**364.  A *covered facility processes* metal sheets containing nickel in a four-step *process*:  (1) sheets are cut with a laser saw (releasing nickel fumes); (2) pieces are further ground to their final shape (releasing grindings); (3) ground pieces are sent off-site for heat treatment; and (4) heat treated pieces are returned to a *facility* where holes are bored (producing turnings) and the resultant pieces are assembled into the final product. How are releases reported?**

Although the pieces are sent off-site in step 3, they are returned to the *process* as essentially the same material.  Thus, the activity is to be treated as a continuous *process* activity.  If there is scrap material which is recognizable as the original form of the *article*, and if releases from steps 1, 2, and 4 (collectively), which are not recycled, do not exceed 0.5 pounds for the entire reporting year, then the metal sheets could be exempt as *articles*.

*Article
Exemption,
Sheet Metal*

**365.  Does the *article* exemption apply to flat rolled sheet metals, if they are used in operations which typically produce scrap but no release?**

Assuming the scrap metal pieces are recognizable as the original piece, the *article* exemption does apply to these metals if the forming process caused 0.5 pounds or less of releases of a listed *toxic chemical* from all like items or the items retain the thickness of sheet metal in whole or in part.  Once an operation is performed on a metal that causes a release which is not recycled and which exceeds 0.5 pounds for the reporting year (for example, from operations such as heating, grinding, or welding), the *article* exemption no longer applies and releases must be reported when listed chemicals in a sheet metal are *processed* in quantities greater than 25,000 pounds.

*Article
Exemption,
Article
Releases*

**366.  A metals working plant machines, cuts, forms, and joins plate, cylinder, and other purchased metal alloy parts.  Alloys of nickel and chromium, above <u>de minimis</u> levels, are *processed* in amounts that exceed 50,000 pounds per year.  Does the *article* exemption apply since emissions from operations such as welding represent only a small fraction of the total metallic component of the surface area *processed*?**

Releases greater than 0.5 lbs/yr of the chemicals contained in *mixtures*, including alloys, during fabrication operations disqualifies the item *processed* from the *article* exemption.  Releases include the chemical component of fumes, dust, grindings, and turnings generated from metal fabrication activities.  However, wastes generated in a form recognizable as the *processed article* (<u>e.g.</u>, pieces of a plate or cylinder) are exempt from *release* and other *waste management* calculations.

*Article
Exemption, Bar
Stock*

**367.  Is bar stock that is used to make precision tuned parts an *article* and thus exempt from Section 313 reporting?  The bar stock is *processed* to produce parts that in whole or in part retain the basic dimensional**

116

**EXEMPTIONS**

characteristic of the bar stock. The production of the part itself is dependent upon the specific shape and dimension of the bar stock and there are no *releases* during *processing.*

Bar stock is an *article* if its basic dimensional characteristics are maintained in whole or in part in the finished product and if *processing* the bar stock does not result in releases. If the end product is totally different in diameter or thickness from the bar stock, the bar stock would not be an *article.*

*Article Exemption, Bar Stock*

**368. Can *covered facilities* which extrude copper bars or rods into wire treat the bar or rod as an *article*?**

No. If you are completely changing the shape or form of an item during *processing,* the *article* exemption no longer applies. An *article* has end use functions dependent in whole or in part upon its shape or design during end use. The end use function is dependent upon the copper being in the shape of the wire, so the copper bar cannot be considered an *article.* Also, in the above example the thickness or diameter of the entire item has been altered.

*Article Exemption, Manufacturing Article, Plastic Bottles*

**369. A manufacturer of plastic bottles makes the bottles by blow-molding a *mixture* of plastic resin and polymer pellets that contain lead chromate (a *toxic chemical*) and fillers. Once the bottles are made, they are checked for flaws (i.e., a quality assurance check). Any bottles that do not pass the quality assurance test are placed in the *facility* dumpster and are subsequently *disposed* of in the local municipal landfill. Do these substandard bottles meet the *article* exemption and thereby exempt the lead chromate from being a *release* of a listed *toxic chemical* under Section 313?**

No. The manufacture of *articles* is not exempt. Thus, the lead chromate that is sent to the landfill is considered a release of lead chromate since the substandard bottles that are *disposed* of are waste from the manufacturing process.

*Article Exemption, Lead Bricks*

**370. A ship building *facility* incorporates lead bricks as ballast into the ships it distributes in commerce. The lead bricks remain permanently with the ship. They could be considered *articles* and therefore be exempt from reporting. However, the *facility* infrequently cuts some of the bricks, generating lead dust, which it collects and sends to an off-site lead reprocessor. How should the *facility* report? What should be counted towards the threshold if the lead bricks are not considered *articles*?**

If all of the lead is recycled or reused then the lead dust does not have to be counted as a release. Therefore, the cut bricks retain their *article* status. If while cutting the bricks, there are *releases* which are not recycled and that

117

**EXEMPTIONS**

exceed 0.5 pounds for a year, then the cut bricks would not be considered *articles*. In this case, count only the lead in bricks actually *processed* toward the threshold determination. Any amounts of *toxic chemicals* sent off-site for recycling would be reported appropriately on the Form R.

*Article Exemption, Article Releases, Steel Plates*

**371. During the construction and repair of ships, small quantities of a listed *toxic chemical* are emitted in the form of fumes when steel plates are being welded together. The steel plates are formed to a specific shape during manufacture and their end use function is dependent upon their shape. Are these steel plates *articles* and should the amount of *toxic chemical* (fumes from the steel plates) emitted from the steel plates during the welding *process* be included in determining the threshold?**

If the *processing* or *otherwise use* of all like manufactured items results in the release of 0.5 pounds or less of a *toxic chemical*, EPA will allow this quantity to be rounded to zero and the steel plates may be exempt as *articles*. If the listed *toxic chemical* that is released exceeds 0.5 pounds over a calender year and is completely recycled or reused, on-site or off-site, then these steel plates may also be exempt as *articles*. Any amount that is not recycled or reused will count toward the 0.5 pound per year cut-off value.

*Article Exemption, Batteries*

**372. How should a *facility* owner/operator handle the reporting requirement for listed *toxic chemicals* found in industrial and commercial batteries under EPCRA Section 313 that it uses on site? What if the *facility* manufactures the batteries?**

An already manufactured item (e.g., maintenance-free batteries) containing a listed *toxic chemical* may be considered an *article* if the *facility* uses the item as intended and the listed *toxic chemical* is not emitted during its *processing* or *otherwise use*. If the *facility* services the item by replacing the listed *toxic chemical*, the amount of the listed *toxic chemical* added during the reporting year must be counted toward the threshold determination. For *facilities* which manufacture batteries, lead that is incorporated into a lead acid battery is *processed* to manufacture the battery, and; therefore, must be counted toward threshold determinations and *release* and other *waste management* calculations. The *article* exemption does not apply to the manufacture of an item. However, the use of the battery elsewhere in the *facility* may not have to be counted. *Disposal* of the battery after its use does not constitute a release.

*Article Exemption, Catalyst*

**373. A *facility* uses a catalyst containing a listed *toxic chemical* in a fixed bed reactor. The catalyst is in the form of cylindrical or trilobed extrudates (pellets) in a specific size. It is used to promote a chemical reaction and is not physically altered during use. The spent catalyst is sent to a reclaimer for eventual reuse. Can the catalyst be exempted as an *article* under Section 313?**

No. Although the catalyst is manufactured to a specific shape or design, and has end use functions dependent upon its shape during end use, EPA believes that releases occur during transfer operations. Therefore, the *article* exemption does not apply. Such catalysts usually contain dust size material that is not the same size and shape of the pellets. The likely releases would be dust emissions and potential spills that occur during charging and removing the catalyst from the reactor. Such operations are part of the normal conditions of *processing* and *otherwise use* that must be considered under the *article* definition. The intent of EPCRA is to capture all *releases*, whether they are intentional or not. The spent catalyst sent off-site for recycling does not itself constitute a release that invalidates the *article* exemption, as long as all of the *toxic chemical* is recycled. The *facility* should also consider whether any on-site regeneration of the catalyst results in the *toxic chemical* being released in wastestreams.

