IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CREOSOTE COUNCIL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 1:08-cv-00512 (JR) |
| **STEPHEN L. JOHNSON,** ) | |
| **Administrator,** ) | |
| **U.S. Environmental Protection Agency,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Local Rule 7(d) and this Court's order dated March 26, 2008, Creosote Council, Koppers Inc., Southern Pressure Treaters' Association, Treated Wood Council, and Western Wood Preservers Institute (collectively, "Plaintiffs") submit this Reply to the Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (Def. Opp.) filed by the United States Environmental Protection Agency ("EPA"), and its administrator, Stephen L. Johnson (collectively, "Defendants").

**SUMMARY**

Plaintiffs have moved to preliminarily enjoin EPA from requiring the treated wood industry to include in their July 1, 2008 reports to EPA's Toxic Chemical Release Inventory ("TRI") air emissions from finished treated wood articles that are stored at their facilities. Plaintiffs have asserted that this requirement, which was established in the October 15, 2007 letter of Michael Petruska, Director of EPA's TRI Program Division ("Petruska Letter"), represents a change of an approximately 20 year EPA policy without the required notice and comment. In opposition, EPA argues that it has never taken a definitive position on whether

released from finished goods in storage, or more specifically, from treated wood products in storage, are reportable, thus it "cannot be required to undergo notice and comment to 'change' a position that it never took in the first place." Def. Opp. at 15.

EPA mischaracterizes Plaintiff's position as being based on a "storage exemption." Def. Opp. at 14. Rather, Plaintiffs' claims are based on EPA's change of its prior position—which is set forth in the 1988 letter from Charles L. Elkins, then Director of EPA's Office of Toxics Substances ("Elkins Letter"), Pl. Mem. Ex. 4, and EPA's reporting instructions to the industry, Pl. Mem. Ex. 5—with its new position as set forth in the Petruska letter. Since the Elkins letter, EPA's position has been that once a chemical has been processed into a product, that product becomes an article, and if there was no further processing of the article, there was no need to report emissions naturally occurring from it – the situation occurring at the treated wood facilities.

Thus, EPA instructed industry that in completing the TRI Form R: "[y]ou are not required to count, as a release, quantities of a toxic chemical that are lost due to natural weathering or corrosion, normal/natural degradation or a production, or normal migration of a chemical from a product. For example, amounts of a covered toxic chemical that migrate from plastic products in storage do not have to be counted . . . ." Pl. Mem. Ex. 5. The reason that reporting is not required is that the product qualifies as an article and thus is exempt from reporting. The Petruska letter attempts to change that definition. In the Petruska letter, EPA stated unequivocally that "releases that occur . . . [in] storage areas" are reportable based on EPA's unexplained conclusion that the treated wood product is not an "article" at that time. It is this change of position that is unlawful and requires the requested injunction.

# ARGUMENT

I.  **Plaintiffs are Likely to Succeed on the Merits**

EPA argues that it has never taken a definitive position on whether releases from finished goods in storage, or more specifically, from treated wood products in storage, are reportable. Def. Opp. at 15. EPA contends that the Agency statements relied upon by Plaintiffs do not constitute an "express, direct and uniform interpretation" of the Agency's position, and thus EPA "cannot be required to undergo notice and comment to 'change' a position that it never took in the first place." *Id.*

Plaintiffs have cited the Elkins Letter and EPA's TRI reporting instructions to the industry as establishing an "express, direct and uniform" interpretation of the applicability of the "article exemption" to treated wood. These pronouncements, when combined with the fact that they have been in place for over 20 years and that EPA has never cited a treated wood facility prior to 2005 for failing to report emissions from storage, are sufficient to be definitive. *See Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579, 587 (D.C. Cir. 1997) (noting that two public statements by the U.S. Department of Justice (DOJ) "almost but do not quite establish" that DOJ significantly changed interpretation of regulation at issue). In fact, the evidence needed to demonstrate the existence of a definitive agency position need not be in writing. *See Ball Memorial Hosp. v. Leavitt*, 2006 WL 2714920, *7 (D.D.C. 2006); *Mercy Medical Skilled Nursing Facility v. Thompson*, 2004 WL 3541332 (D.D.C. 2004).