*Article Exemption*

**374. A *covered facility processes* a metal item containing nickel. The finished product retains in part the dimension characteristics of the original item and all the metal shavings resulting from the *process* are sent off-site for recycling. Since the Pollution Prevention Act requires reporting of recycled amounts of a listed *toxic chemical*, does that mean the material is not an *article*?**

The Pollution Prevention Act requirements do not affect the *article* status of the metal item. If all of the releases from the *article* are sent off-site for recycling, the item would still be exempt as an *article*. If this is the only occurrence of nickel in the *facility*, the *facility* would not have to report for nickel.

*Article Exemption, End Use Function*

**375. A *facility* manufactures lead came (i.e., slender, grooved, lead rods). A lead billet is placed into a press and pushed through a die to produce a unique form. The *facility processes* 100,000 pounds of lead came. Is this *process* exempt from reporting under the *article* exemption?**

The *article* exemption does not apply. The lead billet does not qualify as an *article* because it does not have an end use function other than to be of a size and shape convenient to further processing, and the end product is significantly different in shape and dimension from the starting material. Since the *facility processes* more than 25,000 pounds of lead, the *facility* must report for this *toxic chemical*.

*Article Exemption, Recognizable as an Article, Disposal, Process, Lead*

**376. A covered manufacturing *facility* produces neon signs by bending leaded glass tubing. The *facility* uses enough tubing annually to *process* in excess of 25,000 pounds of lead, an EPCRA Section 313 *toxic chemical*. When signs are formed from glass tubing, the diameter of the tubes remains unchanged and lead is not released during the heating or bending *process*, qualifying the tubes for the *article* exemption. If a discrete number of glass tubes are broken and discarded during the**

119

EXEMPTIONS

**EXEMPTIONS**

year, under what circumstances would *disposal* of the broken tubes constitute a release that negates the *article* exemption, and how would the *facility* calculate the amount of lead used in their operation?

*Disposal* of the glass does not necessarily constitute a release which automatically negates the *article* exemption. For the tubing to meet the definition of an *article* when discarded, the diameter of the tubing must remain intact and unchanged. As a result, shards of glass no longer qualify as *articles*. If more than 0.5 pounds of lead is released and not recycled, then the *article* exemption would not apply to this glass tubing.

*Article Exemption, Light Bulbs*

**377. A *facility* subject to EPCRA Section 313 crushes light bulbs and uses the crushed glass in their *process*. The light bulb stems are not used in the *process* and are *disposed*. There is a lead "button" in each light bulb stem which is *disposed*. Is this button considered an *article* and therefore exempt from threshold and *release* and other *waste management* calculations under 40 CFR Section 372.38(b)?**

No, the lead buttons from crushed light bulbs would not be considered *articles* and the lead would not be exempt from threshold determinations and *release* and other *waste management* calculations. The lead in these buttons would not be counted toward any threshold. The *facility* would only be required to report the release of lead buttons if a threshold for lead was exceeded by a covered activity or other *waste management* elsewhere at the *facility*.

*Article Exemption, PCB Transformers*

**378. A *covered facility* uses PCB transformers. Are these considered to be *articles*, and therefore exempt from reporting under Section 313?**

PCB transformers are considered to be *articles*, as long as PCBs are not released from the transformers during normal use or if the *facility* does not service the transformer by replacing the fluid with other PCB-containing fluid. (See also: Section 313 Policy Directives - Directive #6: PCBs Threshold Determinations and *Release* and other *Waste Management* Reporting.)

*Article Exemption, PCB Transformers, Ancillary Use*

**379. A *covered facility* has a PCB transformer on-site which it uses for energy. The PCBs were removed from the transformer and *disposed*. Is the amount of PCB removed for *disposal* counted towards the *otherwise use* threshold? How is this activity covered under EPCRA Section 313?**

If the *facility* removes the entire transformer including the PCB-laced oil as an *article*, the amount of PCB in the *article* would not be included in Section 313 threshold determinations and *release* and other *waste management* calculations. If a *toxic chemical* is present in an *article* at a *covered facility*, the owner/operator is not required to consider the quantity of the *toxic*

*chemical* present in such *article* when determining whether an applicable threshold has been met or when determining the amount to be reported as a *release* or other *waste management*.

If the *facility* removes the PCB-laced oil from the *article*, this removal would negate the *article* exemption. To determine if the *facility* exceeds a threshold, the operator of the *facility* must count the amount of the chemical added to the recycle/reuse operation during the reporting year (40 CFR Section 372.25(e)).

If a *facility* has a transformer that leaks PCB-laced oil, this leaking would also negate the *article* exemption. To determine if the *facility* exceeds a threshold, again, the owner/operator of the *facility* must count the amount of the chemical added to the recycle/reuse operation during the reporting year.

The *facility* would be *otherwise using* the PCB added to the transformer (ancillary use). Only the amount of PCB added to the transformer needs to be aggregated for threshold determination, and the *facility* will most likely not be adding PCB-laced oil to the transformer. Therefore, it is unlikely that the *facility* will exceed the 10,000 pound *otherwise use* threshold. The *facility*, therefore, would not be required to report *releases* and other *waste management* of the PCBs for Section 313.

If, however, the *facility* exceeds the 10,000 pound threshold and needs to report PCBs, the PCBs removed from the transformer and sent off-site for final *disposal* would be a reportable *release*.

*Article Exemption, Article Releases*

**380. I *process* a plastic pipe which contains formaldehyde (3 percent by weight). I also know how much formaldehyde is *released* when I *process* the pipe. Do I need to report these emissions?**

If the quantity of the formaldehyde released during *processing* of all like items exceeds 0.5 pounds per year, the *facility* cannot take the *article* exemption for the pipe and all formaldehyde incorporated into the pipe should be counted toward the *processing* threshold. The *facility* should report if the *processing* threshold is exceeded. If the quantity of formaldehyde released during *processing* of the pipes is 0.5 pounds or less per year, the *facility* would not have to report because it is part of an *article*.

*Article Exemption, Article Releases, Polyurethane Foam*

**381. A *facility* buys and sells rigid polyurethane insulating foam containing a fluorocarbon in higher than the <u>de minimis</u> concentration. The *facility* cuts the foam and packages it to be sold and distributed in commerce. Does the *facility* need to report the fluorocarbon, a Section 313 chemical, *released* to the air as a result of cutting polyurethane foam?**

EXEMPTIONS

Fluorocarbon in foam pieces that are cut counts toward the *processing* threshold. If the threshold is met, the *facility* must report all *releases* and other *waste management* of fluorocarbon as a result of cutting polyurethane foam and any diffusion of fluorocarbon in polyurethane foam to the *environment* under normal storage conditions. Note that the polyurethane foam may meet the *article* exemption if 0.5 pounds or less of fluorocarbon, from all like items, is released during *processing* and the foam maintains a specific shape or design.

*Article Exemption, Facility-Facility Reporting, Metals, SIC Code*

**382. Are there recommended methods for determining if the 0.5 lb *release* limit is exceeded from a metal stamping operation?**

EPA recommends that *facilities* use one or more of the following for performing *release* and other *waste management* calculations of EPCRA Section 313 chemicals: monitoring data, mass balance, emission factors, and engineering calculations. If all wastes generated from stamping operations (including fume, dust, sludge and scrap pieces) are recycled or reused and the *facility's* total *releases* will be equal to or less than 0.5 lb limit for each *toxic chemical* per year, the *article* exemption may apply. If *releases* (including *disposal*) of a *toxic chemical* are more than 0.5 lb, the *article* exemption is negated for that chemical and all quantities of that chemical in the metal sheets should be included in threshold determinations and *release* and other *waste management* calculations.