Indeed, even a tacit pattern of acquiescing to a particular interpretation of a regulation can be enough to establish a definitive agency position. In *Torch Operating Co. v. Babbitt*, a group of offshore federal mineral lessees challenged the Department of the Interior's (DOI's) refusal to allow use of tariff rates filed with FERC for purpose of calculating royalties. 172 F.Supp.2d 113 (D.D.C. 2001). For over six years, DOI had allowed parties to use FERC-

3

approved tariff rates so long as the affiliated pipeline company had a tariff on file at FERC. On summary judgment, the Court noted that in contrast to *Assn. of Am. R.R.* and *Paralyzed Veterans*, the DOI for years prior to and after the regulation was passed, uniformly and consistently allowed such use. "Every time DOI granted a FERC exception, it was called upon to interpret that regulation. Each of those decisions creates a pattern and practice reflecting a consistent agency interpretation of its regulation."[1]

Both the quantity and quality of the evidence Plaintiffs submitted with their Motion and Memorandum for Preliminary Injunction clearly exceed these minimum thresholds. Plaintiffs do not contend, as EPA supposes, that some form of "storage exemption" exists to excuse treated wood emissions from storage. Def. Opp. at 14. Rather Plaintiff object to EPA's conflation of "processing of a chemical" as that term is defined under the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq*., with "processing of an item" for purposes of defeating the article exemption. Thus EPA's objections concerning the sufficiency and weight of Plaintiff evidence simply are inapposite. Moreover, the countervailing documents EPA included in its Opposition prove Plaintiffs' point.

    A.    **EPA has Consistently and Definitively Maintained that Releases of Reportable Chemicals Alone do not Defeat the Article Exemption**

What Plaintiffs have consistently argued is that application of a preservative to wood, in which wood treating facilities are involved, constitutes processing of a reportable chemical as that term is defined under EPCRA. *See* Compl., ¶20; Pl. Mem. at 21. According to EPA's own regulations, the term "process" means:

---

[1] The cases cited by EPA (*Association of American Railroads v. Department of Transportation*, 198 F.3d 944 (D.C. Cir. 1999); and *Air Transport Association of America v. Federal Aviation Administration*, 291 F.3d 49 (D.C. Cir. 2002)) merely support the proposition that the statements and actions relied upon by plaintiffs must be "definitive." The cases do not compel a finding that the evidence cited in this case is not "definitive."

4

>  the preparation of a toxic chemical, after its manufacture, for distribution in commerce:
>
>> (1) In the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance, or
>
>> (2) <u>As part of an article containing the toxic chemical</u>. Process also applies to the processing of a toxic chemical contained in a mixture or trade name product.

40 C.F.R. § 372.3 (emphasis added).[2] Thus it is possible to produce an "article" by "processing a reportable chemical" into the item as occurs during wood treatment. For example, the manufacture of a treated wood utility pole involves the "process" of impregnating the pole with a chemical, resulting in an "article" containing the chemical (a utility pole). Reportable chemicals may be released to the environment at varying points, and to varying degrees, during this "process." These releases are reportable during this step, and Plaintiffs have never contended otherwise. Pl. Mem. at 20.

Once preservative application is completed, the processing of a reportable chemical is completed and the resultant treated product is an article. From that point, reporting of additional releases is required only if the item is further "processed" because in that case it is no longer qualifies for the article exemption. Storage alone is not a process, and EPA has not alleged that any change to, or use <u>of the treated wood product</u> occurs at industry facilities sufficient to defeat the article exemption.