*G. Coal Mining/Extraction Exemption*

*Coal Mining, Surface Mining, Extraction Exemption*

**383. A covered coal mine uses material containing listed *toxic chemicals* (waste rock, ash, etc.) in its surface mining operation to replace excavated land. Is this activity considered extraction and; therefore, eligible for the coal mining extraction exemption (40 CFR Section 372.3)?**

No. The *otherwise use* of waste rock, ash, or other material in surface mining to replace excavated land is a reclamation activity. The *otherwise use* of these materials for reclamation is not considered part of extraction, and amounts of listed *toxic chemicals* contained in these materials must be considered toward threshold determinations and *release* and other *waste management* calculations.

*Metal Mining, Overburden Exemption*

**384. Are listed *toxic chemicals* in *overburden* displaced at a covered metal mine subject to reporting under EPCRA Section 313? What about *toxic chemicals* used in removing *overburden*?**

No. Listed *toxic chemicals* that are constituents of *overburden*, as defined in the May 1, 1997, final rule (62 <u>FR</u> 23833), which are *manufactured*, *processed*, or *otherwise used* are not subject to threshold determinations or reporting for *releases* and other *waste management* activities (40 CFR

EXEMPTIONS

Creosote Council Et al. v. EPA
No. 08-00512

Ex. 5 to EPA's Memorandum in Opposition to Motion for Preliminary Injunction

| United States Environmental Protection Agency | Office of Pesticides and Toxic Substances | EPA 560/4-88-004p February 1988 |
|---|---|---|

**♻EPA**

# Title III Section 313 Release Reporting Guidance

*Estimating Chemical Releases From Wood Preserving Operations*

# Estimating Chemical Releases From Wood Preserving Operations

Facilities engaged in wood preserving operations may be required to report annually any releases to the environment of certain chemicals regulated under Section 313, Title III, of the Superfund Amendments and Reauthorization Act (SARA) of 1986. If your facility is classified under SIC codes 20 through 39 (wood preserving facilities generally fall under SIC code 2491) and has 10 or more full-time employees, for calendar year 1987 you must report all environmental releases of any Section 313-listed chemical or chemical category manufactured or processed by your facility in an amount exceeding 75,000 pounds per year or otherwise used in an amount exceeding 10,000 pounds per year. For calendar years 1988 and 1989 (and beyond), the threshold reporting quantity for manufactured or processed chemicals drops to 50,000 and 25,000 pounds per year, respectively.

This document has been developed to assist facilities engaged in wood preserving operations in the completion of Part III (Chemical Specific Information) of the Toxic Chemical Release Inventory Reporting Form. Included herein is general information on toxic chemicals used and process wastes generated, along with several examples to demonstrate the types of data needed and various methodologies available for estimating releases. If your facility performs other operations in addition to wood preserving, you must also include any releases of toxic chemicals from these operations.

## Step One

**Determine if your facility processes or uses any of the chemicals subject to reporting under Section 313.**

A suggested approach for determination of the chemicals your facility uses that could be subject to reporting requirements is to, make a detailed review of the chemicals and materials you have purchased. If you do not know the specific ingredients of a chemical formulation, consult your suppliers for this information. If they will not provide this information, you must follow the steps outlined to handle this eventuality in the instructions provided with the Toxic Chemical Release Inventory Reporting Form.

The list presented here includes chemicals typically used in wood preserving operations that are subject to reporting under Section 313. This list does not necessarily include all of the chemicals your facility uses that are subject to reporting, and it may include many chemicals that you do not use. You should also determine whether any of the listed chemicals are created during processing at your facility.

**Compounds found in wood preserving agents:** Arsenic compounds, copper compounds, chromium compounds, zinc compounds, anthracene, benzene (in petroleum solvents), o-cresol, pentachlorophenol, dibenzofuran, naphthalene, quinoline

**Vapor drying agents:** Various solvents

**Preserving carriers:** Various solvents

**Fire retardants:** Zinc chloride, antimony trioxide, titanium dioxide, urea-melamine-formaldehyde resin

## Step Two

**Determine if your facility surpassed the threshold quantities established for reporting of listed chemicals last year.**

You must submit a separate Toxic Chemical Release Inventory Reporting Form for each listed chemical that is "manufactured," "processed," or "otherwise used" at your facility in excess of the threshold quantities presented earlier. Manufacture includes materials produced as byproducts or impurities. Toxic compounds that are incorporated into your products (for example, wood preserving agents such as pentachlorophenol) would be considered "processed" because they become part of the marketed finished product. Degreasing solvents, cleaning agents, and other chemicals that do not become part of the finished product (for example, vapor drying agents and preserving carriers) would be considered "otherwise used."

The amount of a chemical processed or otherwise used at your facility represents the amount purchased during the year, adjusted for beginning and ending inventories. To ascertain the amount of chemical in a mixed formulation, multiply the amount of the mixture (in pounds) by the concentration of the chemical (weight percent) to obtain the amount of chemical processed.

*Example: Determining whether chromium, copper, and arsenic were used in sufficient quantity to require reporting under Section 313.*

*In 1987, a wood preserving facility purchased 600,000 pounds of a chromated*

*copper arsenate solution containing 23.75 percent chromium oxide ($CrO_3$), 9.25 percent copper oxide (CuO), 17.0 percent arsenic pentoxide ($As_2O_5$), and 50.0 percent $H_2O$. At the beginning of the year, 36,000 pounds of this solution was held in storage; the amount in storage at the end of the year was 18,000 pounds. Therefore, the total amount of solution processed during the year would be:*

> *36,000 lb (beginning inventory) +*
>
> *600,000 lb (purchased) −*
>
> *18,000 lb (ending inventory)*
>
> *= 618,000 lb*

*The amount of chromium oxide processed would be equal to:*

> *618,000 lb solution x*
>
> *23.75 lb $CrO_3$ / 100 lb solution*
>
> *= 146,775 lb*

*The amount of copper oxide processed would be equal to:*

> *618,000 lb solution x*
>
> *9.25 lb CuO / 100 lb solution*
>
> *= 57,165 lb*

*The amount of arsenic pentoxide processed would be equal to:*

> *618,000 lb solution x*
>
> *17 lb $As_2O_5$ / 100 lb solution*
>
> *= 105,060 lb*

*In this example, only chromium and arsenic compounds were processed in sufficient quantity (that is, more than 75,000 pounds) to require reporting under Section 313 in calendar year 1987. In calendar year 1988, reports would be required for all three metal compounds.*

A listed chemical may be a component of several formulations you purchase, so you may need to ask your supplier for information on the concentration (percentage) of the chemical in each. For chemical categories (for example, chromium compounds), your reporting obligations are determined by the total amounts of all chemicals in the category.

You must complete a report for each chemical for which a threshold is exceeded. The thresholds apply separately; therefore, if you both process and use a chemical and either threshold is exceeded, you must report for both activities. If neither threshold is exceeded, no report is needed.

## Step Three
### Identify points of release for the chemical(s) subject to reporting.

An effective means of evaluating points of release for listed toxic chemicals is to draw a process flow diagram identifying the operations performed at your facility. The figure below is an example flow diagram of a pressurized wood-treating process in which vapor is conditioned. Because each facility is unique, you are strongly urged to develop a flow diagram for your particular operations that details the input of materials and chemicals and the waste sources resulting from the operation of each unit.



**Example Flow Diagram of a Wood Preserving Facility Using the Boulton Conditioning Process**

Wood preserving facilities generate wastewater during the conditioning of the wood prior to its treatment and as a result of the condensation of vapors drawn off the treatment cylinder. Rainwater and spills collected from the area around the treatment cylinder also contribute to wastewater volume. Typically, the preservative chemicals and solvents (solvents are used during vapor conditioning) entrained in the wastewater are recycled to the extent possible. Solid waste in facilities using oil-borne preservatives is generated primarily as a result of treatment and/or evaporation of wastewater. Typical air emission sources are volatilization of organic chemicals during wastewater evaporation, vapors released from the treating cylinder during unloading and charging operations, and emissions from the vacuum vent during the treating cycle.