The Elkins letter clearly speaks to this issue. The Elkins letter was intended to clarify when manufactured items become "articles" exempt from TRI reporting under 40 C.F.R. § 372.38(b). Pl. Mem. Ex. 4 at 1. Critically, the Elkins letter recognizes a "distinction between

---

[2] An article is "a manufactured item: (1) which is formed to a specific shape or design during manufacture; (2) which has end use functions dependent in whole or in part upon its shape or design during end use; and (3) which does not release a toxic chemical under normal conditions of processing or use of that item at the facility or establishments." 40 C.F.R. § 372.3.

5

continuous low-level releases <u>that occur over the life of the product from those releases that are the direct result of processing and use of the [product]</u>." *Id.* (emphasis added).[3]   Moreover, EPA does not dispute that that these continuous low level releases are not reportable releases.  Def. Opp. at 13.

Although the Elkins letter does not speak specifically to storage, it does speak to releases "over the life of the product," which necessarily include storage and other activities occurring after the production of treated wood.  However, EPA did specifically raise the issue of finished goods in storage when, three months after issuing the Elkins letter, it revised the instructions for completing the TRI Form R.  The instructions included a specific storage-related example, which provides that "…amounts of an EPCRA section 313 chemical that migrate from plastic products in storage do not have to be counted in estimates of releases of that EPCRA section 313 chemical from the facility."  Pl. Mem. Ex. 5.

EPA attempts to avoid its prior position by arguing first that the Elkins letter focuses only on whether the release results from the processing of the product or not.  In so doing, EPA ignores Mr. Elkins' conclusion that the natural emissions from stored goods are not the result of processing.  Second, EPA tries to undermine the relevance of the TRI instructions by arguing that the paragraph at issue has not appeared in the instructions since 2002.  But the unexplained deletion of this language, without more (such as affirmative statements to the contrary in the instruction manual's errata and change pages), simply cannot repudiate the statement's status as a definitive Agency interpretation.  EPA made no attempt to instruct industry that it should act differently than previously instructed.  Thus, EPA has taken an explicit, definitive and repeated

---

[3] Unlike the situation in *Assn. of Am. R.R.*, 198 F.3d 948 (D.C. Cir. 1999) on which EPA mainly relies, where the letter sought to be relied upon was from a low-level Department of Justice employee, Charles Elkins, as Director of EPA's Office of Toxic Substances, was vested with policy-making authority.

position with regard to the article exemption that it now seeks to change without the required notice and comment.

### B. EPA has Consistently and Definitively Maintained that an Affirmative Act is Necessary to Constitute "Processing of an Item" Sufficient to Defeat the Article Exemption

Notwithstanding, the existence of non-processing related releases discussed in the preceding section, the Parties agree that the article exemption does not apply if a release of a reportable chemical occurs as a result of the "processing or use of an item" at the facility. Def. Opp. at 13. It is this somewhat metaphysical delineation between where manufacturing or production of a product ends and it becomes an article, and processing of that item begins that is at the heart of this dispute.

The article exemption applies "whether the person received the article from another person or the person produced the article." 40 C.F.R. § 372.38(b). The plain language of the article exemption intends for the manufacture of an item to mean something distinct from, and occurring prior to, the processing of that item. Indeed, the Agency's EPCRA Section 313 Questions and Answers guidance document, on which it relies in its opposition, repeatedly and consistently confirms that "processing of an item" sufficient to defeat the article exemption requires the performance of some type of affirmative act upon the item after its manufacture. *See* Def. Ex. 4, at Q 351 (shaving and melting of a die block); Q 354 (releases occurring during maintenance of a car battery); Q 356 (heating of glass light bulbs), Q 357 (cutting, grinding of metal sheets), Q 358 (cutting of plastic), Q 359 (cutting sheet metal), Q 360 (cut and bending copper wire), Q 363 (cutting metal sheets), Q 364 (cutting, grinding, heat treatment, and boring of metal sheets), Q 366 (cutting forming and joining metal alloy parts), Q 373 (charging of pellet-sized and shaped catalysts), Q 377 (crushing light bulbs), and Q 381 (cutting and packaging of insulating foam).