Your reporting must account for all releases.

## Step Four
### *Estimate releases of toxic chemicals.*

After all of the toxic chemicals and waste sources have been identified, you can estimate the releases of the individual chemicals. Section 313 requires that releases to air, water, and land and transfers to offsite facilities be reported for each toxic chemical meeting the threshold reporting values. The usual approach entails first estimating releases from waste sources at your facility (that is, wastewater, air release points, and solid waste) and then, based on the disposal method used, determining whether releases from a particular waste source are to air, water, land, or an offsite disposal facility.

In general, there are four types of release estimation techniques:

- **Direct measurement**
- **Mass balance**
- **Engineering calculations**
- **Emission factors**

Descriptions of these techniques are provided in the general Section 313 guidance document, Estimating Releases and Waste-Treatment Efficiencies for the Toxic Chemical Release Inventory Form.

Provisions of the Clean Air Act, Clean Water Act, Resource Conservation and Recovery Act, and other regulations require monitoring of certain waste streams. If available, data gathered for these purposes can be used to estimate releases. When only a small amount of direct measurement data is available, you must decide if another estimation technique would give a more accurate estimate.

Mass balances of the entire wood preserving process are of limited value in estimating emissions. Because recycling is practiced extensively, the quantities of waste produced are very small in relation to the quantities of chemicals processed. Any inaccuracies in the calculation of the quantity of chemical purchased or retained in the wood product would greatly affect the estimated quantity of chemical released as waste; therefore, the accuracy of the estimate would be questionable. The use of mass balances may be feasible for specific units, however, if sufficient input and output data are available. For example, if the quantity of a chemical entering a wastewater evaporator and the quantity exiting as a sludge are known, the quantity exiting as air emissions from the evaporator can be determined by mass balance.

Engineering assumptions and calculations can be used to estimate toxic releases in a variety of situations. Information such as the water solubility and vapor pressure of a chemical can be used in conjunction with process parameters such as treatment cylinder size, vacuum exhaust rate, and wastewater evaporation temperature to develop engineering calculations of releases. This method of estimation relies heavily on process operating parameters; thus, the techniques developed are very site-specific.

Emission factors are usually not available for wood preserving operations; however, the reference sources presented at the end of this document contain considerable information on wood preserving wastes. You may be able to use this information to develop emission factors or waste characteristics applicable to your facility to serve as a basis for release estimates. You may also be able to develop emission factors for your particular facility in-house by performing detailed measurements of wastes at different production levels.

## Toxic Releases Via Wastewater

Most wood preserving facilities do not discharge wastewater. Instead, the wastewater is either completely recycled or evaporated. Some facilities, however, discharge wastewater to publicly owned treatment works (POTWs) or dispose of it by land application, and a few facilities discharge wastewater directly into navigable waters. If you dispose of wastewater by landspreading, the toxic chemicals contained in the wastewater are considered "released to land." The same is true for those facilities who discharge to onsite lagoons that have no discharge; however, the quantities of chemicals that evaporate into the air or are removed as sludge from these lagoons must be accounted for.

Facilities that use steam conditioning or the Boulton process must monitor wastewater discharged to POTWs for copper,

chromium, and arsenic to comply with pretreatment standards set for this portion of the industry. These monitoring data can be used to estimate releases of these toxic chemicals via wastewater. Release amounts should be estimated for the parent metal, even though the facility is processing and reporting for the metal compound. For other toxic chemicals, in-house monitoring data can be used. If such data are unavailable, a different release estimation technique must be used.

Although wastewater is not discharged at most wood preserving facilities, estimates of the toxic chemical content in wastewater streams within a facility can be useful for estimating releases as air emissions or solid waste. Most process pollutants can be found in the wastewater generated within the facility, and they are released as solid waste or air emissions during recycling, treatment, or evaporation. The following example demonstrates the use of an engineering calculation to estimate toxic releases via wastewater.

*Example: Using an engineering calculation to estimate releases of pentachlorophenol via wastewater.*

*A wood preserving facility uses open steaming to condition wood before it undergoes pressure treatment with a pentachlorophenol (PCP) preservative. The condensed steam used during this conditioning generates wastewater containing excess preservative. This preservative is recycled to the work tank after the wastewater flows through an oil/water separator. The wastewater exiting the oil/water separator is discharged to a POTW.*

*No direct measurement data for PCP are generated at this facility. The quantity of PCP discharged can be estimated by use of an engineering calculation that assumes the PCP concentration in the wastewater exiting the oil/water separator is equal to the PCP's solubility in water (0.002 percent*

or 20 mg/liter). Based on a known waste-water flow rate of 3,250 gallons per day from a plant that operates 250 days per year, the quantity of PCP released via wastewater to the POTW can be estimated as follows:

Amount of PCP released into wastewater =

20 mg/liter PCP x

3.78 liter/1 gal x

1 lb/453,000 mg x

3,250 gal/day x

250 days/year

≈ 136 lb

Using this approach, the plant in this ex-ample could report releases of 140 pounds of PCP to wastewater. If direct measure-ment data were available for PCP in the wastewater, using these data would be the preferred method of estimating releases.

The assumption used in the preceding example (that the concentration of PCP in the wastewater exiting the oil/water separator is equal to the water solubility of the PCP) may not be valid at your facility because of waste-water flow rates and emulsion formations. If monitoring data are not available or in-house emission factors cannot be developed, how-ever, this is probably the best approach to estimating releases via wastewater.

## Toxic Releases Via Solid Waste

The RCRA regulations specifically list solid wastes from wood preserving operations as hazardous. Therefore, the generation, transportation, and disposal of most of your solid wastes are regulated under this Act. The RCRA manifesting procedure for hazard-ous wastes shipped offsite requires documen-tation of waste quantities, and treatment, storage, and disposal facilities must perform detailed chemical and physical analyses on the wastes. Your facility may also analyze these wastes. It should be possible to estimate solid waste releases for a number of compounds by direct measurement.

**Example: Using direct measurement to estimate releases of toxic chemicals via solid waste.**

Wastewater treatment sludge from a wood preserving operation was shipped monthly to an offsite secure chemical landfill for disposal. Shipping manifests for the past year contain detailed informa-tion on the quantity of sludge sent to the offsite facility. The landfill performed detailed chemical analysis for penta-chlorophenol (PCP) on representative portions of each shipment before final disposal. The information from the manifests and landfill records can be combined to estimate the quantity of PCP shipped offsite each month in the waste-water treatment sludge by using the following equation.

Amount of PCP shipped offsite =

amount of sludge shipped x

PCP concentration

The results of this equation for each month are shown on the following table. These results are then totalled to yield the yearly amount of PCP shipped offsite in the sludge.

| Month | Quantity of sludge shipped, lb | PCP conc., % | PCP in wastewater sludge, lb |
|---|---|---|---|
| January | 2,000 | 5.06 | 101 |
| February | 2,400 | 5.19 | 73 |
| March | 700 | 4.88 | 34 |
| April | 1,500 | 3.70 | 56 |
| May | 2,100 | 3.00 | 63 |
| June | 2,800 | 7.50 | 210 |
| July | 3,200 | 8.40 | 269 |
| August | 2,400 | 5.55 | 134 |
| September | 2,900 | 5.00 | 95 |
| October | 500 | 10.55 | 53 |
| November | 1,200 | 6.90 | 83 |
| December | 1,300 | 2.00 | 26 |

Using this approach, the plant in this example could report that 1,200 pounds of PCP was transferred offsite in wastewater sludge.

*This example addresses only PCP releases in wastewater sludge. The landfill would likely also have analytical data on other toxic chemicals in this sludge, which could be used to calculate releases for those compounds.*

When no direct measurement data are available, another method of estimating releases is needed. A toxic chemical entering wastewater treatment or an evaporation device may be subject to numerous fates (for example, air emission, sludge residue, recycling to work tank). This makes it difficult to estimate releases of the chemical in sludge unless the content of the influent wastewater is known. In this case, a mass balance combined with an engineering assumption might be used.