### C. The Petruska Letter Plainly Contradicts EPA's Longstanding Determination

It is the Petruska letter's attempt to change and expand the definition of the term "process" such that treated wood products at the factory can never be articles which is the policy change to which Plaintiffs object. In defense, EPA claims that the Petruska letter merely "clarifies that if toxic chemicals are released as the result of the processing of an item, at <u>any</u> stage the item is no longer an 'article' and <u>all</u> releases of those chemicals at the facility must be reported." Def. Opp. at 18-19; *see also id*. at 12, n.4. However, Mr. Petruska approached the problem differently.

First, Mr. Petruska asserted that "[t]he toxic chemicals that are released from the treated wood once it has left the treatment cylinder and is placed on the drip pad are released as a result of the <u>processing</u> of the wood." Pl. Mem. Ex. 9 at 3. Based on that "fact," Mr. Petruska draws the legal conclusion that "the wood cannot be considered an article under the articles exemption because there is a release of a toxic chemical as a result of the <u>processing</u> of the wood at the facility. Because the wood is not an article, releases from it are not eligible for the articles exemption regardless of where they take place." *Id.* Thus, Mr. Petruska asserts that because the wood was processed at some time, it can never be considered an article even when it has been put in a storage yard and left alone – an assertion in direct contradiction to EPA's prior definitive position that once the processing is completed, the item becomes an article. EPA's claims that there is no such change in policy are not convincing.

## II. Plaintiffs Are Likely to Suffer Irreparable Harm

EPA raises several categories of additional arguments that can effectively be distilled to the notion that, as Plaintiffs are already reporting releases to the TRI, the Agency's clarification of reporting requirements will have minimal impact on, and cause no irreparable injury to, the treated wood industry. *See* Def. Opp. at 15-16, 19-22. One fundamental premise of this

8

argument—namely, that the Petruska letter merely clarifies reporting obligations for a narrow aspect of one industry's operations—has already been addressed above.

> A.  **EPA Grossly Mischaracterizes the Reporting Burden Stemming From its Change in Policy**

EPA contends that Plaintiffs will not suffer irreparable harm because any burden associated with EPA's position change lacks "any significant impact" in that Plaintiffs' reporting obligations will not change measurably. Def. Opp. at 16. EPA grossly underestimates the level of detail required by EPCRA and EPA's own guidance in order to report correctly under the TRI program.

EPCRA section 313(g)(2) requires that in preparing TRI reports facilities must use "readily available data (including monitoring data) collected pursuant to other provisions of law, or, where such data are not readily available, reasonable estimates of the amounts involved." 42 U.S.C. 11023(g)(2). EPA suggests that a "reasonable estimate" for purposes of the wood treating industry encompasses the widely divergent estimation methodologies previously rejected by the Agency. See Pl. Mem. Ex. 1, ¶¶ 23-26. Inexplicably, this contention contravenes the most recent TRI instructions cited by EPA (*see* Def. Opp. at 22:

> Reasonable estimates of the amounts released should be made using published emission factors, material balance calculations, or engineering calculations. You may not use emission factors or calculations to estimate releases if more accurate data are available.