### Toxic Releases to Air

Your facility probably does not make direct measurements of fugitive air emission sources. In the absence of such measurements, a mass balance might be used to estimate releases of organic chemicals during wastewater evaporation if sufficient information is available on the content of wastewater entering and sludge exiting the evaporation device. A mass balance would be difficult to apply to releases from the treating cylinder during loading/unloading or from the vacuum vent during the treating cycle, however, and the results generated would be unreliable. Another possible approach to determining fugitive toxic releases would be to derive emission factors from the considerable information on air emissions from wood preserving operations contained in the material referenced at the end of this pamphlet. Engineering calculations can also be used to estimate releases from these sources.

To estimate air releases from wastewater treatment and evaporation devices, you must know the concentration of the toxic chemical of concern in the wastewater. As discussed earlier, this concentration can be determined by direct measurement or engineering calculation. Air releases can then be calculated by applying mass transfer principles to the process parameters of the wastewater treatment and/or evaporation devices. The EPA's Wood Preserving Industry Multimedia Emission Inventory and its Hazardous Waste Treatment, Storage and Disposal Facilities (TSDF)–Air Emission Models provide the theoretical background information you need to perform this engineering calculation. For some organic chemicals commonly found in creosote and pentachlorophenol preservative solutions, you can use the information in the following table for quick determination of the approximate fraction of chemical released to the atmosphere from evaporation devices.

#### Effect of Wastewater Treatment and/or Evaporation on Organic Constituents[a]

| Preservative component | Percent emitted during evaporation at ambient temperature | Percent emitted during evaporation at elevated temperature (>60° C) |
|---|---|---|
| **Penta** | | |
| Benzene | 100 | 100 |
| Ethylbenzene | 100 | 100 |
| Toluene | 100 | 100 |
| Phenol | 100 | 100 |
| Pentachlorophenol | 0 | 0 |
| Trichlorophenol | 0 | 0 |
| | | |
| **Creosote** | | |
| Naphthalene | 0 | 95 |
| Phenanthrene/ anthracene | 0 | 40 |

[a]   Data obtained from Wood Preserving Industry Multimedia Emission Inventory

*Example: Using an emission factor to estimate air releases of naphthalene from a wastewater evaporator.*

*Wastewater entering a thermal (PAN) evaporator is sampled to characterize its toxic chemical content. The results of the sampling program show that the average naphthalene content of wastewater is 5 mg/liter. The wastewater flow rate*

averages 15,300 gallons per day. The mass flow rate of naphthalene entering the evaporator would be:

5 mg/liter x

3.78 liter/gal x

1 lb/453,000 mg x

15,300 gal/day

≈ 0.64 lb/day

The PAN evaporator is operated at 80°C. Based on the preceding table, an estimated 95 percent of the naphthalene would be emitted to the atmosphere (the remaining 5 percent would be found in the sludge). Thus, the quantity of naphthalene released to the air from the evaporator would be 0.61 pound per day. If the plant operates 250 days a year, the total air emissions of naphthalene per year would be 150 pounds.

It is more likely, however, that the quantity of naphthalene disposed of as solid waste would be known by direct measurement and the content in the wastewater would be unknown. If direct measurement showed that 20 pounds of naphthalene per year was disposed of as solid waste from the evaporator (which would represent 5 percent of the total amount), the total amount of naphthalene per year in the influent wastewater would be:

20 lb ÷ 0.05 ≈ 400 lb

Therefore, the total quantity of naphthalene released to air annually for this source would be:

400 lb  x 0.95 ≈ 380 lb

Estimating air releases from the treating cylinder and vacuum vent can become a complicated task because of the number of variables involved, which include the amount of preservative solution in the treatment cell, the surface area of the liquid, the temperature of the process steam, the barometric pressure, the humidity, and the length of the treatment cycle. One approach is to estimate the volume of gas exhausted and the concentration of toxic chemicals in the exhaust gas. You can estimate the concentration in the exhaust air by assuming equilibrium between the preservative solution and the exhaust air. At equilibrium, the concentration in the exhaust air can be expressed as:

$$\frac{P_A}{P_T} = X_{AG} = \text{mole fraction of A in gas phase}$$

where $P_A$ = partial pressure of compound A

$P_T$ = total pressure of system

In this instance, $P_T$ is equal to the barometric pressure, and $P_A$ can be calculated as:

$$P_A = x_{AL}P°$$

where $P°$ = vapor pressure of pure compound A

$x_{AL}$ = mole fraction of compound A in solution

Data on vapor pressures are readily available; however, be sure the vapor pressure used is appropriate for the operating temperature of the air exhaust.

### Example:  Using engineering calculations to estimate air releases of naphthalene from the vacuum exhaust.

The vacuum vent for a wood preserving operation in which creosote is used operates for a total of 4 hours per day at a flow rate of 400 cubic feet per minute. The preservative used in the treatment cycle contains 0.5 percent naphthalene by weight. Based on the molecular weights of the preservative components, the mole fraction of naphthalene in the preservative is 0.0076 (pounds ÷ molecular weight = moles). The liquid temperature in the accumulator is typically 90° C. The concentration of naphthalene in the air

exhausted through the vacuum vent can be estimated as follows:

Vapor pressure $(P^\circ) = 10$ mm Hg at $85.8\,^\circ C$

Partial pressure $(P_A) = 0.0076 \times 10$
$= 0.076$ mm Hg

Total pressure $(P_T) = 760$ mm Hg (barometric pressure)

$$\frac{P_A}{P_T} = \frac{0.076}{760} = 0.0001 \text{ mole fraction of naphthalene in exhaust air}$$

Assuming 250 operating days per year, the amount of naphthalene released through the exhaust vent would be calculated as follows:

Amount of naphthalene released through vent =

0.0001 lb-mole naphthalene/lb-mole exhaust gas x

1 lb-mole exhaust gas/2387 cubic feet x

128 lb naphthalene/lb-mole naphthalene x

400 cubic feet/minute x

240 minutes/day x

250 days/year

= 129 lb

Using this approach, the facility in this example could report air emissions of 130 pounds of naphthalene.

The assumption used in the preceding example (that the exhaust air from the vacuum vent is in equilibrium with the preservative liquid) is not entirely appropriate. A better assumption would be that the exhaust air is in equilibrium with the condensate liquid in the accumulator. It is highly unlikely, however, that the mole fraction of a particular chemical in the condensate liquid is known or could be estimated.

## Other Toxic Releases

Other wastes in wood preserving operations from which toxic chemicals may be released include:

- **Residues from pollution control devices**

- **Wash water from equipment cleaning**

- **Product rejects**

- **Used equipment**

- **Empty chemical containers**

Releases from these sources may already have been accounted for, depending on the release estimation methods used. These items (and any other of a similar nature) should be included in your development of a process flow diagram.

The contribution of sources of wastes such as cleaning out vessels or discarding containers should be small compared with process losses. If you do not have data on such sources (or any monitoring data on overall water releases), assume up to 1 percent of vessel content may be lost during each cleaning occurrence. For example, if you discard (to landfill) "empty" drums that have not been cleaned, calculate the release as 1 percent of normal drum content. If the drums are washed before disposal, this may contribute 1 percent of the content to your wastewater loading.

## Step Five

**Complete the Toxic Chemical Release Inventory Reporting Form.**

After estimating the quantity of each chemical released via wastewater, solid waste, and air emissions, you must determine the amount of each chemical released to water, land, or air or transferred to an offsite disposal facility. This determination will be based on the disposal method you use for each of your waste streams. Enter the release estimates for each chemical or chemical category in Part III of the Toxic Chemical Release Inventory Reporting Form. Also enter the code for each treatment method used, the weight percent by which the treatment reduces the chemical in the treated waste stream, and the concentration of the chemical in the influent to treatment (see instructions). Report treatment methods that do not affect the chemical by entering "0" for removal efficiency.