Indeed, EPA's Q&A Guidance makes clear that the Agency's obligation to review TRI data requires more than merely rubber-stamping industry TRI data reports:

> **475. Form R requires estimates of the release to the environment of listed toxic chemicals in specific release categories. If a facility is unable to complete its estimate of these releases by the deadline, should the company leave that entry blank and promise a future estimate, or make the best estimate possible and submit later revisions?**

9

> Any covered facility must report by July 1 for the previous reporting year, and the data provided should be the best estimate using the best readily available data. Records supporting the data must be kept for three years. If more accurate data are developed, the facility may submit revised forms. <u>EPA can take enforcement action if they believe that the data do not represent reasonable estimates</u>.
>
> **644. Are specific audit provisions in the regulations? What about resolving differences of opinion, (i.e., does the auditor have final judgment)?**
>
> Specific audit provisions are not in the EPCRA Section 313 regulations. <u>The Agency, however, has the responsibility to assure that the data submitted are based on reasonable estimates</u>. Audit results will be used to identify problems with calculating releases and other waste management quantities. In resolving differences of opinion, we expect that a final judgment will be made by the Agency. Also note that EPA has finalized a self-audit policy (December 12, 1995; 60 FR 66706) for facilities who choose to conduct their own audits.

Excerpts from EPCRA Section 313 Questions and Answers (emphasis added), attached as Exhibit A.

Moreover, EPA overlooks the fact that industry submissions are often scrutinized by environmental interest and neighborhood groups with an eye towards the facilities' environmental performance and the exercise of their rights under EPCRA's citizen suit provisions. *See* 42 U.S.C. § 11046(a)(1). Thus industry filings are never undertaken lightly. It is for these reasons that the level of scrutiny detailed in the Rollins Declaration (Pl. Mem. Ex. 1) are necessary to ensure that the data industry submits for public an EPA scrutiny is both complete and accurate.

### B. <u>Plaintiffs Have Demonstrated Irreparable Harm</u>

EPA's contention that the nearly six month time period between the October 15, 2007 Petruska letter and the filing of this action on March 25, 2008 undermines Plaintiffs' irreparable harm claim also lacks merit.[4] In support of its contention that Plaintiffs alleged delay in seeking

---

[4] Plaintiffs were actively seeking to address this situation in the time period involved. The coalition of parties that constitute the plaintiffs in this case was formed. Counsel was retained and the appropriate papers were drafted and reviewed. Furthermore, plaintiffs were aware that a

injunctive relief defeats their claim of irreparable harm, EPA cites several cases that involved "delayed" filing where either the plaintiff, or a third party, was harmed during the period of delay – a situation that has not occurred here. *See, e.g.*, *Citibank N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (trademark dilution action in which large, sophisticated multinational bank should have been aware of competitor's marketing and infringing activities for over two years); *Quince Orchard Valley Citizen Assn. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (plaintiffs waited nine months after final approval of "time-sensitive" public construction project during which time the contractor spent $7.1 million).

Thus, in *Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1986), cited by EPA, environmental groups challenged the Fish and Wildlife Service (FWS) proposed regulations allowing the hunting of certain birds. Although the preliminary injunction was denied on other grounds, the D.C. Circuit noted that their decision was bolstered by the fact that due to the groups' delay in seeking an injunction, the bird hunt was effectively over the day the case argued. 530 F.2d at 987. In this case, neither Plaintiffs, EPA, nor anyone else has been negatively impacted by the "delay" in the filing of this injunction request. Plaintiffs have not yet incurred the unrecoverable costs that constitute the irreparable injury they will suffer if the preliminary injunction is not issued.[5]

---

broader coalition of industries which had expressed significant concerns about the implications of EPA's "processing" interpretations in the Petruska Letter was seeking to meet with EPA to explore the issues raised in this suit. *See* Letter to Marcus C. Peacock, Deputy Administrator EPA (Feb. 12, 2008), attached as Exhibit B. Plaintiffs filed this action less than a week after EPA representatives abruptly cancelled a meeting with this broader coalition of industries.