# For More Information

**Emergency Planning and Community Right-to-Know Hotline**
(800) 535-0202
or
(202) 479-2449
(in Washington, D.C. and Alaska)

**Small Business Ombudsman Hotline**
(800) 368-5888
or
(703) 557-1938
(in Washington, D.C. and Virginia)

The EPA brochure, Emergency Planning and Community Right-to-Know Act, Section 313 Release Reporting Requirements (EPA 560/4-88-001) presents an overview of the new law. It identifies the types of facilities that come under the provisions of Section 313, the threshold chemical volumes that trigger reporting requirements, and what must be reported. It also contains a complete listing of the chemicals and chemical categories subject to Section 313 reporting. The EPA publication, Estimating Releases and Waste-Treatment Efficiencies for the Toxic Chemical Release Inventory Form (EPA 560/4-88-002), presents more detailed information on general release estimation techniques than is included in this document.

### Additional Sources of Information on Releases From Wood Preserving Operations

U.S. Environmental Protection Agency. Wood Preserving Industry Multimedia Emission Inventory. EPA 600/2-81-066. NTIS PB81-205999. April 1981.

U.S. Environmental Protection Agency. Emission and Residue Values From Waste Disposal During Wood Preserving. EPA-600/2-82-062. NTIS PB82 234246. April 1982.

U.S. Environmental Protection Agency. Development Document for Effluent Limitations Guidelines, New Source Performance Standards for the Timber Products Processing Point Source Category. EPA 440/1-81/023. NTIS PB81-227282. January 1981.

U.S. Environmental Protection Agency. Multimedia Pollution Assessment of the Wood Products Industries. EPA-600/2-81-008. NTIS PB84-160366, February 1984.

U.S. Environmental Protection Agency. Hazardous Waste Treatment, Storage and Disposal Facilities (TSDF)–Air Emission Models. EPA Draft Report. April 1987.

☆U.S. Government Printing Office : 1988 - 516-002/80163

<u>Creosote Council Et al. v. EPA</u>
No. 08-00512

**Ex. 6 to EPA's Memorandum in Opposition to Motion for Preliminary Injunction**



EPA 260-C-06-901
January 2007

# Toxic Chemical Release Inventory Reporting Forms and Instructions

*Revised 2006 Version*

# Section 313

of the Emergency Planning and
Community Right-to-Know Act
(Title III of the Superfund Amendments
and Reauthorization Act of 1986)

| SECTION 1. TOXIC CHEMICAL IDENTITY | (Important: DO NOT complete this section if you completed Section 2 below.) |
|---|---|
| **1.1** | CAS Number (Important: Enter only one number exactly as it appears on the Section 313 list. Enter category code if reporting a chemical category.)<br>**334-88-3** |
| **1.2** | Toxic Chemical or Chemical Category Name (Important: Enter only one name exactly as it appears on the Section 313 list.)<br>**Diazomethane** |
| **1.3** | Generic Chemical Name (Important: Complete only if Part 1, Section 2.1 is checked "yes". Generic Name must be structurally descriptive.) |

**1.4  Distribution of Each Member of the Dioxin and Dioxin-like Compounds Category.**
(If there are any numbers in boxes 1-17, then every field must be filled in with either 0 or some number between 0.01 and 100. Distribution should be reported in percentages and the total should equal 0 or 100%. If you do not have speciation data available, check NA.)

| NA | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| SECTION 2. MIXTURE COMPONENT IDENTITY | (Important: DO NOT complete this section if you completed Section 1 above.) |
|---|---|
| **2.1** | Generic Chemical Name Provided by Supplier (Important: Maximum of 70 characters, including numbers, letters, spaces, and punctuation.) |

**SECTION 3. ACTIVITIES AND USES OF THE TOXIC CHEMICAL AT THE FACILITY**
(Important: Check all that apply.)

| 3.1 Manufacture the toxic chemical: | 3.2 Process the toxic chemical: | 3.3 Otherwise use the toxic chemical: |
|---|---|---|
| a. [X] Produce   b. [ ] Import | a. [X] As a reactant | a. [ ] As a chemical processing aid |
| If produce or import: | b. [ ] As a formulation component | b. [ ] As a manufacturing aid |
| c. [X] For on-site use/processing | c. [ ] As an article component | c. [ ] Ancillary or other use |
| d. [X] For sale/distribution | d. [ ] Repackaging | |
| e. [ ] As a byproduct | e. [ ] As an impurity | |
| f. [ ] As an impurity | | |

**Weight Range in Pounds**

| Range Code | From... | To... |
|---|---|---|
| 01 | 0 | 99 |
| 02 | 100 | 999 |
| 03 | 1,000 | 9,999 |
| 04 | 10,000 | 99,999 |
| 05 | 100,000 | 999,999 |
| 06 | 1,000,000 | 9,999,999 |
| 07 | 10,000,000 | 49,999,999 |
| 08 | 50,000,000 | 99,999,999 |
| 09 | 100,000,000 | 499,999,999 |
| 10 | 500,000,000 | 999,999,999 |
| 11 | 1 billion | more than 1 billion |

If the EPCRA section 313 chemical present at your facility was part of a mixture or other trade name product, determine the maximum quantity of the EPCRA section 313 chemical present at the facility by calculating the weight percent of the EPCRA section 313 chemical only.

Do not include the weight of the entire mixture or other trade name product. These data may be found in the Tier II form your facility may have prepared under Section 312 of EPCRA. See Part 40, Section 372.30(b) of the *Code of Federal Regulations* for further information on how to calculate the weight of the EPCRA section 313 chemical in the mixture or other trade name product. For EPCRA section 313 chemical categories (e.g., nickel compounds), include all chemical compounds in the category when calculating the maximum amount, using the entire weight of each compound.

When reporting for dioxin and dioxin-like compounds you should convert the maximum amount from grams to pounds before choosing the appropriate range code in Section 4 of Part II.

## Section 5.  Quantity of the EPCRA Section 313 Chemical Entering Each Environmental Medium On-site

In Section 5, you must account for the total aggregate on-site releases of the EPCRA section 313 chemical to the environment from your facility for the calendar year.

On-site releases to the environment include emissions to the air, discharges to surface waters, and releases to land and underground injection wells.

For all toxic chemicals (except the dioxin and dioxin-like compound category), do not enter the values in Section 5 in gallons, tons, liters, or any measure other than pounds. You must also enter the values as whole numbers (do not use scientific notation). Numbers following a decimal point are not acceptable for toxic chemicals other than those designated as PBT chemicals. For PBT chemicals, facilities should report release and other waste management quantities greater than 0.1 pound (except the dioxin and dioxin-like compounds category), provided the accuracy and the underlying data on

which the estimate is based supports this level of precision. For the dioxin and dioxin-like compounds category, facilities

> **Example 12:   Reporting Dioxins and Dioxin-Like Compounds**
>
> If the total quantity for Section 5.2 of the Form R (i.e., stack or point air emissions) is 0.00005 grams or less, then zero can be entered. If the total quantity is between 0.00005 and 0.0001 grams, then 0.0001 grams can be entered or the actual number can be entered (e.g., 0.000075).

should report at a level of precision supported by the accuracy of the underlying data and the estimation techniques on which the estimate is based. For the dioxin and dioxin-like compounds chemical category, which has a reporting threshold of 0.1 gram, facilities need only report all release and other waste management quantities greater than 100 micrograms (i.e., 0.0001 grams). (See example 12.) Notwithstanding the numeric precision used when determining reporting eligibility thresholds, facilities should report on Form R to the level of accuracy that their data supports, up to seven digits to the right of the decimal. EPA's reporting software and data management systems support data precision up to seven digits to the right of the decimal.

**NA vs. a Numeric Value (e.g., Zero).** Generally, NA is applicable if the waste stream that contains or contained the EPCRA section 313 chemical is not directed to the relevant environmental medium, or if leaks, spills and fugitive emissions cannot occur. If the waste stream that contains or contained the EPCRA section 313 chemical is directed to the environmental medium, or if leaks, spills or fugitive emissions can occur, NA should not be used, even if treatment or emission controls result in a release of zero. If the annual aggregate release of that chemical was equal to or less than 0.5 pound, the value reported is zero (unless the chemical is a listed PBT chemical).