[5]  EPA makes the fallacious argument that Plaintiffs alleged delay prevented this court from adjudicating this matter in a timely way and thus defeats Plaintiffs' request. Def. Opp. at 20. It is clearly unreasonable to assert that had Plaintiffs filed earlier that a preliminary injunction request would not have been necessary. Even if Plaintiffs had filed on October 15, 2007, the date upon which the Petruska letter was issued, given the pleading timelines in the Federal Rules of Civil Procedure and the size and complexity of this Court's docket, it is unlikely that this

11

EPA, relying on two thirty-five year old cases, asserts that the cost of compliance with government regulations does not constitute irreparable harm. Def. Opp. at 22-23 (citing *Armour & Co. v. Ball*, 337 F. Supp. 938 (D. Mich. 1971), *rev'd on other grounds* 468 F.2d 76 (6th Cir. 1972) and *A.O. Smith Corp v. FTC*, 530 F.2fd 515, 527-528 (3d Cir. 1976)). The cases cited by EPA are not helpful. In *Armour*, the court refused to relieve Armour of complying with state regulations with which it had complied for the past 19 years while considering a question of federal preemption, while the *Smith* court relied on the outmoded concept that "all that is lost is 'profits,'" which in this case would not bankrupt a large company and thus were insufficient to constitute irreparable harm. These cases do not establish the proposition that Plaintiffs will not be irreparably harmed by incurring the costs of developing a methodology to comply with EPA new regulations, costs that Plaintiffs cannot recover from EPA if the Court finds, as we expect it will, that EPA has improperly imposed this reporting burden on Plaintiffs. *See* Pl. Mem. at 23. Nor should Plaintiffs "be forced into the position of choosing to either violate an allegedly invalid ordinance and suffer the inherent consequences of doing so or comply with the same and suffer a loss with little hope of recovery." *Tafas v. Dudas*, 511 F.Supp.2d 652, 669 (E.D.Va. 2007) (quoting *Synagro-Wwt, Inc. v. Louisa County*, 2001 WL 868638, (W.D.Va.2001)).

### C. The Requested Injunction Is In the Public Interest

EPA claims that the public interest will not be served by the requested injunction. According to EPA, the public will be harmed by the requested injunction because it will not be informed about the emissions at issue. However, there is no dispute that the treated wood industry has not reported emissions from stored articles for the past seven years. Further, EPA makes no claim that the quantity of allegedly unreported emissions for any particular location are

---

Court would have adjudicated this case on the merits sufficiently prior to July 1 to assure Plaintiffs that a preliminary injunction was not required.

significant.  Therefore, there is no basis for EPA's claim that continuing the *status quo* for another year will somehow meaningfully harm the public.

## **CONCLUSION**

For the reasons stated above and in their Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, Plaintiffs respectfully request the issuance of a Preliminary Injunction.

Dated:  April 17, 2008                                    Respectfully submitted,

*/s/ Jean-Cyril Walker*

Douglas J. Behr (Bar No. 163998)
behr@khlaw.com
Peter L. de la Cruz (Bar No. 362358)
delacruz@khlaw.com
Jean-Cyril Walker (Bar No. 474498)
walker@khlaw.com

KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
Tel.: 202-434-4100
Fax: 202-434-4646

Attorneys for Plaintiffs

**Exhibit A**

**Excerpts from EPCRA Section 313 Questions and Answers**



United States
Environmental Protection Agency

Office of Pollution
Prevention and Toxics
Washington, DC  20460

December 1998
EPA 745-B-98-004

# EPCRA Section 313 Questions and Answers

Revised 1998 Version



Section 313 of the
Emergency Planning and
Community Right-to-Know Act

Toxic Chemical Release Inventory

amounts involved. A *facility* must use its best judgment to determine whether data are readily available. Thus, with regard to use of average concentration levels, a *facility* must use its best judgment to decide whether the raw data from which it might base any average concentration level are readily available. In any event, a *facility* should carefully document its decision making. For example, if a *facility* decides to use average concentration levels, it should document why the raw data from which the averages are based are not readily available, how it arrived at any average concentration level used, and why the average concentration level is a reasonable estimate of the amount of the *toxic chemical* in the wastestream. EPA does not have a recommended approach for determining average concentration levels.