For Section 5.1, NA generally is not applicable for volatile organic compounds (VOCs). For Section 5.5.4, NA generally would not be applicable, recognizing the possibility of accidental spills or leaks of the EPCRA section 313 chemical.

An example that illustrates the use of NA vs. a numeric value (e.g., zero) would be nitric acid involved in a facility's processing activities. If the facility neutralizes the wastes containing nitric acid to a pH of 6 or above, then the facility reports a release of zero for the EPCRA section 313 chemical, not NA. Another example is when the facility has no underground injection well, in which case NA should be entered in Part I, Section 4.10 and checked in Part II, Section 5.4.1 and 5.4.2 of Form R. Also, if the facility does not landfill the acidic waste, NA should be checked in Part II, Section 5.5.1.B of Form R.

All releases of the EPCRA section 313 chemical to the air must be classified as either stack or fugitive emissions, and included in the total quantity reported for these releases in Sections 5.1 and 5.2. Instructions for columns A, B, and C follow the discussions of Sections 5.1 through 5.5.

**5.1 Fugitive or Non-Point Air Emissions**

Report the total of all releases of the EPCRA section 313 chemical to the air that are not released through stacks, vents, ducts, pipes, or any other confined air stream. You must include (1) fugitive equipment leaks from valves, pump seals, flanges, compressors, sampling connections, open-ended lines, etc.; (2) evaporative losses from surface impoundments and spills; (3) releases from building ventilation systems; and (4) any other fugitive or non-point air emissions. Engineering estimates and mass balance calculations (using purchase records, inventories, engineering knowledge or process specifications of the quantity of the EPCRA section 313 chemical entering product, hazardous waste manifests, or monitoring records) may be useful in estimating fugitive emissions. You should check the NA box in Section 5.1 if you do not engage in activities that result in fugitive or non-point air emissions of this listed toxic chemical. For VOCs, NA generally would not be applicable.

**5.2 Stack or Point Air Emissions**

Report the total of all releases of the EPCRA section 313 chemical to the air that occur through stacks, confined vents, ducts, pipes, or other confined air streams. You must include storage tank emissions. Air releases from air pollution control equipment would generally fall in this category. Monitoring data, engineering estimates, and mass balance calculations may help you to complete this section. You should check the NA box in Section 5.2 if there are no stack air activities involving the waste stream that contains or contained the EPCRA section 313 chemical.

**5.3 Discharges to Receiving Streams or Water Bodies**

In Section 5.3 you are to enter all the names of the streams or water bodies to which your facility directly discharges the EPCRA section 313 chemical on which you are reporting. A total of three spaces is provided on page 2 of Form R. Enter the name of each receiving stream or surface water body to which the EPCRA section 313 chemical being reported is directly discharged. Report the name of the receiving stream or water body as it appears on the permit for the facility. If the stream is not included in the NPDES permit or its name is not identified in the NPDES permit, enter the name of the off-site stream or water body by which it is publicly known or enter the first publicly named water body to which the receiving waters are a tributary, if the receiving waters are unnamed. Do not list a series of streams through which the EPCRA section 313 chemical flows. Be sure to include all the receiving streams or water bodies that receive stormwater runoff from your facility. Do not enter names of streams to which off-site treatment plants discharge. You should enter NA in Section 5.3.1 if there are no discharges to receiving streams or water bodies of the waste stream that contains or contained the EPCRA section 313 chemical (See discussion of NA vs. a Numeric Value (e.g., Zero) in the introduction of Section 5).

Enter the total annual amount of the EPCRA section 313 chemical released from all discharge points at the facility to each receiving stream or water body. Include process outfalls such as pipes and open trenches, releases from on-site wastewater treatment systems, and the contribution from stormwater runoff, if applicable (see instructions for column C



EPA 260-B-06-001
January 2006

# Toxic Chemical Release Inventory Reporting Forms and Instructions

## *Revised 2005 Version*

## Section 313

### of the Emergency Planning and Community Right-to-Know Act

(Title III of the Superfund Amendments and Reauthorization Act of 1986)



OFFICE OF
ENVIRONMENTAL
INFORMATION

*Instructions for Completing Part II of EPA Form R*

| SECTION 1. TOXIC CHEMICAL IDENTITY | (Important: DO NOT complete this section if you completed Section 2 below.) |

| 1.1 | CAS Number (Important: Enter only one number exactly as it appears on the Section 313 list. Enter category code if reporting a chemical category.) |
|---|---|
| | 334-88-3 |

| 1.2 | Toxic Chemical or Chemical Category Name (Important: Enter only one name exactly as it appears on the Section 313 list.) |
|---|---|
| | Diazomethane |

| 1.3 | Generic Chemical Name (Important: Complete only if Part 1, Section 2.1 is checked "yes". Generic Name must be structurally descriptive.) |
|---|---|
| | |

**1.4 Distribution of Each Member of the Dioxin and Dioxin-like Compounds Category.**
(If there are any numbers in boxes 1-17, then every field must be filled in with either 0 or some number between 0.01 and 100. Distribution should be reported in percentages and the total should equal 0 or 100%. If you do not have speciation data available, check NA.)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NA | | | | | | | | | | | | | | | | | |

| SECTION 2. MIXTURE COMPONENT IDENTITY | (Important: DO NOT complete this section if you completed Section 1 above.) |

| 2.1 | Generic Chemical Name Provided by Supplier (Important: Maximum of 70 characters, including numbers, letters, spaces, and punctuation.) |
|---|---|
| | |

**SECTION 3. ACTIVITIES AND USES OF THE TOXIC CHEMICAL AT THE FACILITY**
(Important: Check all that apply.)

| 3.1 Manufacture the toxic chemical: | 3.2 Process the toxic chemical: | 3.3 Otherwise use the toxic chemical: |
|---|---|---|
| a. [X] Produce   b. [ ] Import | a. [X] As a reactant | a. [ ] As a chemical processing aid |
| *If produce or import:* | b. [ ] As a formulation component | b. [ ] As a manufacturing aid |
| c. [X] For on-site use/processing | c. [ ] As an article component | c. [ ] Ancillary or other use |
| d. [X] For sale/distribution | d. [ ] Repackaging | |
| e. [ ] As a byproduct | e. [ ] As an impurity | |
| f. [ ] As an impurity | | |

**Weight Range in Pounds**

| Range Code | From... | To... |
|---|---|---|
| 01 | 0 | 99 |
| 02 | 100 | 999 |
| 03 | 1,000 | 9,999 |
| 04 | 10,000 | 99,999 |
| 05 | 100,000 | 999,999 |
| 06 | 1,000,000 | 9,999,999 |
| 07 | 10,000,000 | 49,999,999 |
| 08 | 50,000,000 | 99,999,999 |
| 09 | 100,000,000 | 499,999,999 |
| 10 | 500,000,000 | 999,999,999 |
| 11 | 1 billion | more than 1 billion |

If the EPCRA section 313 chemical present at your facility was part of a mixture or other trade name product, determine the maximum quantity of the EPCRA section 313 chemical present at the facility by calculating the weight percent of the EPCRA section 313 chemical only.

Do not include the weight of the entire mixture or other trade name product. These data may be found in the Tier II form your facility may have prepared under Section 312 of EPCRA. See Part 40,

Section 372.30(b) of the *Code of Federal Regulations* for further information on how to calculate the weight of the EPCRA section 313 chemical in the mixture or other trade name product. For EPCRA section 313 chemical categories

(e.g., nickel compounds), include all chemical compounds in the category when calculating the maximum amount, using the entire weight of each compound. When reporting for dioxin and dioxin-like compounds you should convert the maximum amount from grams to pounds before choosing the appropriate range code in Section 4 of Part II.