*Reasonable Estimates, Chromium*

**474. A covered treatment, storage, and disposal (TSD) *facility* receives a waste from off site that contains chromium. The waste profile indicates only that the wastestream contains chromium. The waste profile does not indicate if the waste contains elemental chromium or a chromium compound. Can the TSD make threshold determinations based on the assumption that the chromium contained in the wastestream is present as elemental chromium?**

A *facility* must use the best readily available information to determine which listed chemicals or compounds are being *manufactured, processed* or *otherwise used*. If the waste profile is incomplete or inaccurate, the *facility* should look to other sources of information that it believes are more representative of the needed information. *Facilities* should document assumptions and calculations used in making their determinations.

*Releases, Reporting Deadline, Best Available Information*

**475. Form R requires estimates of the *release* to the *environment* of listed *toxic chemicals* in specific release categories. If a *facility* is unable to complete its estimate of these *releases* by the deadline, should the company leave that entry blank and promise a future estimate, or make the best estimate possible and submit later revisions?**

Any *covered facility* must report by July 1 for the previous reporting year, and the data provided should be the best estimate using the best readily available data. Records supporting the data must be kept for three years. If more accurate data are developed, the *facility* may submit revised forms. EPA can take enforcement action if they believe that the data do not represent reasonable estimates.

*Reporting Requirements, Photocopying*

**476. A *covered facility* handles the same amount of chemicals each year, with the same emissions quantities. Is it allowable to simply change the date on the previous year's Form R, photocopy it, and send the altered document in, if no information but the date has changed?**

RELEASE/WASTE MANAGEMENT

| | |
|---|---|
| *Form R, Significant Figures* | **641. Please explain the "two significant figures" reporting guideline.**<br><br>Estimates are not required to be reported to a greater accuracy than two significant figures (e.g., 4224 may be entered as 4200). The number of significant figures is the number of non-zero digits. One significant digit may be reported if the estimation techniques used do not support two digit accuracy. |
| *Form R, Release Estimate, Significant Figures* | **642. When reporting *release* estimates on the Form R, EPA recommends *release* estimates be rounded to no more than two significant figures. Should *release* estimates always be reported in whole numbers, or should decimal places be reported in certain instances?**<br><br>When reporting *release* and other *waste management* estimates on the Form R, always report using whole numbers (i.e., round to the nearest pound). |
| *Reporting Requirements, Recordkeeping* | **643. What are the EPCRA Section 313 recordkeeping requirements for *facilities* that do not exceed thresholds?**<br><br>If a *facility* does not exceed an activity threshold for any listed toxic chemical, or is not in a *covered SIC code*, or does not have ten or more full time employees, it is not required under EPCRA Section 313 to maintain any records associated with its uses, *releases*, or other *waste management* activities involving listed *toxic chemicals*. Such facilities, however, may want to keep records of the amounts of listed *toxic chemicals* they *manufacture*, *process*, or *otherwise use* in order to defend against any claim that they failed to report. |
| *Form R, Audit Provisions* | **644. Are specific audit provisions in the regulations? What about resolving differences of opinion, (i.e., does the auditor have final judgment)?**<br><br>Specific audit provisions are not in the EPCRA Section 313 regulations. The Agency, however, has the responsibility to assure that the data submitted are based on reasonable estimates. Audit results will be used to identify problems with calculating *releases* and other *waste management* quantities. In resolving differences of opinion, we expect that a final judgment will be made by the Agency. Also note that EPA has finalized a self-audit policy (December 12, 1995; 60 FR 66706) for *facilities* who choose to conduct their own audits. |
| *Form R, Enforcement* | **645. The enforcement requirements of EPCRA (Section 325), state that the civil and administrative penalties for Section 313 noncompliance shall not exceed $25,000 for each violation. Is a noncompliance violation determined on a per *facility* or per *toxic chemical* basis? Also, is that penalty assessed on a per day basis?** |