## Section 5. Quantity of the EPCRA Section 313 Chemical Entering Each Environmental Medium On-site

In Section 5, you must account for the total aggregate on-site releases of the EPCRA section 313 chemical to the environment from your facility for the calendar year.

On-site releases to the environment include emissions to the air, discharges to surface waters, and releases to land and underground injection wells.

For all toxic chemicals (except the dioxin and dioxin-like compound category), do not enter the values in Section 5 in gallons, tons, liters, or any measure other than pounds. You must also enter the values as whole numbers (do not use scientific notation). Numbers following a decimal point are not acceptable for toxic chemicals other than those designated as PBT chemicals. For PBT chemicals, facilities should report release and other waste management quantities greater than 0.1 pound (except the dioxin and dioxin-like compounds

*Instructions for Completing Part II of EPA Form R*

category), provided the accuracy and the underlying data on which the estimate is based supports this level of precision.

> **Example 12:  Reporting Dioxins and Dioxin-Like Compounds**
>
> If the total quantity for Section 5.2 of the Form R (i.e., stack or point air emissions) is 0.00005 grams or less, then zero can be entered. If the total quantity is between 0.00005 and 0.0001 grams, then 0.0001 grams can be entered or the actual number can be entered (e.g., 0.000075).

For the dioxin and dioxin-like compounds category, facilities should report at a level of precision supported by the accuracy of the underlying data and the estimation techniques on which the estimate is based. For the dioxin and dioxin-like compounds chemical category, which has a reporting threshold of 0.1 gram, facilities need only report all release and other waste management quantities greater than 100 micrograms (i.e., 0.0001 grams). (See example 12.) Notwithstanding the numeric precision used when determining reporting eligibility thresholds, facilities should report on Form R to the level of accuracy that their data supports, up to seven digits to the right of the decimal. EPA's reporting software and data management systems support data precision up to seven digits to the right of the decimal.

**NA vs. a Numeric Value (e.g., Zero).** Generally, NA is applicable if the waste stream that contains or contained the EPCRA section 313 chemical is not directed to the relevant environmental medium, or if leaks, spills and fugitive emissions cannot occur. If the waste stream that contains or contained the EPCRA section 313 chemical is directed to the environmental medium, or if leaks, spills or fugitive emissions can occur, NA should not be used, even if treatment or emission controls result in a release of zero. If the annual aggregate release of that chemical was equal to or less than 0.5 pound, the value reported is zero (unless the chemical is a listed PBT chemical).

For Section 5.1, NA generally is not applicable for volatile organic compounds (VOCs). For Section 5.5.4, NA generally would not be applicable, recognizing the possibility of accidental spills or leaks of the EPCRA section 313 chemical.

An example that illustrates the use of NA vs. a numeric value (e.g., zero) would be nitric acid involved in a facility's processing activities. If the facility neutralizes the wastes containing nitric acid to a pH of 6 or above, then the facility reports a release of zero for the EPCRA section 313 chemical, not NA. Another example is when the facility has no underground injection well, in which case NA should be entered in Part I, Section 4.10 and checked in Part II, Section 5.4.1 and 5.4.2 of Form R. Also, if the facility does not landfill the acidic waste, NA should be checked in Part II, Section 5.5.1.B of Form R.

All releases of the EPCRA section 313 chemical to the air must be classified as either stack or fugitive emissions, and included in the total quantity reported for these releases in Sections 5.1 and 5.2. Instructions for columns A, B, and C follow the discussions of Sections 5.1 through 5.5.

**5.1 Fugitive or Non-Point Air Emissions**

Report the total of all releases of the EPCRA section 313 chemical to the air that are not released through stacks, vents, ducts, pipes, or any other confined air stream. You must include (1) fugitive equipment leaks from valves, pump seals, flanges, compressors, sampling connections, open-ended lines, etc.; (2) evaporative losses from surface impoundments and spills; (3) releases from building ventilation systems; and (4) any other fugitive or non-point air emissions. Engineering estimates and mass balance calculations (using purchase records, inventories, engineering knowledge or process specifications of the quantity of the EPCRA section 313 chemical entering product, hazardous waste manifests, or monitoring records) may be useful in estimating fugitive emissions. You should check the NA box in Section 5.1 if you do not engage in activities that result in fugitive or non-point air emissions of this listed toxic chemical. For VOCs, NA generally would not be applicable.

**5.2 Stack or Point Air Emissions**

Report the total of all releases of the EPCRA section 313 chemical to the air that occur through stacks, confined vents, ducts, pipes, or other confined air streams. You must include storage tank emissions. Air releases from air pollution control equipment would generally fall in this category. Monitoring data, engineering estimates, and mass balance calculations may help you to complete this section. You should check the NA box in Section 5.2 if there are no stack air activities involving the waste stream that contains or contained the EPCRA section 313 chemical.

**5.3 Discharges to Receiving Streams or Water Bodies**

In Section 5.3 you are to enter all the names of the streams or water bodies to which your facility directly discharges the EPCRA section 313 chemical on which you are reporting. A total of three spaces is provided on page 2 of Form R. Enter the name of each receiving stream or surface water body to which the EPCRA section 313 chemical being reported is directly discharged. Report the name of the receiving stream or water body as it appears on the permit for the facility. If the stream is not included in the NPDES permit or its name is not identified in the NPDES permit, enter the name of the off-site stream or water body by which it is publicly known or enter the first publicly named water body to which the receiving waters are a tributary, if the receiving waters are unnamed. Do not list a series of streams through which the EPCRA section 313 chemical flows. Be sure to include all the receiving streams or water bodies that receive stormwater runoff from your facility. Do not enter names of streams to which off-site treatment plants discharge. You should enter NA in Section 5.3.1 if there are no discharges to receiving streams or water bodies of the waste stream that contains or contained the EPCRA section 313 chemical (See discussion of NA vs. a Numeric Value (e.g., Zero) in the introduction of Section 5).

Enter the total annual amount of the EPCRA section 313 chemical released from all discharge points at the facility to each receiving stream or water body. Include process outfalls such as pipes and open trenches, releases from on-site wastewater treatment systems, and the contribution from stormwater runoff, if applicable (see instructions for column C

<u>Creosote Council Et al. v. EPA</u>
No. 08-00512

Ex. 7 to EPA's Memorandum in Opposition to Motion for Preliminary Injunction



**KELLER AND HECKMAN LLP**
*Serving Business through Law and Science®*

1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
*tel.* 202.434.4100
*fax* 202.434.4646

Writer's Direct Access
**Herbert Estreicher, J.D., Ph.D.**
**(202) 434-4334**
estreicher@khlaw.com

November 6, 2007

**Via Overnight Delivery and Electronic Delivery**

Michael Petruska
Director, TRI Program Division
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 2844T
Washington, DC 20460
petruska.mike@epa.gov

Re:    **Your Letter of October 15, 2007 Concerning Guidance on the Toxic Release Inventory Reporting Requirements Applicable to Certain Activities Conducted by the Wood Treating Industry**

Dear Mr. Petruska:

We are writing on behalf of the Creosote Council, the Southern Pressure Treaters' Association, the Treated Wood Council, the Western Wood Preservers' Institute, and our client the Pentachlorophenol Task Force [hereinafter, jointly referred to as "Treated Wood Coalition" or "Coalition"]. We have received and have carefully reviewed your letter of October 15, 2007, concerning guidance on the Toxic Release Inventory ("TRI") reporting requirements applicable to certain activities conducted by the wood treating industry. Respectfully, we have identified a number of issues and concerns in connection with the letter and intend shortly to provide a detailed response seeking reconsideration. In the interim, we wanted to thank you for your efforts on this matter.

Sincerely yours,

Herbert Estreicher

cc:    Ben Smith, Assoc. Div. Dir., TRI Program Div., EPA
       Rebecca Moser, EPA, Chief, Regulatory Development Branch, TRI Program Div., EPA
       Marc Edmonds, TRI Reg. Dev. Branch, EPA
       Erin Koch, Office of General Counsel, EPA
       Jeff Miller, Treated Wood Council