FORM SUBMISSIONS

**Exhibit B**

**Letter to Marcus C. Peacock, Deputy Administrator EPA (Feb. 12, 2008)**

American Forest & Paper Association
American Home Furnishings Alliance
Association of Woodworking & Furnishings
Copper and Brass Fabricators Council, Inc.
Council of Industrial Boiler Owners
Industrial Fasteners Institute
Institute of Makers of Explosives
Kitchen Cabinet Manufacturers Association
Leather Industries of America
Motor & Equipment Manufacturers Association
National Association of Manufacturers
The Society of the Plastics Industry, Inc.

February 12, 2008

The Honorable Marcus C. Peacock
Deputy Administrator
U.S. Environmental Program Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Mail Code: 1102A
Washington, DC 20460

**RE:   Meeting Request: Toxic Release Inventory Reporting**

Dear Administrator Peacock:

We recently became aware of a letter from the Agency that appears to amend Toxic Chemical Release Inventory ("TRI") reporting obligations by effectively repealing the article exemption. The organizations listed above represent an informal coalition of concerned industries potentially affected by this recent Environmental Protection Agency ("EPA") interpretation of reporting obligations under Section 313 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"). We are writing to request a meeting at your earliest opportunity to discuss these issues, which have nationwide implications for our members and an even broader array of industries.

In an October 15, 2007 letter from Michael Petruska to the Treated Wood Coalition, which is enclosed, the Agency took the position that emissions of EPCRA 313 listed chemicals from finished goods in storage are reportable to the TRI. This position appears to contradict the article exemption to TRI reporting at 40 C.F.R. § 372.38(b), which is a fundamental scoping provision of the TRI Program. The article exemption has long acted to set reporting parameters and reconcile competing societal interests: protecting the public's right-to-know while minimizing the reporting burden on industries that produce finished goods, most of which are small businesses.

The EPA letter does not consider these broad policy implications. Our purpose in requesting this meeting is to obtain the Agency's assurance that the letter has not effectively revoked the article exemption and that emissions from products in storage remain exempt from TRI reporting. If it is the Agency's position that emissions from finished goods in storage

The Honorable Marcus C. Peacock
February 12, 2008
Page 2

should now be reportable, EPA may not impose such consequential national reporting obligations in the manner it has chosen.

With the July 1 TRI filing deadline just a few months away, an expeditious resolution to this issue is critical for our members and a broad array of other businesses. We look forward to meeting with you to discuss these important considerations at the earliest opportunity. A representative from our coalition will call your office in the next few days to ascertain the earliest mutually opportune time to meet.

Cordially yours,

**American Forest & Paper Association**
John L. Festa
Senior Scientist

**American Home Furnishings Alliance**
Bill Perdue
Vice President ESH -- Standards

**Association of Woodworking & Furnishings Suppliers® (AWFS®)**
Dale Silverman, CAE, SPHR
Executive Vice President

**Copper and Brass Fabricators Council, Inc.**
Joseph L. Mayer
President

**Council of Industrial Boiler Owners**
Robert D. Bessette
President

**Industrial Fasteners Institute**
Robert Harris
Managing Director

**Institute of Makers of Explosives**
Susan JP Flanagan
Counsel, Environment and Health

**Kitchen Cabinet Manufacturers Association**
C. Richard Titus
Executive Vice President

**Leather Industries of America**
John L. Wittenborn
President

**Motor & Equipment Manufacturers Association**
Robert McKenna
President and CEO

**National Association of Manufacturers**
Rosario Palmieri
Vice President, Infrastructure, Legal & Regulatory Policy

**The Society of the Plastics Industry, Inc.**
Lynne Harris
Senior Vice President of Science and Technology


Encl:  October 15, 2007, letter from Michael Petruska

cc:    Michael Petruska, EPA TRI Program Division
       Kevin Bromberg, U.S. Small Business Administration